**UNITED STATES DISTRICT
COURT DISTRICT OF NEW
JERSEY**

---

MATTHEW PENSO,

        Plaintiff,

                           Civil Action No. 2:23-cv-00474-SDW-JBC

      -against-

                           **FINAL PRETRIAL ORDER**

PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, BOMBARDIER
TRANSPORTATION (HOLDINGS)
USA INC., and JOHN DOE
COMPANY #1-5
(fictitious name),

        Defendants.

---

    This matter having come before the Court for a pretrial conference pursuant to <u>Fed. R. Civ. P.16</u>; and **Domenic B. Sanginiti, Jr., Esquire,** and **Evan J. Lide, Esquire**, of **Stark & Stark,** having appeared for plaintiff, and **Andrew J. Heck, Esquire** of **Wilson Elser Moskowitz Edelman & Dicker LLP**, having appeared for defendants; the following Final Pretrial Order is hereby entered:

1. **JURISDICTION** (set forth specifically).

    a. **Subject Matter Jurisdiction -** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

    b. **Venue -** Venue is proper in the District of New Jersey, Newark Vicinage, under 28 U.S.C. § 1391 because the incident giving rise to Plaintiff's claims occurred at

**STARK
&STARK** ₚc

Newark Liberty International Airport in Newark, New Jersey, and a substantial part of the events and omissions giving rise to the claims occurred within this District.

2. **PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

**Counsel have been advised that all pending motions are pending for January 29, 2026,** or as soon as Judge Wigenton can address them. JBC

a. **Motion for Summary Judgment filed by Plaintiff** – Plaintiff seeks partial summary judgment to resolve threshold legal issues where no genuine dispute of material fact exists, namely that Defendants operated the AirTrain as common carriers owing the highest duty of care, and that the doctrine of Res Ipsa loquitur applies to the undisputed emergency-braking incident. Plaintiff further seeks a ruling that the uncontroverted medical evidence, including Defendants' own expert testimony, establishes proximate causation between the AirTrain incident and Plaintiff's CRPS, while leaving negligence, damages, and valuation issues for the jury. Defendants contend Port Authority is not a common carrier as a matter of law, and questions of fact persist precluding the requested relief.

b. **Motion for Summary Judgment filed by Defendants** – Defendants move for summary judgment dismissing the Complaint in its entirety on the grounds that Plaintiff cannot establish liability as a matter of law because his sole liability expert offers inadmissible net opinions that fail Rule 702 and Daubert, leaving Plaintiff without competent proof of defect, negligence, or causation. Defendants further argue that the New Jersey Products Liability Act provides the exclusive remedy, Plaintiff has neither pled nor proven a viable NJPLA claim, and, absent admissible expert testimony, no genuine dispute of material fact exists for trial. Plaintiff opposed Defendants' motions for reasons set forth in Plaintiff's briefing.

c. **Motion to Bar Defendants' Biomechanical Expert, Dr. Gary Yamaguchi, Ph.D.** – Plaintiff moved to bar Dr. Yamaguchi's biomechanical testimony because his causation opinions are based on assumptions directly contradicted by the evidentiary record, including undisputed testimony that Plaintiff was holding a support at the time of the emergency stop, and therefore lack Rule 702 "fit." His methodology is independently unreliable because he relied on non-incident-specific braking data from materially dissimilar conditions, performed no accident or injury reconstruction, and offered speculative opinions untethered to any quantified biomechanical analysis, rendering his testimony inadmissible under Daubert and Rule 702. Defendants contend his opinions are relevant, not speculative, and reached by way of reliable methodology.

**STARK &STARK** ℠

4917-2687-0667, v. 1
328625419v.1

d. **Motion to Bar Defendants' Expert, J. Sam Lott, P.E.** – Plaintiff moves to bar Mr. Lott's engineering testimony because he reviewed no braking data, deceleration rates, diagnostics, or maintenance testing and admitted his opinions are based on assumptions and Alstom's purported reputation rather than any scientific methodology or incident-specific analysis. Moreover, the only opinion he is arguably qualified to offer, whether emergency braking is generally appropriate after a loss of PMA, is irrelevant to the issues in dispute, rendering his testimony inadmissible under Rule 702 and Daubert. Defendants contend his opinions are relevant and reached by way of reliable methodology.

e. **Motion to Bar Defendants' Vocational Expert, Terry Leslie, M.Ed.** – Plaintiff moved to bar Defendants' vocational expert, Terry Leslie, because he lacks specialized qualifications to assess employability in a case involving severe, four-limb Complex Regional Pain Syndrome and applied no recognized vocational methodology, testing, labor-market analysis, or individualized evaluation of Plaintiff. Mr. Leslie's opinions are based on generalized assumptions tied only to age and education, ignore Plaintiff's documented work history and medical limitations, and therefore constitute inadmissible net opinions that fail Rule 702's qualification, reliability, and fit requirements. Defendants contend his opinions are relevant non-net opinions reached by way of reliable methodology.

f. **Motion to Bar Defendants' Expert, Kara Flavin, M.D.** – Plaintiff moved to bar Dr. Flavin's life-care and future-medical testimony because she admittedly lacks expertise in Complex Regional Pain Syndrome and offered opinions based on speculation, subjective judgments, and unexplained numerical estimates rather than any reliable medical methodology or CRPS-specific analysis. Dr. Flavin conducted no independent medical evaluation, cited no supporting literature, and failed to explain how her conclusions were derived, rendering her opinions inadmissible net opinions under Rule 702 and Daubert. Defendants contend her opinions are relevant and reached by way of reliable methodology.

g. **Motion to Bar Defendants' Expert, Farheen Khan, Ph.D.** – Plaintiff moved to bar Dr. Khan's human-factors testimony because her opinions are entirely derivative of, and expressly dependent upon, the inadmissible biomechanical opinions of Dr. Yamaguchi, rendering her analysis unsupported by independent facts, testing, or methodology. Because Dr. Khan conducted no incident-specific analysis and merely serves as a conduit for another expert's unreliable conclusions, while offering speculative opinions on Plaintiff's conduct, her testimony fails Rule 702's requirements of qualification, reliability, and fit and must be excluded in its entirety. Defendants contend her opinions are relevant and reached by way of reliable methodology.

h. **Plaintiff has filed the following Motions *in Limine* to bar the following:**

4917-2687-0667, v. 1
328625419v.1

STARK &STARK.

**1. Text messages referenced by Dr. Just** - Plaintiff moves to preclude the jury from hearing or seeing the wide-ranging text messages summarized in Dr. Nancy Just's report (spanning August 1, 2022 to September 9, 2023), arguing they are irrelevant to the negligence issues for trial and, in any event, are unduly prejudicial because they contain intensely personal, emotionally charged content (including suicidal ideation/self-harm themes) that would distract the jury and invite improper character judgments.  Defendants dispute that prejudice outweighs probative value and same should be admissible both as evidence and to explain Dr. Just's opinions.

**2. PRG operations/performance and PRG emails generally -** Plaintiff seeks exclusion of evidence derived from the PRG email production (including corporate operations, finances, tax returns, earnings, and workplace communications), contending that because Plaintiff waived economic-loss claims, PRG's business records and internal operations have no bearing on liability, medical causation, prognosis, or non-economic damages, and would only waste time and confuse issues.  Defendants reject that waiver of a claim for damages eliminates the probative value of these documents on credibility and vocational capacity matters.  Defendants further contend that Plaintiff's failure to produce these materials for more than a year after being court ordered requires reopening of discovery and that Plaintiff should not benefit from his unclean hands.

**3. PRG emails about Netflix/TV show casting efforts -** Plaintiff separately moves to bar any PRG-email references to Plaintiff's efforts to join a TV show (including "Triad"), arguing the evidence is untethered to any claim at trial, serves no legitimate evidentiary purpose, and would be used primarily to embarrass or humiliate Plaintiff and derail the trial into collateral side issues.  Defendants reject this contention given that reality television appearance efforts both before and after the subject incident are highly relevant to numerous issues.

**4. Unrelated prior medical treatment before 12/15/2021 -** Plaintiff moves to exclude evidence of medical history predating the AirTrain incident (December 15, 2021), asserting no expert links childhood or earlier treatment to Plaintiff's CRPS, and the material is irrelevant and risks juror confusion by inviting speculation about alternative causes—while also adding cumulative, time-wasting side litigation over remote history.  Defendants respond that Plaintiff's preexisting history is commented upon by experts as a basis for questioning Plaintiff's credibility and his highly relevant.

**5. Amanda Stergas' testimony beyond limited topics -** Plaintiff asks the Court to restrict former fiancé Amanda Stergas' testimony to the trip and events

**STARK &STARK** ꜰᴄ

4

surrounding December 15, 2021, her care and observations of Plaintiff's pain and treatment, and the life impact of CRPS—while excluding testimony about breakup details, alleged threats, religious matters, college drinking, financial or storage disputes, and other relationship history as irrelevant and unfairly prejudicial character evidence that would prolong trial and mislead the jury. Defendants respond that Plaintiff has put these matters at issue continually through expert disclosures and the jury is entitled to get the full picture.

**6. Dr. Delk testing/notes (Newport Psychology Group) -** Plaintiff moves to bar any evidence from treating psychologist Kerry Delk, Ph.D.'s progress notes and testing, arguing the content (including personality-disorder labels and pejorative characterizations) is not probative of liability or CRPS medical causation and carries a substantial risk of unfair prejudice by inviting the jury to decide the case based on perceived personality or character rather than the AirTrain malfunction and resulting injuries. Defendants respond that Plaintiff's treating physician's records are clearly relevant to his post-incident condition which is the central focus of this litigation.

**7. Learning disabilities/college accommodations and related records -** Plaintiff seeks exclusion of records regarding historical learning disabilities and accommodations and old college incident reports (including references in Dr. Just's "records review"), contending these decade-old academic materials have no tendency to prove any fact of consequence in the AirTrain/CRPS case and would confuse the jury—particularly where such records reference unrelated medical assertions that could trigger improper causal speculation. Defendants respond that Plaintiff's vocational capacity and credibility are both impacted by this evidence which is more probative than prejudicial.

**8. Prior motor vehicle accident of 2015 and related treatment -** Plaintiff moves to preclude evidence concerning Plaintiff's 2015 motor vehicle accident and ensuing treatment, asserting no medical expert connects those injuries to Plaintiff's CRPS, and introducing the accident would inject irrelevant collateral causation disputes and confuse the jury about what caused the CRPS at issue here. Defendants respond that Plaintiff's pre-accident history and inconsistent testimony relating thereto are highly relevant to Plaintiff's credibility and are fair game for comment by experts.

**9. Exclusion of Dr. Nancy Just's report/opinions for failure to produce raw data -** Plaintiff seeks to bar Dr. Just's testimony and opinions in full on the ground she did not produce the underlying raw psychological testing and exam data supporting her conclusions, arguing that this violates expert disclosure requirements and prevents meaningful reliability testing—leaving only untestable

STARK &STARK ℗c

4917-2687-0667, v. 1
328625419v.1

conclusions that would prejudice and confuse the jury. Defendants respond that the raw data was offered to counsel but Dr. Greenberg failed to accept the raw data in a timely fashion.

10. Defendants' Motion to Bar Plaintiff's Expert Kristin Kucsma, M.A. pursuant to Federal Rule of Evidence 702 as her opinions do not satisfy the standard for admissibility and are net opinions. Plaintiff disputes Defendants' contentions preclude admissibility and that same go to weight. Returnable January 29, 2026. Plaintiff contends her opinions are relevant and reached by way of reliable methodology.

11. Defendants' Motion to Bar Plaintiff's Expert Jay Grossman, D.M.D. pursuant to Federal Rule of Evidence 702 as his opinions do not satisfy the standard for admissibility and are net opinions. Plaintiff disputes Defendants' contentions preclude admissibility and that same go to weight. Returnable January 29, 2026. Plaintiff contends his opinions are relevant and reached by way of reliable methodology.

12. Defendants' Motion to Bar Plaintiff's Expert Stuart B. Kahn, M.D. pursuant to Federal Rule of Evidence 702 as his opinions do not satisfy the standard for admissibility and are net opinions. Plaintiff disputes Defendants' contentions preclude admissibility and that same go to weight. Returnable January 29, 2026. Plaintiff contends his opinions are relevant and reached by way of reliable methodology.

13. Defendants' Motion to Bar Plaintiff's Expert Jeffrey Bone, Psy.D. pursuant to Federal Rule of Evidence 702 as his opinions do not satisfy the standard for admissibility and are net opinions. Plaintiff disputes Defendants' contentions preclude admissibility and that same go to weight. Returnable January 29, 2026. Plaintiff contends his opinions are relevant and reached by way of reliable methodology.

14. Defendants' Motion to Bar Plaintiff's Expert Daniel Wolstein, Ph.D. pursuant to Federal Rule of Evidence 702 as his opinions do not satisfy the standard for admissibility and are net opinions. Further, Dr. Wolstein lacks the qualifications to proffer expert opinions regarding plaintiff's injuries and treatment. Plaintiff disputes Defendants' contentions preclude admissibility and that same go to weight. Returnable January 29, 2026. Plaintiff contends his opinions are relevant and reached by way of reliable methodology. Plaintiff further contents he has the qualifications necessary to offer an expert opinion.

15. Defendants' Motion to Bar Plaintiff's Expert Christopher Skerritt, M.Ed. pursuant to Federal Rule of Evidence 702 as his opinions do not satisfy the standard for admissibility and are net opinions. Further, Mr. Skerritt lacks the qualifications to proffer expert opinions in the field of economics. Plaintiff disputes Defendants' contentions preclude admissibility and that same go to weight. Returnable January 29, 2026. Plaintiff contends his opinions are relevant and reached by way of reliable

**STARK & STARK**, ℠

4917-2687-0667, v. 1
328625419v.1

methodology. Plaintiff further contents he has the qualifications necessary to offer an expert opinion.

16. Defendants' Motion to Bar Plaintiff's Expert Autumn Perry, P.T. pursuant to Federal Rule of Evidence 702 as her opinions do not satisfy the standard for admissibility and are net opinions. Further, plaintiff's failure to produce Dr. Perry for her deposition warrants the exclusion of her testimony and report at Trial. Plaintiff has not opposed. Returnable January 29, 2026. Plaintiff did not file an opposition to this motion.

17. Defendants' Motion to Bar Plaintiff's Expert Joshua Prager, M.D. pursuant to Federal Rule of Evidence 702 as his opinions do not satisfy the standard for admissibility and are net opinions. Further, plaintiff's failure to produce Dr. Prager for his deposition warrants the exclusion of his testimony and report at Trial. Plaintiff has not opposed. Returnable January 29, 2026. Plaintiff did not file an opposition to this motion.

18. Defendants' Motion to Bar Plaintiff's Day In The Life Video pursuant to case law and Rule 402, the video's probative value is substantially outweighed by the prejudice it would cause to Defendants if the jury were allowed to view it. Further, the video is not relevant, probative or an accurate representation of plaintiff's injuries. Returnable January 29, 2026. Plaintiff opposed Defendants' motion to bar as the video is relevant demonstrative evidence depicting the impact of Plaintiff's injuries on his daily activities of daily living as set forth in Plaintiff's opposition.

19. Defendants' Motion to Bifurcate Trial pursuant to FRCP 16(c)(13) as bifurcation of liability and damages is necessary to prevent undue prejudice and to foster judicial economy. Returnable January 29, 2026. Plaintiff opposed Defendants' motion to bifurcate as feature of this case that distinguishes it from the many negligence actions routinely tried in a single proceeding and the mere fact that Plaintiff's alleged damages are significant does not transform this case into one warranting bifurcation. Additionally, bifurcation would prejudice Plaintiff, all of which is set forth in Plaintiff's opposition to Defendants' motion.

20. Defendants' Motion to Allow The False in One – False in All Jury Charge pursuant to the Third Circuit's upholding of the use of a falsus in uno instruction as consistent with the Jury's central function to assess credibility and weigh conflicting evidence. Returnable January 29, 2026. Plaintiff opposed Defendants motion on the basis that such an instruction is not the basis of a motion in limine and is briefed fully in Plaintiff's opposition.

21. Defendants' motion to adjourn the trial due to Plaintiff's untimely production of court-ordered emails. As set forth at length in the Court's December 3, 2025 Order, denying Plaintiff's motion for reconsideration, Plaintiff was ordered to produce the PRG emails on October 1, 2024. The 94,653 pages of emails were not produced until after December 8, 2025. Defendants maintain Plaintiff's failure to

STARK &STARK ᴘᴄ

4917-2687-0667, v. 1
328625419v.1

comply with the orders of the court prejudiced Defendants' ability to take discovery which is incurably prejudicial to Defendants' ability to try this matter on its merits. Plaintiff does not dispute the non-compliance; rather, Plaintiff attempts to re-litigate a relevance defense and to raise untimely other discovery disputes. Returnable January 29, 2026. Plaintiff opposed Defendants' requests for reasons set forth in prior oppositions, letters and arguments, while also and Plaintiff produced responsive answers in accordance with the Court's Orders.

3. **STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

   1. On December 15, 2021, Plaintiff and his then-fiancée Amanda Stergas traveled by rail to Newark Liberty International Airport and boarded the AirTrain Tram to reach the airport terminals.
   2. The AirTrain at Newark Liberty International Airport is a driverless/automated people mover system used to transport members of the public between airport terminals and related facilities, with trains operating frequently throughout the day.
   3. The Port Authority is the owner of the AirTrain system.
   4. Alstom operates and maintains the AirTrain pursuant to its contractual relationship with the Port Authority.
   5. The AirTrain system includes a Central Control Center and employs a track layout divided into signal blocks, and it uses wayside control units (WCUs) as part of its operations and control architecture.
   6. The AirTrain requires Permissive Movement Authority (PMA) to move along the track. .
   7. PMA is communicated through the system's control architecture, including WCUs.
   8. With respect to the event at issue on December 15, 2021, Defendants' operations manager Luis Martin reviewed the system's ATS printout / string chart reflecting the train's movement and alarms, and he testified that the train experienced an invalid PMA condition that resulted in emergency braking.
   9. The ATS printout reflects that the event occurred in system block 128.
   10. Following the emergency braking, the train's recorded operation reflected repeated stopping and starting over a period of less than two minutes and thirty-four seconds, with the train oscillating between 0 mph and approximately 1 mph, and thereafter the train resumed forward operation and arrived at the next station.
   11. After arriving at the next station, the train was removed from service for inspection due to the emergency braking event.

**STARK**
**&STARK** PC

12. Plaintiff testified that he first noticed pain in his foot/ankle after exiting the AirTrain and proceeding into the terminal area, and that he began limping and believed he had broken something while walking toward his gate.

13. Plaintiff did not obtain medical evaluation immediately that day and first sought treatment approximately two weeks after the incident, at which time he was diagnosed with a significant sprain.

14. He was subsequently diagnosed with Complex Regional Pain Syndrome (CRPS) involving his left foot/ankle.

4. **PLAINTIFF'S CONTESTED FACTS** (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

Plaintiff intends to prove the following contested facts with regard to liability:

a. **Contested Liability Facts**

15. Plaintiff contends that the subject train departed the Rail Link station, reached a significant speed of 17 mph, and then made an abrupt, unscheduled stop to zero in less than four seconds, between stations, causing Plaintiff to lose his balance, take a step to gain his balance, lose grip of what he was holding onto, and be injured.

16. The abrupt stop was followed by repeated low-speed movements and stoppages over approximately two minutes.

17. Plaintiff contends that the stop resulted from an unnecessary emergency brake application caused by a malfunction in the vehicle and/or control system, specifically an invalid Permissive Movement Authorization ("PMA"), due to loss of signal, rather than any track obstruction or collision-avoidance condition.

18. Plaintiff further contends that, in the thirty days preceding the incident, Defendants recorded multiple invalid PMA alarms, including repeated entries involving Train 8, the train Plaintiff was riding.,

19. Defendants had notice of PMA related issues in the same signal territory, including diagnostic work performed by Defendants between November 30 and December 4, 2021.

20. Plaintiff contends that following the incident, Train 8 was removed from service for inspection due to the invalid PMA.

21. Repeated invalid PMAs are recognized as grounds for removing a train from service.

22. Plaintiff also contends that adjustments were made prior to Train 8 back into service for the public.

23. Plaintiff contends that Defendants' written procedures required root-cause analyses for recurring, service-affecting events, as well as prompt investigation and data review following unscheduled stoppages and safety relevant alarms.

STARK
&STARK ꜰᴄ

4917-2687-0667, v. 1
328625419v 1

24. Those procedures were not timely or properly implemented with respect to the known PMA issues or the subject incident.

25. Plaintiff contends that the Defendants were required to operate the AirTrain as often as possible without being taken from service.

26. Plaintiff contends that unnecessary emergency braking events in an Automated People Mover system constitute a known safety hazard because they create an increased risk to standing passengers, regardless of whether a collision is avoided.

27. Plaintiff contends that Stephen Noonan, P.E., will testify that Defendants had prior notice of recurring PMA and control-system issues affecting the subject train and signal territory, that those issues were not properly diagnosed, trended, or corrected before the incident, and that Defendants failed to implement appropriate corrective actions consistent with their own maintenance, diagnostic, and safety procedures.

28. Plaintiff further contends through the testimony of Dr. Carolyn Albert, Ph.D., that Defendants' biomechanical opinions are unreliable because they are not supported by proper biomechanical testing, event-specific modeling, or analysis tied to the kinematics of the subject emergency braking event.

29. Plaintiff further contends that Defendants' own employees, Luis Martin, Yazeed Khayyat, Jim Pampinto, will testify that the train experienced a malfunction resulting in an unscheduled emergency braking event and will describe the steps taken to inspect, diagnose, and attempt to remediate the issue.

30. Plaintiff also contends that non-party witnesses, Paul Drejaj and Kelly Drejaj, will testify that they experienced similar abnormal train behavior and emergency braking events shortly before Plaintiff's incident, supporting the existence of a recurring malfunction condition prior to the subject event.

Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).

b. Contested Damages Facts

    i. Non Economic Damages

31. Plaintiff intends to prove that as a result of the incident in question, he suffered a twisting injury to his lower extremity and subsequently developed CRPS, which spread throughout his body.

32. Plaintiff lives every day in the shadow of a condition his treating physicians describe as permanent, progressive, and unimaginably painful, and his non-economic damages reflect that reality.

33. Instead of walking, working, or moving freely through his home, Plaintiff is functionally non-ambulatory, confined to a motorized scooter or wheelchair and

**STARK & STARK** *PC*

10

requiring hands-on assistance for basic tasks such as toileting, bathing, dressing, and transferring, stripping him of independence and dignity at an age when he should be fully self-sufficient.

34. The same disease that burns through all four of his limbs also invades every corner of his life: he has lost the ability to participate in ordinary social, recreational, and outdoor activities, his intimate and family relationships have been fundamentally altered, and even a routine car ride or therapy visit can leave him so exhausted and inflamed that he needs days to recover.

35. Psychologically, he endures relentless depression, anxiety, and what his treating psychologist describes as profound, lifelong emotional suffering from a "suicide disease" that offers no cure and no realistic hope of meaningful recovery, necessitating continuous psychiatric and psychological care simply to cope with each day.

36. Taken together, these facts support a substantial award for past and future pain and suffering, loss of enjoyment of life, emotional distress, and loss of independence that far exceeds what any verbal description or dollar figure can truly capture.

37. Plaintiff will rely upon the testimony of the treating physicians, including but not limited to, Dr. Richard Paicius, Dr. Jeffrey Bone, and Dr. Damon Orlando, as to the nature and extent of the Plaintiff's injuries.

38. Plaintiff offers the testimony of his family members, including Marc Penso, Nancy Penso, and Michael Penso, in addition to the testimony of his two friends, Joseph Testenrude and Sam Carr, to show the loss of enjoyment of life, pain, suffering, and disfigurement that he has suffered due to his condition.

39. With regard to expert opinion on non-economic damages, Plaintiff will rely upon the testimony of Anton Moise, MD., pain management specialist, Dr. Rhonda Greenberg, Psychologist, and Dr. Jay Grossman, dentist.

ii. Economic Damages-

40. Plaintiff's economic damages are enormous and fully supported by the vocational, medical, and economic evidence in the record.

41. Plaintiff has permanently lost his earning capacity, with adjusted lifetime earnings losses ranging from $3,557,460, if the jury credits the more conservative "food service manager" trajectory, to $5,634,760 under the "operations manager" scenario, and $5,193,138 under the mean bachelor's-degree scenario, as calculated by economist Daniel Wolstein, Ph.D., using government wage data and work-life adjustments.

42. These earning-capacity opinions are grounded in the vocational analysis that Plaintiff is unemployable due to his four-limb CRPS, quadriparesis, inability to perform basic activities of daily living, and lack of sustainable sitting, standing, or



4917-2687-0667, v. 1
328625419v.1

fine motor capacity, as set forth in Dr. Wolstein's vocational reports and corroborated by the treating pain specialist and life care planner.

43. Independently, the life care plan prepared by Dr. Stuart Kahn and reduced to present value by Kristin Kucsma, an Economist, demonstrates that Plaintiff will require lifelong medical care, therapies, home health and attendant care, durable medical equipment, medications, home modifications, transportation, and related services, with a present-value cost of $23,848,901 for core life-care components, plus $338,558 in injury-related potential and contingent costs (including spinal cord stimulators and replacements), for a total present-value life-care cost of $24,187,459.

44. At trial, Plaintiff will support these numbers through the testimony and reports of his treating physicians (including Dr. Paicius), the life care planner (Dr. Kahn), the treating psychologist (Dr. Bone), and economist/vocational expert Kristin Kucsma, together with the underlying medical records and life expectancy data, which collectively show that, depending on which reasonable earning-capacity scenario the fact-finder adopts, the combined present-value economic loss (lost earnings plus life-care costs) ranges from $27,744,919 to $29,822,219, all directly attributable to the injuries Plaintiff suffered in this incident.

5. **DEFENDANT'S CONTESTED FACTS** (State separately for each defendant. See instructions above).

A. Defendants intend to prove the following contested facts with regard to liability.

1. Plaintiff Matthew Penso was born on June 3, 1994, in California.

2. When Mr. Penso was approximately five years old, his family moved to Irvine, California, where they have resided since.

3. Mr. Penso attended the College of Charleston for his freshman year of college.

4. He subsequently attended Arizona State University for his sophomore year; Irvine Valley College and Saddleback College in California for his junior year; and California State University, Fullerton for his final two years of college.

5. Mr. Penso obtained a Bachelor's degree in Political Science from California State University, Fullerton.

6. At the time of the incident, Mr. Penso was engaged to be married to Amanda Stergas; that relationship is no longer ongoing.

7. Mr. Penso is 6 feet, 3 inches tall. He reported his weight as 250 pounds to a health provider a few weeks after the incident.

8. He was involved in CrossFit and other athletic activities.

9. Following college, Mr. Penso worked for Prime Restaurant Group, a family company.

10. His father, Marc Penso, an attorney, started the company with himself as President, his wife Nancy as CFO, and both Matthew and his brother Michael as directors/officers.


STARK
&STARK ʀᴄ

11. Matthew resided in the family home.

12. Matthew was not paid a salary; he received lifestyle benefits, i.e. living in the family home and provision of spending money.

13. He has never filed tax returns.

14. Mr. Penso had prior experience with public transportation.

15. He testified that he had been on a "sky train" more than once before the incident.

16. His mother, Nancy, testified that the family used public transportation when they traveled, including subways and buses.

17. Alstom is the successor in interest to Bombardier (and other predecessor entities) and as such is the manufacturer, designer, installer, and operator of the Newark Airport AirTrain, and has been since its installation in 1996.

18. Alstom engages in ongoing operation of the AirTrain pursuant to contract with the Port Authority, which owns/operates Newark Airport, generally.

19. The AirTrain is an Automated People Mover ("APM") system.

20. The AirTrain cars have four seats on one side of the car, horizontal handrails along the walls on the side of the car opposite the seats, and vertical handrails along the door openings.

21. The AirTrain train cars are rubber-tired vehicles that are mounted to the guide beam and locked in place by guide wheels that ensure the cars stay on the track.

22. The train cars were provided by Bombardier and are referred to as APM 100 vehicles.

23. The same train cars have been in use since the system opened.

24. The AirTrain is comprised of approximately 3 miles of service guideway.

25. Under normal standard operation, the trains are automated and do not require a human operator to drive them.

26. The trains are capable of being taken over by an individual and being driven manually, but someone would need to physically go into the train to take control.

27. The train needs to receive a "Permissive Movement Authorization" ("PMA") from the system's Wayside Control Unit ("WCU") in order to move.

28. Losing the PMA causes the train to stop immediately in an emergency braking event. The AirTrain system has both propulsion braking and friction braking.

29. The emergency brake is a friction brake.

30. Alstom maintains a Central Control facility with control operators who monitor and manage the AirTrain system.

31. Control operators are required to undergo a year of training, complete coursework, and pass tests, before becoming certified.

32. The Port Authority had a manager for the AirTrain system.

33. In December 2021, that manager was Yazeed Khayyat.

34. Mr. Khayyat's primary responsibility was oversight over Alstom's performance and to apply the contract between the Port Authority and Alstom.

4917-2687-0667, v. 1
328625419v.1

STARK &STARK ᴾᶜ

35. On December 15, 2021, at approximately 5:54 p.m., Mr. Penso was a passenger aboard Train #8 on the Newark AirTrain system.

36. Mr. Penso was traveling with Amanda Stergas.

37. They were traveling from the New York/New Jersey region to California and had taken a train from Penn Station in New York City to the Newark Liberty International Airport Train Station, where they boarded the AirTrain to travel to their airport terminal for their flight.

38. Mr. Penso and Ms. Stergas boarded the AirTrain at the Rail Link station on the north end of the Newark AirTrain system.

39. Mr. Penso and Ms. Stergas were riding in the first car of the train and were facing rearward (toward the back of the train).

40. The inside of the train was very crowded.

41. According to Ms. Stergas, people were standing shoulder-to-shoulder with no room to move around.

42. Mr. Penso and Ms. Stergas did not recall specifically what, if anything, they were holding onto when the train stopped.

43. Ms. Stergas testified that she did not recall whether she or Mr. Penso were holding onto any handrails or straps and stated, "I don't remember holding onto anything or seeing anything."

44. The incident occurred between the Newark Liberty International Airport Train Station and AirTrain Station P4.

45. This area is in the M2 territory at the northern end of the system.

46. According to the string chart and Operations Control Center ("OCC") records, Train #8 was traveling at approximately 17 miles per hour in Block 127 when the incident began.

47. At 5:54:00 p.m., an emergency brake was triggered due to an invalid PMA alarm, and Train #8 came to a complete stop in Block 128.

48. Mr. Penso testified that the train "abruptly stopped and jerked backwards."

49. He testified that he fell forward on his right leg and his left leg twisted behind him.

50. Ms. Stergas testified that the train stopping was "a little rougher than what she had previously experienced" but that she was used to public transportation being "kind of rough."

51. She did not recall falling or anyone else falling.

52. The Operations Control Center personnel took actions to remotely reset and reconfigure the onboard control equipment in Train #8 during the incident.

53. After the initial stop, the train repeatedly cycled through starting and stopping at low speed (approximately 1.1 mph) for roughly 2½ minutes before resuming normal operation.

54. Ms. Stergas used her mobile phone to record video during the incident. The video captured the train's movement after the initial stop.

4917-2687-0667, v. 1
328625419v.1

STARK
&STARK

55. The video recorded by Ms. Stergas depicted the train alternately moving very slowly with respect to the ground and stopping.

56. After the incident, the AirTrain resumed normal operations and Mr. Penso and Ms. Stergas continued on the until they exited at their stop at the airport terminal.

57. Mr. Luis Martin, Operations Manager for Alstom, testified that if the train ever moved in a reverse direction, it would have triggered an emergency braking "rollback" alarm and stopped the train, which did not happen.

58. Train #8 was removed from service on December 15, 2021, inspected, and later returned to service – no need for maintenance or repair was identified.

59. The train was still in service as of the date of Mr. Martin's deposition.

60. Other than this incident, Train #8 and the balance of the AirTrain system operated normally on December 15, 2021.

61. Emergency braking tests conducted on the AirTrain showed deceleration rates of 2.35 meters per second squared (0.24 g) in the northbound direction and 2.10 meters per second squared (0.21 g) in the southbound direction.

62. No specific cause of the PMA loss has been identified.

63. No evidence or testimony suggests the AirTrain's braking system operated outside of industry specification as to the rate of deceleration.

64. A comprehensive maintenance program is in place relative to the AirTrain. No expert has criticized the scope of or compliance with the maintenance plan relative to Plaintiff's complained-of incident.

65. Under the contract between the Port Authority and Bombardier/Alstom, Alstom's Maintenance Department is responsible for the maintenance of the AirTrain system.

66. The Maintenance Department performs required preventative and corrective maintenance of vehicles and wayside equipment according to the scope of the most current revision of the Maintenance Plan, along with compliance with all existing standard operating procedures (SOPs) and other procedures.

67. The contract specifies performance metrics that the Port Authority monitors, including an availability matrix, a maintenance indicator with specific items that must be completed, training records, and safety incidents.

68. The contract is primarily performance-based, and the Port Authority determines, either jointly with Alstom or individually, whether Alstom is in compliance with the contract and whether any deductions must be applied.

69. PMA-loss-driven braking incidents are not a separately reported on item within those reports. Port Authority relies on Alstom as its subject matter experts with respect to the technical details of operating the AirTrain.

70. The contract requires a monthly maintenance shutdown during which scheduled maintenance is performed.

STARK &STARK ᴘᴄ

4917-2687-0667, v. 1
328625419v.1

71. This monthly shutdown is a collaborative effort scheduled jointly by the Port Authority and Alstom. The trains undergo bi-daily inspections (every other day).

72. These bi-daily inspections are generally performed during first and second shift activities, although the third shift may perform them if the earlier shifts are unable to complete them.

73. The bi-daily inspections include various activities such as checking the collector shoes, physical inspection of the vehicle interior, pneumatics checks to ensure there are no leaks, and checking headlights and taillights.

74. Technicians also check the VOBCs (vehicle onboard computers) to make sure they are secure, but do not perform a detailed diagnostic on them during these inspections.

75. During the bi-daily inspections, technicians complete a checklist.

76. The checklist is filled out by a technician physically on paper, and then brought to the foreman, who signs off that the inspection was completed and enters it into the Maximal system, which is where all work orders and preventive maintenance documentation are stored digitally.

77. If a technician discovers a discrepancy during an inspection, the technician initials the step performed and marks it on the discrepancy page or in the designated space.

78. Unless the deficiency is such that the train cannot be returned to service, the technicians generally complete the preventive maintenance and then inform the foreman.

79. The foreman ultimately determines whether a unit is able to return to service. The Wayside Control Units (WCUs) are inspected on a semi-annual basis.

80. These inspections are performed by the wayside maintenance team and include checking the signaling of the CTF rack and the operation of the communication units.

81. Technicians take measurements with an oscilloscope and other meters, checking voltage peak to peak and the power supply units.

82. If an issue with a WCU is identified during a semi-annual inspection, technicians usually attempt to troubleshoot and fix it then and there, especially if the issue is minor. If the issue cannot be resolved immediately, a work order is generated for later troubleshooting.

83. The AirTrain system has redundant WCUs at each line location (two WCUs per location). The second WCU is on standby.

84. A daily test of both WCUs is performed at 2:15 a.m., which is built into the firmware and occurs automatically.

85. During this test, the whole system is stopped, the train is at the station, and the doors are cycled open and closed as part of the self-test.

86. The test takes less than five minutes. Trains also undergo mileage-based preventive maintenance inspections.

87. The 12,000 Miles Inspection for Train #8 was conducted November 10-16, 2021.


STARK
&STARK PC

4917-2687-0667, v. 1
328625419v.1

88. As part of this inspection, Train #8 passed emergency brake testing on November 16, 2021, with reported emergency brake deceleration rates of 2.35 meters per second squared (northbound) and 2.10 meters per second squared (southbound).

89. A pre-launch checklist was completed for Train #8 on December 15, 2021, and did not note any open work orders.

90. The pre-launch check ensures that a train is ready for service by making sure compartments are secure, running the train up and down to make sure it responds to ATS commands and operator commands, and verifying that the train is emergency braking properly.

91. Pre-launch tests are performed on a spur track (test track) connected to Building 16.

92. Importantly, Plaintiff's version of the incident did not happen as Plaintiff claims.

93. Plaintiff testified falsely under oath with respect to the degree of post-incident deficits in abilities to engage in activities of daily living, with respect to inability to work, and with respect to the degree of pre-incident work he was engaged in.

94. The jury is free to disregard Plaintiff's version of events, which is not corroborated by any witness.

95. Plaintiff was an experienced traveler who was familiar with the mechanics of public transit, including unexpected deceleration; Plaintiff was not holding on. Plaintiff was aware of the danger arising from not holding on.

96. Plaintiff's failure to hold onto the handrails was unreasonable. Plaintiff's unreasonable failure to hold onto the handrails was a proximate cause of any damages claims.

97. Plaintiff's failure constitutes a superseding/intervening cause that breaks the causal chain between any action of either defendant and the complained-of damages.

98. Neither Alstom nor Port Authority was on notice of a condition of the AirTrain which resulted in the PMA loss complained of.

99. Plaintiff's expert concedes that no prior PMA loss is demonstrably sufficiently similar to the facts of this incident to be causally related.

100.     Alstom complied with all aspects of its contractual undertaking.

101.     Alstom complied with all aspects of its contractual undertaking without increasing the risk of harm to foreseeable third parties.

102.     It was reasonable for Port Authority to rely on Alstom regarding the AirTrain.

103.     In sum, the AirTrain constitutes a product within the meaning of the Products Liability Act.

104.     Plaintiff lacks admissible expert testimony on issues of liability.

105.     The complained-of PMA loss did not result from a provable manufacturing defect, a design defect, or deficient warnings.

**STARK &STARK** ᴘᴄ

4917-2687-0667, v. 1
328625419v.1

106.    The happening of the complained-of PMA loss does not bespeak negligence, and Defendants were not in exclusive control over the AirTrain.

107.    Stated differently, the happening of the complained-of PMA loss does not give rise to an inference of a defect, and the AirTrain operated properly in all respects.

108.    Defendants will support these claims at trial through cross-examination of Plaintiff's witnesses, as well as through the affirmative testimony of Defendants' fact witnesses, Mr. Martin and Mr. Khayyat, and liability expert witnesses, including Drs. Yamaguchi and Khan, as well as Mr. Lott.

B. Defendants intend to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against plaintiff's claims for damages).

1. Defendants intend to prove that Plaintiff's complained-of CRPS condition and its current deteriorated condition are not causally related to this incident.

2. As demonstrated above, Plaintiff's untrue testimony with respect to post-incident inability to perform activities of daily living, inability to continue working, and scope of pre-incident activities, severely undermines if not eliminates entirely Plaintiff's credibility, permitting the jury to disregard his claims entirely.

3. Plaintiff's failure to pursue timely treatment, despite claiming his foot was broken, is illogical and inconsistent with his prior practice of seeking immediate medical treatment for orthopedic injuries.

4. His failure to report this incident to anyone at the airport and, instead, fly home and wait a further two weeks, is revelatory of the lack of causation. Separately, Plaintiff's text messages reveal a pattern of self-harm that is supported by testimony of Ms. Stergas.

5. Plaintiff has also failed to engage in treatment modalities his treating physicians have recommended – this not only constitutes a failure to mitigate damages but precludes the reliability of his expert's long-term prognoses.

6. Stated differently, his treating physician, Dr. Paicius, admits that Plaintiff has treatment modalities available to him that could ameliorate if not entirely relieve his subjective complaints, which have not been exhausted.

7. Plaintiff has also engaged in physical activities and travel that are contraindicated by his medical treatment.

8. Plaintiff has minimized or outright denied relevant prior conditions, which bears again on his credibility.

9. The premature nature of the future prognosis precludes his experts' opinions as to long-term repercussions from being anything but speculation.

10. At no point has the specific mechanism of injury within his lower left extremity been identified.

11. Stated differently, no physician has opined that a specific tendon was torn, a bone was fractured, etc.

4917-2687-0667, v. 1
328625419v.1

**STARK & STARK** PC

12. This is a separate and distinct ground for lack of causation.

13. As to treatment to date, Plaintiff's repeated sessions without progress are unreasonable.

14. As per Dr. Flavin, defense physiatrist, Dr. Kahn's life care plan would hurt, rather than help, Plaintiff's long term prognosis to the extent aspects of it are not wholly speculative and unnecessary.

15. Dr. Flavin further opines that environmental factors and personality issues are significant unaddressed impediments to recovery that are unrelated to the underlying incident.

16. Plaintiff and his family have the financial means to do so, but for reasons unbeknownst have declined to modify the family home to put in accessibility features or a chair lift, constituting a failure to mitigate.

17. Dr. Kahn's admission at his deposition that his life care plan lacks citations to reliable authority as to pricing data, and his rejection of insurance pricing, despite Plaintiff's insured status and the ongoing availability of insurance coverage without regard for pre-existing conditions renders his report unreliable speculation.

18. As to Plaintiff's mental health claims, Plaintiff's diagnosis of PTSD is contrary to the DSM for lack of inciting trauma.

19. Dr. Just, defense psych expert, critiques the methodology and conclusions of his treatment providers and questions the ultimate causation of current complaints.

20. As to vocational claims, Plaintiff's failure to disclose the PRG emails until after the close of all discovery precluded Defendants from relying upon expert discovery to attack the claim that he could not longer work, or to attack the lack of validity to the claim that he was performing valuable services for the business before.

21. That failure further precluded Defendants from pursuing fact discovery on those issues, such as issuing deposition subpoenas for individuals engaged in business transactions with Matthew and his family after he claimed to no longer work, and it precluded Defendants from pursuing documents from such entities as reality television casting agencies to whom Plaintiff submitted post-incident audition tapes, or additional hospitalizations and business trips.

22. Plaintiff never filed a tax return, was never paid a dollar for his pre-incident work, and the business closed zero deals in its existence.

23. The notion that he experienced any vocational loss is pure speculation.

24. Defendants may rely upon cross-examination of adverse witnesses, the testimony of Ms. Stergas, and the expert opinions of James A. Stavros, C.P.A. (Economic Loss), Terry P. Leslie, M.Ed. (Vocational), Kara Flavin, M.D. (Physiatrist), Nancy Just, Ph.D. (Psychological), and Andrew G. Kaufman, M.D. (Pain Management).

**STARK & STARK**,₁ꜱ

6. **PLAINTIFF'S WITNESSES** (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

On liability, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

    a. **Matthew Penso** – 29 Camellia, Irvine, California, 92620 – Mr. Penso will testify regarding his life, skills, goals, and aspirations prior to the AirTrain incident, the circumstances of the incident itself, and the immediate and long-term physical, mental, and emotional injuries he sustained as a result. He will further testify regarding the substantial losses he has suffered, including loss of physical abilities, diminished independence and relationships, fear and uncertainty regarding the future, and his ongoing needs and hopes moving forward. Mr. Penso will also authenticate photos, drawings, and videos identified in Plaintiff's list of exhibits. Mr. Penso will testify live and in person.

    b. **Luis Martin** – Employee of Defendant Alstom – Mr. Martin, an employee of Defendant, will testify regarding the operation of the AirTrain system, including the requirement of a permissive movement authorization for train movement and the circumstances under which emergency braking occurs. He will further testify that, although no contemporaneous investigation was undertaken related to the Emergency braking event on December 15, 2021, he later identified the incident as resulting from an invalid permissive movement authorization, described the event as atypical, and will explain the corrective actions taken with respect to the train following the incident which caused Plaintiff's injuries. Mr. Martin will testify live and in person.

    c. **Yazeed Khayyat** – Employee of Defendant Alstom – Mr. Khayyat, an employee of Defendant Alstom, will testify regarding the operation of the AirTrain system, including the requirement of a permissive movement authorization for train movement and the circumstances under which emergency braking occurs. He will further testify that, although no contemporaneous investigation was undertaken related to the Emergency braking event on December 15, 2021, he later identified the incident as resulting from an invalid permissive movement authorization, described the event as atypical, and will explain the corrective actions taken with respect to the train following the incident which caused Plaintiff's injuries. Mr. Khayyat will testify live and in person.

    d. **James Pampinto** – Employee of Defendant Alstom – Mr. Pampinto, site director for Alstom at Newark Airport AirTrain, will testify regarding the operation, maintenance, and safety oversight of the AirTrain system, including train automation, acceleration and braking functionality, inspection protocols, and safety measures in place at the time of the incident. He will further testify regarding Alstom's role as operator and maintainer of the AirTrain, the Port Authority's responsibilities. Mr. Pampinto will testify live and in person.

STARK
&STARK ₚc

e. **Paul Drejaj**, 29 Sycamore Road, Clark, New Jersey 07066 – Mr. Drejaj will testify regarding his prior incident on the same AirTrain involving a sudden and unexpected acceleration/deceleration, resulting in him being injured, and the circumstances surrounding that event. This testimony is offered as relevant to liability, including notice, foreseeability, and the operation of the AirTrain system. Mr. Drejaj will testify live and in person.

f. **Kelly Drejaj**, 29 Sycamore Road, Clark, New Jersey 07066 – Mrs. Drejaj will testify regarding her observations of her husband before and after a prior incident on the same AirTrain involving a sudden and unexpected acceleration and/or deceleration, as well as the effects of that incident on him. Her testimony is offered as relevant to liability, including corroboration of the occurrence and Defendants' notice of similar incidents. Ms. Drejaj will testify live and in person.

g. **Amanda Stergas,** 34 Newgate Road, Oxford, Connecticut 06478 – Ms. Stergas will testify regarding the circumstances of the AirTrain incident, Plaintiff's physical condition and activity level prior to the incident, and her observations of the incident itself. She will further testify regarding the significant changes in Plaintiff's physical abilities, daily functioning, and quality of life following the incident. Finally, she will confirm and authenticate the video she took immediately after the improper braking of the action of the subject train. Ms. Stergas will testify live and in person.

h. **Stephen B Noonan, P.E.** – 1570 Fruitville Pike, Ste 300, Lancaster PA, 17601 – Mr. Noonan will testify regarding the operation, control systems, maintenance, and applicable safety standards governing the Newark Airport AirTrain Automated People Mover. He will opine that the subject train experienced an unnecessary emergency braking event caused by an invalid Permissive Movement Authorization (PMA), followed by abnormal start-stop cycling that is not normal operation and poses a foreseeable hazard to standing passengers. Mr. Noonan will further testify that defendants failed to properly investigate, diagnose, and correct known signal and PMA-related issues in violation of applicable industry standards, including ASCE standards governing motion control, braking, and alarm response. He will opine that proper maintenance and diagnostic testing would have prevented the incident, there were significant number of incidents in the prior thirty days, the train was worked on, but never fixed which caused Plaintiff's injuries. Mr. Noonan will testify live and in person.

i. **Carolyn Albert, Ph.D.,** 5470 Kitzke Lane, Reno, Nevada 89511 – Dr. Albert is being offered as a biomechanical engineering expert (forensic orthopaedic/musculoskeletal biomechanics) to critique and rebut Dr. Gary Yamaguchi's biomechanical opinions about the AirTrain event and whether the event mechanics are consistent with the claimed left foot/ankle injury mechanism. Due to her location, and that she will be called as a rebuttal witness, Plaintiff requests to offer her testimony live via zoom. ᶠᴺ¹

**STARK**
**&STARK** ᴾᶜ

---

1 Both Plaintiff and Defendants indicate they may want to offer testimony of witnesses, particularly expert witnesses, in some manner (i.e. remotely via Zoom) other than live and in person. The parties are advised that the testimony of all witnesses is expected to be live and in person. Should the parties wish, however, to request an accommodation due to demonstrable hardship, they are to raise their intention to do so at least one week before trial and Judge Wigenton will address the request as she deems appropriate.

On damages, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

a. **Nancy Penso** – 29 Camellia, Irvine, California, 92620 – Plaintiff's mother will testify concerning Plaintiff's life, health, and independence prior to the AirTrain incident, their family life and relationship, and how she first learned of the incident. She will also address Plaintiff's recovery, the significant physical and emotional challenges he continues to face, and the lasting impact the incident has had on Plaintiff and the family. Mrs. Penso will also authenticate various photos and videos identified on Plaintiff's Exhibit List. Mrs. Penso will testify live and in person.

b. **Michael Penso** – 29 Camellia, Irvine, California, 92620 – Plaintiff's brother will testify regarding Plaintiff's life and character before the AirTrain incident, their upbringing and family relationship, their desire to work together and build a future together, as well as the circumstances under which he learned of the incident. He will further describe Plaintiff's recovery, ongoing physical and personal struggles, his travels with Plaintiff for treatment, and the profound impact the incident has had on Plaintiff and on their family relationship. Mr. Penso will also authenticate various photos and videos identified on Plaintiff's Exhibit List. Mr. Penso will testify live and in person.

c. **Marc Penso** – 29 Camellia, Irvine, California, 92620 – Plaintiff's father will testify regarding Plaintiff's upbringing, character, Plaintiff's lifestyle, education, work ability and function before the AirTrain incident, the circumstances surrounding his learning of the incident, and his observations of Plaintiff's condition thereafter. He will further describe Plaintiff's recovery, ongoing limitations, and the substantial and permanent effect the incident has had on Plaintiff and the family as a whole. Mr. Penso will also authenticate various photos and videos identified on Plaintiff's Exhibit List. Mr. Penso will testify live and in person.

d. **Joe Tostenrude**, 47 Juneberry, Irvine, CA 92606 – Mr. Tostenrude will testify regarding the Plaintiff's condition and character before the AirTrain incident, the circumstances under which the witness first learned of the incident, and the changes observed in Plaintiff thereafter, including the significant and permanent impact the incident has had on his physical functioning, daily activities, and quality of life. Due to his location, Plaintiff requests that Mr. Tostenrude be permitted to testify live via zoom.

e. **Sam Carr**, 38 Alicante-Aisle, Irvine, California 92614 – Mr. Carr will testify regarding the Plaintiff's character before the AirTrain incident and the changes observed in Plaintiff thereafter, including the impact the incident has had on Plaintiff's quality of life. Due to his location, Plaintiff requests that Mr. Carr be permitted to testify live via zoom.

f. **Andrew Gerken, M.D.,** 16300 Sand Canyon Ave #400, Irvine, California - Dr. Gerken, an orthopedic surgeon, will testify regarding his evaluation and treatment of Plaintiff immediately following the AirTrain incident, including his clinical findings, diagnoses, and opinions based on his medical training, experience, and


**STARK & STARK** PC

4917-2687-0667, v. 1
328625419v.1

review of Plaintiff's medical records. Dr. Gerken was the initial physician to diagnose Plaintiff with Complex Regional Pain Syndrome and will also offer opinions in rebuttal to any orthopedic or related expert testimony presented by Defendants. Due to his location and because he is a physician with an active clinical practice, Plaintiff requests that Dr. Gerken testify live via zoom.

g. **Brandon Hadverdian, M.D.,** 16300 Sand Canyon Avenue, Suite 511, Irvine, California – Dr. Hadverdian, an orthopedic surgeon, will testify regarding his evaluation and treatment of Plaintiff's broken right foot, including his clinical findings and opinions based on his medical training, experience, and review of Plaintiff's medical records. Dr. Hadverdian will further testify that surgical intervention was not feasible due to Plaintiff's underlying medical condition and will offer rebuttal opinions to any orthopedic or related expert testimony presented by Defendants. Due to his location and because he is a physician with an active clinical practice, Plaintiff requests that Dr. Hadverdian testify live via zoom.

h. **Meredith Vaughan, OTR/L, CHT,** 1700 Adams Ave # 103, Costa Mesa, California – Ms. Vaughan, a licensed occupational therapist and Certified Hand Therapist, will testify regarding her evaluation and treatment of Plaintiff's hands, including her clinical observations of Matthew, his functional limitations, and her treatment of Matthew, her experience, and review of Plaintiff's medical records and relevant literature. Due to her location and because she is a therapist with an active clinical practice, Plaintiff requests that Ms. Vaughan testify live via zoom.

i. **Dr. Damon Orlando, D.C.,** 2080 Century Pk E # 1615, Los Angeles, California – Dr. Orlando, a board-certified chiropractor and pain management provider specializing in Calmare scrambler therapy, will testify regarding his evaluation and treatment of Plaintiff, including his clinical observations and opinions based on his training, experience, and review of Plaintiff's medical records and relevant literature. Due to his location and because he is a physician with an active clinical practice, Plaintiff requests that Dr. Orlando testify live via zoom.

j. **Stephen D'Amato, M.D.,** 28901 Trails Edge Blvd. Unit 101, Bonita Springs, Florida – Dr. D'Amato, a board-certified emergency medicine physician specializing in pain relief therapy, will testify regarding his treatment of Plaintiff for pain arising from the December 15, 2021 AirTrain incident, including the administration of Calmare scrambler therapy. Due to his location and because he is a physician with an active clinical practice, Plaintiff requests that Dr. D'Amato testify live via zoom.

k. **Jeffrey Bone, PsyD,** 23 Corporate Plaza Drive, Suite 150, Newport Beach, California 92660 - Dr. Bone, Mr. Penso's treating psychologist, will testify that Mr. Penso suffers from severe, chronic, and progressive psychological injuries directly resulting from his four-limb Complex Regional Pain Syndrome, including major depression, anxiety, trauma-related symptoms, emotional dysregulation, and persistent suicidal ideation. He will further opine, to a reasonable degree of psychological certainty, that Mr. Penso's emotional suffering is genuine and not exaggerated or the product of somatization, that short-term or restorative programs

**STARK & STARK** K.

are inappropriate given his profound functional limitations, and that Mr. Penso will require lifelong psychological and psychiatric care as an essential component of managing an incurable, devastating pain condition. Due to his location and because he is a pyschologist with an active clinical practice, Plaintiff requests that Dr. Bone testify live via zoom.

l. **Rhonda E. Greenberg, PsyD,** 479 State Rt 17 North #1043, Mahwah, New Jersey 07430-2116 - Dr. Greenberg, a licensed forensic psychologist, will testify that Mr. Penso suffers from severe and progressive psychological injuries, including chronic depression, anxiety, post-traumatic stress symptoms, emotional dysregulation, and intermittent suicidal ideation, all directly related to the trauma of the AirTrain incident and the relentless progression of his CRPS. She will opine, to a reasonable degree of psychological certainty, that Mr. Penso's chronic pain, isolation, loss of independence, and medical deterioration have caused a marked decline in his quality of life and will require ongoing, long-term psychological treatment, with his emotional condition expected to worsen as his physical disease progresses. Dr. Greenberg will testify live and in person.

m. **Jay S. Grossman, DDS –** 11980 San Vicente Blvd., Suite 507, Brentwood, California, 90049 - Dr. Grossman, a professor of dental medicine and expert in restorative and implant dentistry, will testify that as a direct consequence of Mr. Penso's CRPS, he has been unable to adequately perform oral hygiene due to pain, loss of fine motor control, medication side effects, and frequent vomiting, despite having excellent dental health before the December 15, 2021 incident. He will opine, to a reasonable degree of dental probability, that Mr. Penso is likely to suffer progressive dental decay and eventual loss of all teeth, requiring lifelong preventive care, staged extractions, implants, and related treatment, with future dental costs. Due to his location, Plaintiff requests that Dr. Grossman testify live via zoom.

n. **Stuart B. Kahn, M.D. –** 25 Sutton Place South, 1C, New York, New York 10012 - Dr. Kahn, a specialist in orthopedic and rehabilitation medicine, prepared a life care plan and will testify that Mr. Penso's condition is permanent, progressive, and disabling, resulting in severe pain, profound functional limitations, inability to work or perform activities of daily living independently, and the need for extensive ongoing medical treatment and supportive care. He will discuss the care required for Mr. Penso for the rest of his life. Dr. Kahn will testify live and in person.

o. **Kristin Kucsma, M.A.,** 293 Eisenhower Parkway, 2nd Floor, Livingston, New Jersey 07039 – Ms. Kucsma, a forensic economist will testify that, based on Mr. Penso's age, education, pre-injury vocational trajectory, and permanent inability to work, he has sustained substantial lifetime economic losses. She will opine, to a reasonable degree of economic certainty, the present value of Mr. Penso's lost earning capacity and related pecuniary losses after taxes, depending on alternative


**STARK &STARK** PC

24

pre-injury earning scenarios, exclusive of non-economic damages such as pain and suffering. Ms. Kucsma will testify live and in person.

**p.  Anson M. Moise, M.D.,** 54 South Dean Street, Englewood, New Jersey - Dr. Moise, a pain management and rehabilitation specialist, will testify that Mr. Penso suffered a left foot and ankle injury in the December 15, 2021 Newark AirTrain malfunction that directly caused the onset of severe Complex Regional Pain Syndrome, which rapidly and progressively spread to all four extremities. He will opine, to a reasonable degree of medical certainty, that Mr. Penso's CRPS is permanent, progressive, functionally catastrophic, and totally disabling, with a poor prognosis despite extensive treatment, and that any future interventions can at best provide limited palliative relief rather than recovery. Dr. Moise will testify live and in person.

**q.  Richard M Paicius, M.D.,** 1401 Avocado Ave, ste 709, Newport Beach, California - Dr. Paicius, a board-certified anesthesiologist and pain-management specialist, and Plaintiff's CRPS treating physician, will testify that Mr. Penso's Complex Regional Pain Syndrome was directly caused by the December 15, 2021 AirTrain incident and rapidly progressed from his left foot to all four extremities despite extensive treatment. He will opine, to a reasonable degree of medical certainty, that Mr. Penso's CRPS is permanent, progressive, severely disabling, and will require lifelong pain management, interventional procedures, medications, assistive devices, and increasing levels of personal care, with an extremely poor prognosis. Due to his location and because he is a physician with an active clinical and surgical practice, Plaintiff requests that Dr. Paicius testify live via zoom.

**r.  Daniel Wolstein, Ph.D.,** One University Plaza, Suite 302, Hackensack, New Jersey - Dr. Wolstein, a vocational rehabilitation and earning-capacity expert, will testify that based on Mr. Penso's medical records, particularly the progression of CRPS, his functional limitations eliminate his ability to sustain competitive employment at any exertional level, including sedentary work. He will further opine, to a reasonable degree of vocational certainty, that Mr. Penso has no meaningful access to the labor market, is not a candidate for vocational rehabilitation, and has suffered a total loss of earning capacity despite his strong pre-injury vocational trajectory and skills. Dr. Wolstein will testify live and in person.

**s.  Christopher Skerritt, M.Ed.,** One University Plaza, Suite 302, Hackensack, New Jersey – Mr. Skerritt, an economic rebuttal expert, will testify that the defense economist's analysis is methodologically flawed and materially understates Mr. Penso's economic losses by relying on improper data and unsupported assumptions. Mr. Skerritt will testify live and in person.

Defendants object to the following witnesses for the reasons stated:

STARK
&STARK.PC

4917-2687-0667, v. 1
328625419v.1

Defendants object to Plaintiff's intent to call James Pampinto as Defendants do not believe he was identified by Plaintiff in discovery as an individual who would be offered for testimony.

Defendants object to the testimony of the Drejajs because the denied events subject of that testimony have been dismissed on summary judgment, and, even if not prohibited on that ground, pertain to an acceleration rather than a stop, which is wholly irrelevant to the events subject of this litigation, and, as such, as apt to confuse the jury and are unduly prejudicial.

7. **DEFENDANT'S WITNESSES** (See instructions above).

On liability, Defendants intend to call the following witnesses who will testify in accordance with the following summaries:

| DEFENSE WITNESS | SCOPE OF KNOWLEDGE |
|---|---|
| Gary T. Yamaguchi, Ph.D. Rimkus 3015 Miller Road Ann Arbor, MI 48103 | Biomechanical Engineer retained to determine the inertial forces generated by the incident on the occupant and the consistency of those forces with the mechanisms associated with the injuries claimed. Due to his location, Defendants may request permission for testimony live via zoom |
| J. Sam Lott, P.E. Automated Mobility Services, LLC 3714 Cat Springs Lane Missouri City, TX 77459 | Engineer Liability Expert in automated people mover systems retained to assess whether an unsafe operating condition occurred that posed hazard to Plaintiff. |
| Farheen Khan, Ph.D. Secretariat 100 Colony Square, Suite 400 Atlanta, GA 30361 | Defendants liability expert retained to evaluate human factors, warnings, and safety issues related to the subject incident. Due to her location, Defendants may request permission for testimony live via zoom. |
| Kerry Delk, Ph.D. 2900 Bristol Street Bldg. H, Suite 103 Costa Mesa, CA 92626 | Treating psychologist who diagnosed severe/recurrent narcissistic and sadistic personality disorders. Due to her location, Defendants may request permission for testimony live via zoom. |
| Yazeed Khayyat Port Authority of NY & NJ | Defense fact witness employed by the Port Authority as Manager of the Air Train at Newark Airport and oversees Alstom in its operations of the Air Train. |
| Luis Martin Alstom/Barbardier | Defense fact witness employed by Altstom/Bombardier as Operations Manager of the Air Train at Newark Airport. |

4917-2687-0667, v. 1
328625419v 1

| | |
|---|---|
| Amanda Stergas<br>34 Newgate Road, Oxford, CT 06478 | Plaintiff's former fiancée, present for incident and personal knowledge as to pre- and post-incident condition of Plaintiff and family dynamics. |

On damages, Defendants intend to call the following witnesses who will testify in accordance with the following summaries:

| **DEFENSE WITNESS** | **SCOPE OF KNOWLEDGE** |
|---|---|
| Kara Flavin, M.D.<br>274 Redwood Shores Pkwy #534<br>Redwood City, CA 94065 | Physiatrist - Brain Injury, Spinal Cord Medicine, Neuro-Rehabilitation recommends functional restoration program. Due to her location, Defendants may request permission for testimony live via zoom |
| James A. Stavros, C.P.A.<br>J.S. Held, LLC<br>222 Haddon Ave., Suite 302<br>Westmont, NJ 08108 | Analysis of plaintiff's claim for economic losses resulting from the subject incident. |
| Terry P. Leslie, M.Ed.<br>Premier One Consulting<br>26E East Roseville Rd.<br>Lancaster, PA 17601 | Vocational assessment to determine plaintiff's vocational/economic loss resulting from his alleged accident. |
| Nancy Just, Ph.D.<br>Advanced Psychological Specialists,<br>One Prospect Street, Suites 5-7<br>Ridgewood, NJ 07450 | Psychological evaluation to determine if Plaintiff suffers from emotional disorder and to what extent it is related to the alleged injury; as well as personality factors that may be implicated in Plaintiff's difficulties. |

STARK
&STARK rc

27

| | |
|---|---|
| Andrew G. Kaufman, M.D.<br><br>90 Bergen Street, Suite 3400<br><br>Newark, New Jersey  07103 | Expert anesthesiologist who performed a pain management evaluation recommending spinal cord stimulation.  Due to a recent medical procedure, Defendants may request permission for testimony live via zoom |

Plaintiff objects to the following witnesses for the reasons stated:

Plaintiff objects to Defendants' intent to call Dr. Gary Yamaguchi, J. Sam Lott, P.E., Dr. Farheen Khan, for reasons set forth in each of Plaintiff's motions to bar identified above.

Plaintiff objects to Defendants' intent to call Dr. Delk for the reasons identified in the pending motion to Bar Dr. Delk's testing and notes.  Dr. Delk's testimony is not probative of liability of CRPS medical causation and carries a substantial risk of unfair prejudice by inviting the jury to decide the case based on perceived personality or character rather than the AirTrain malfunction and resulting injuries.

Plaintiff objects to Defendants' intent to call Dr. Kara Flavin, Terry Leslie, M.Ed., and Dr. Nancy Just, for reasons set forth in each of Plaintiff's motions to bar identified above.

8. **EXPERT WITNESSES** (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

Plaintiff's expert witnesses are:

a. **Jeffrey Bone, PsyD**
b. **Rhonda E. Greenberg, PsyD**
c. **Jay S. Grossman, DDS**
d. **Stuart B. Kahn, M.D.**
e. **Kristin Kucsma, M.A.**
f. **Anson M. Moise, M.D.**
g. **Stephen B Noonan, P.E.**
h. **Richard M Paicius, M.D.**
i. **Daniel Wolstein, Ph.D.**
j. **Carolyn Albert, Ph.D.**
k. **Christopher Skerritt, M.Ed.**

Defendant's objections to the qualifications of plaintiff's experts are:

As set forth in pending motions to bar, Defendants dispute the qualifications of Dr. Wolstein to offer medical opinions as he is not a medical doctor, and Mr. Skerritt for lack


STARK<br>&STARK.ĸ

4917-2687-0667, v. 1<br>328625419v 1

of education, training, or experience to offer economic opinions. Defendants reserve the right to contest any qualifications based on facts not presently known.

Defendant's expert witnesses are:

    a. **Andrew Kaufman, M.D.**
    b. **Gary Yamaguchi, Ph.D.**
    c. **Nancy Just, Ph.D.**
    d. **Kara Flavin, M.D**
    e. **Farheen Kahn, Ph.D.**
    f. **James Stavros, CPA**
    g. **Terry Leslie, M.Ed**
    h. **Sam Lott, P.E.**

Plaintiff's objections to the qualifications of defendant's experts are:

1) Plaintiff objects to Defendants' experts for failure to produce proper expert reports;

    a. **Nancy Just, Ph.D.** - Plaintiff seeks to bar Dr. Just's testimony and opinions in full on the ground she did not produce the underlying raw psychological testing and exam data supporting her conclusions, arguing that this violates expert disclosure requirements and prevents meaningful reliability testing, leaving only untestable conclusions that would prejudice and confuse the jury.

2) Plaintiff objects to the following Defendants' experts proposed opinions as beyond the scope of their permissible opinions.

    a. **Gary Yamaguchi, Ph.D.** - Plaintiff objects to Dr. Yamaguchi's qualifications to offer causation opinions because, although styled as a biomechanical expert, he failed to perform any incident-specific biomechanical injury reconstruction and did not analyze the actual forces, mechanisms, or body structures involved in Plaintiff's foot and ankle injuries. His opinions rest on generalized assumptions and non-incident-specific data from dissimilar testing conditions, rather than applying reliable biomechanical principles to the facts of this case. As a result, Dr. Yamaguchi lacks the requisite specialized foundation to opine that Plaintiff's injuries would not have occurred under the circumstances of the subject AirTrain incident, rendering his testimony unreliable and unhelpful to the jury under Rule 702

    b. **Kara Flavin, M.D.** - Plaintiff objects to Dr. Flavin's qualifications to render life-care and future medical opinions because she admittedly lacks expertise, training, or research experience in Complex Regional Pain Syndrome and has never authored, studied, or previously testified regarding a CRPS-specific life care plan. She

**STARK & STARK** ℠

4917-2687-0667, v. 1
328625419v.1

conducted no independent medical analysis, applied no identifiable methodology, and relied instead on subjective judgments and unexplained numerical estimates untethered to medical literature or accepted clinical standards. Accordingly, Dr. Flavin lacks the requisite qualifications to opine on Plaintiff's future medical needs or functional prognosis, and her testimony fails Rule 702's qualification and reliability requirements.

c. **Farheen Kahn, Ph.D.** - Plaintiff objects to Dr. Khan's qualifications to offer human-factors or passenger-behavior opinions because she conducted no independent human-factors analysis of the subject incident and lacks a reliable foundation to opine on Plaintiff's conduct during an unexpected emergency stop. Her opinions merely adopt and rest entirely upon the biomechanical conclusions of Dr. Yamaguchi, opinions that are themselves inadmissible, without any testing, observation, reconstruction, or incident-specific data. As a result, Dr. Khan is not qualified to offer independent expert opinions in this case, and her testimony fails Rule 702's qualification, reliability, and fit requirements

d. **Terry Leslie, M.Ed** - Plaintiff objects to Mr. Leslie's qualifications to offer vocational and earning-capacity opinions because he lacks specialized training or meaningful experience evaluating individuals with severe, four-limb Complex Regional Pain Syndrome and has not provided clinical vocational rehabilitation services for such conditions. He performed no vocational testing, no functional capacity evaluation, no labor market or accommodation analysis, and did not interview or examine Plaintiff, instead relying on generalized assumptions tied only to age and education. As a result, Mr. Leslie lacks the requisite qualifications and methodological foundation to opine on Plaintiff's employability or earning capacity in this case, rendering his testimony inadmissible under Rule 702.

e. **Sam Lott, P.E.** - Plaintiff objects to Mr. Lott's qualifications to offer engineering or safety opinions because he is not a train control or safety engineer, performed no quantitative analysis, and admittedly reviewed no braking data, deceleration rates, diagnostics, or maintenance testing for the subject AirTrain. His opinions rest on assumptions, impressions, and Alstom's purported reputation rather than any reliable methodology or incident-specific facts. Moreover, the only subject on which he is arguably qualified—whether emergency braking is generally appropriate after a loss of PMA—is irrelevant to the issues in dispute, rendering his testimony inadmissible under Rule 702.

9. **PLAINTIFF'S EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits

4917-2687-0667, v. 1
328625419v.1

**STARK & STARK** ᴘᴄ

set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

**See Joint Exhibit List attached hereto**

Defendants object to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):

Defendants object to Plaintiff's Exhibit P-555 as lacking authentication and foundation, constituting inadmissible hearsay, and being unduly prejudicial.

Defendants object to Plaintiff's Exhibit P-602, Plaintiff's Day in the Life video for the reasons set forth in the pending motion to bar same.

Defendants reserve the right to object to Plaintiff's Exhibit P-609, to the extent same has not been reviewed and is not presently established to be a fair and representative summation of otherwise admissible materials that will not mislead the jury.

Defendants object to Plaintiff's Exhibit P-610, medical bills, to the extent any record contained in that exhibit was not timely produced in discovery.

Defendants object to Plaintiff's Exhibit P-616 and P18/19, Dr. Prager's materials, for the reasons set forth in the pending motion to bar same.

Defendants object to Plaintiff's Exhibits P-622 to P-625, PT Perry's materials, for the reasons set forth in the pending motion to bar same.

10. **DEFENDANTS' EXHIBITS** (See instructions above).

Defendants intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

**See Joint Exhibit List attached hereto.**

Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

**Plaintiff objects to the following Defendants' Exhibits:**

**D-1 through D-3, D-5 through D-7, D-11 through D-20, D-23 through D-65, D-70 through D-92** - Plaintiff objects to these exhibits as they are deposition exhibits lacking independent admissibility. The exhibit was marked solely for deposition purposes and has


STARK &STARK.

4917-2687-0667, v. 1
328625419v.1

not been shown to satisfy the requirements of relevance, authentication, or non-cumulativeness. Its admission would violate Fed. R. Evid. 403 and 611.

**D-105 –** This exhibit lacks foundation and authentication and constitutes hearsay to the extent it contains out-of-court statements. Its relevance is unclear, and admission would be unfairly prejudicial and confusing to the jury under Fed. R. Evid. 403.

**D-106 –** Plaintiff objects to Exhibit D-106 on grounds of relevance, hearsay, and lack of proper foundation. To the extent it reflects attorney communications or litigation-generated materials, it is improper for admission and risks juror confusion in violation of Fed. R. Evid. 403.

**D-107 —** Plaintiff objects to Exhibit D-107 for lack of foundation, authentication, and expert interpretation. Any physiological or biometric data requires expert testimony for admissibility. Admission without such foundation would be misleading and improper under Fed. R. Evid. 403 and 702.

**D-108 through D-110 –** Plaintiff objects to Exhibit D-108 though D-110 as cumulative, lacking foundation, and potentially misleading without proper context. The exhibit risks unfair prejudice and confusion under Fed. R. Evid. 403.

**D-111 –** Plaintiff objects to Defendants' medical record exhibits to the extent they are cumulative, lack proper foundation or certification, are remote in time, or are offered without appropriate limiting context. Many of the records pre-date the incident by years and have minimal probative value while posing a substantial risk of juror confusion and unfair prejudice. Admission of such records without proper foundation or relevance violates Fed. R. Evid. 403, 803, and 902.

**D-112 -** This exhibit lacks foundation and authentication and constitutes hearsay to the extent it contains out-of-court statements. Its relevance is unclear, and admission would be unfairly prejudicial and confusing to the jury under Fed. R. Evid. 403.

**D-114 and D-115 -** Plaintiff objects to Exhibit D-114 and D-115 as cumulative, lacking foundation, and potentially misleading without proper context. The exhibit risks unfair prejudice and confusion under Fed. R. Evid. 403.

**D-116 –** Plaintiff objects to Defendants' medical record exhibits to the extent they are cumulative, lack proper foundation or certification, are remote in time, or are offered without appropriate limiting context. Many of the records pre-date the incident by years and have minimal probative value while posing a substantial risk of juror confusion and unfair prejudice. Admission of such records without proper foundation or relevance violates Fed. R. Evid. 403, 803, and 902.

**D-120 and D-121 -** Plaintiff objects to Defendants' medical record exhibits to the extent they are cumulative, lack proper foundation or certification, are remote in time, or are


STARK
&STARK. ʀᴄ

4917-2687-0667, v. 1
328625419v.1

offered without appropriate limiting context. Many of the records pre-date the incident by years and have minimal probative value while posing a substantial risk of juror confusion and unfair prejudice. Admission of such records without proper foundation or relevance violates Fed. R. Evid. 403, 803, and 902.

**D-122 -** Plaintiff objects to this exhibit or references concerning prior motor vehicle accidents or unrelated incidents involving Plaintiff as irrelevant and unfairly prejudicial. Such evidence constitutes improper character or propensity evidence, lacks a causal nexus to the injuries at issue, and risks misleading the jury, in violation of Fed. R. Evid. 401, 403, and 404.

**D-124 -** Plaintiff objects to Exhibit D-108 though D-110 as cumulative, lacking foundation, and potentially misleading without proper context. The exhibit risks unfair prejudice and confusion under Fed. R. Evid. 403.

**D-127 through D-144 -** Plaintiff objects to Defendants' exhibits consisting of internal defense records, subpoena responses, deposition exhibits, expert disclosures, and other litigation materials that lack independent foundation or admissibility. These exhibits were created for purposes of litigation, are not proper substantive evidence, and would confuse the jury if admitted, contrary to Fed. R. Evid. 403, 611, and 901.

**D-145 –** Plaintiff objects to Exhibit D-145 for lack of foundation, authentication, and expert interpretation. Any physiological or biometric data requires expert testimony for admissibility. Admission without such foundation would be misleading and improper under Fed. R. Evid. 403 and 702.

**D-146 though D-149 –** Plaintiff objects to Defendants' exhibits consisting of internal defense records, subpoena responses, deposition exhibits, expert disclosures, and other litigation materials that lack independent foundation or admissibility. These exhibits were created for purposes of litigation, are not proper substantive evidence, and would confuse the jury if admitted, contrary to Fed. R. Evid. 403, 611, and 901.

**D-150 through D-159 –** Plaintiff objects to Defendants' exhibits consisting of prior school records subpoenaed from Plaintiff's educational institution. These records are irrelevant to the issues of liability and damages, are remote in time, and lack a causal nexus to the injuries at issue. Admission would be unfairly prejudicial, risk juror confusion, and invade Plaintiff's privacy interests. To the extent the records contain hearsay or sensitive personal information, they lack proper foundation and admissibility. Exclusion is warranted under Fed. R. Evid. 401, 403, 801, and 901.

**D-160 through D-166 –** Plaintiff objects to Defendants' exhibits consisting of internal defense records, subpoena responses, deposition exhibits, expert disclosures, and other litigation materials that lack independent foundation or admissibility. These exhibits were

4917-2687-0667, v. 1
328625419v.1

STARK
&STARK₍ₚ𝒸₎

created for purposes of litigation, are not proper substantive evidence, and would confuse the jury if admitted, contrary to Fed. R. Evid. 403, 611, and 901.

**D-167 and D-168** – Plaintiff objects to Defendants' exhibits consisting of articles, publications, or internet materials that have not been established as authoritative or reliable. Such materials constitute inadmissible hearsay, lack proper foundation, and are not admissible as substantive evidence. To the extent offered in connection with expert testimony, Defendants have not established that the materials qualify as reliable authority under Fed. R. Evid. 803. Admission would confuse the jury and unfairly prejudice Plaintiff, in violation of Fed. R. Evid. 403, 702, and 803.

**D-169** – Plaintiff has filed multiple Daubert challenges to Defendants' experts disclosed on September 15, 2025.

**D-170 through D-173** - Plaintiff objects to Defendants' medical record exhibits to the extent they are cumulative, lack proper foundation or certification, are remote in time, or are offered without appropriate limiting context. Many of the records pre-date the incident by years and have minimal probative value while posing a substantial risk of juror confusion and unfair prejudice. Admission of such records without proper foundation or relevance violates Fed. R. Evid. 403, 803, and 902.

(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

11. **PLAINTIFF'S LEGAL ISSUES** FN2

   a. **Negligence:**

Plaintiff asserts a claim for negligence arising from the design, operation, inspection, and maintenance of the Newark Liberty International Airport AirTrain system. Plaintiff contends that Defendants owed Plaintiff a heightened duty of care as common carriers transporting passengers for hire, and that Defendants breached that duty, proximately causing Plaintiff's injuries and damages.

      i. **Duty Owed (Common Carrier)**

At all relevant times, Plaintiff was a fare-paying passenger on the Newark AirTrain. Defendants, as the designers, operators, maintainers, and/or entities responsible for the AirTrain system and its passenger service, owed Plaintiff the duty of care applicable to a **common carrier**. Under the common-carrier standard, Defendants were required to exercise a **high degree of care** for the safety of passengers and to take reasonable precautions to protect passengers from


**STARK & STARK** PC

2 The Court notes that the issues listed here are for informational purposes and indicate the issues each party intends to advance at trial. This list of issues does nothing to obviate disputes regarding whether the issues have been properly presented or preserved during the course of this litigation. For example, Plaintiff asserts a claim under the NJ Products liability Act which Defendants deny was ever previously asserted and is therefore not a proper issue for trial. Issues regarding the proper presentation and preservation of issues – via pleadings or otherwise – are not waived by virtue of this section of the Pretrial Order and shall be raised to Judge Wigenton either prior to or at an appropriate point during the trial.

foreseeable risks inherent in the transportation system, including risks associated with sudden starts, stops, emergency braking, and system malfunctions.

Plaintiff will contend that this duty includes, among other things, the obligation to (1) design the system to minimize foreseeable hazards; (2) operate the system in a manner consistent with passenger safety; (3) reasonably inspect, test, and maintain the system to prevent hazardous events; and (4) provide effective warnings and/or operational safeguards where known hazards cannot be eliminated.

**ii. Breach**

Plaintiff contends Defendants breached the common-carrier duty of care by negligent acts and omissions in the **design, operation, and maintenance** of the Newark AirTrain, including but not limited to:

**a. Design negligence**: failing to design the AirTrain system and related control/signal components to reasonably prevent or mitigate foreseeable emergency braking events, including those associated with signal interruption/loss and system faults; failing to incorporate reasonable redundancy, fail-safes, and/or hazard-reduction measures to prevent sudden, unexpected stops that pose a foreseeable risk to standing or unsecured passengers.

**b. Operational negligence**: operating the AirTrain in a manner that permitted sudden emergency braking without adequate passenger protection; failing to implement and follow reasonable operational protocols to address known risks of abrupt stops; failing to ensure passenger-safety measures (including warnings and passenger communication) were utilized when conditions presented a foreseeable risk of sudden stops.

**c. Maintenance/inspection negligence**: failing to properly inspect, test, maintain, repair, and/or monitor the AirTrain system and its components so as to prevent foreseeable signal faults and emergency braking events; failing to timely identify, correct, and remediate conditions that increased the likelihood of sudden braking incidents; and failing to take reasonable corrective action in response to prior incidents, known issues, or system performance indicators demonstrating a risk of abrupt stops.

Plaintiff will further contend that Defendants either knew or should have known of the foreseeable risk that sudden emergency braking would cause passengers to lose balance and be injured, and that reasonable alternatives existed to reduce or eliminate that risk.

4917-2687-0667, v. 1
328625419v.1

### iii. Causation (Proximate Cause)

Plaintiff contends that Defendants' negligence was a **proximate cause** of the incident and Plaintiff's injuries. Plaintiff will prove that, as a result of Defendants' negligent design, operation, and/or maintenance, the AirTrain experienced an abrupt stop/emergency braking event during Plaintiff's ride, causing Plaintiff to be thrown, lose balance, and sustain injury.

Plaintiff further contends that the injuries and damages were the natural and foreseeable consequence of Defendants' failure to comply with the common-carrier duty to provide safe carriage and to protect passengers from foreseeable hazards associated with sudden stops. Plaintiff will seek all damages allowed by law that were caused by Defendants' negligence, including medical expenses, lost earnings, impairment/disability, pain and suffering, and loss of enjoyment of life.

### b. Plaintiff's Product Liability Claim pursuant to New Jersey Product Liability Act – N.J.S.A. 2A:58C-1 et seq

Plaintiff asserts a claim under the New Jersey Product Liability Act against Defendants for defects in the design, manufacture, and maintenance of the AirTrain system. The AirTrain experienced a defective emergency braking event caused by an invalid permissive movement authorization, resulting in an abrupt stop and unexpected movement. The system was unreasonably dangerous for its intended and foreseeable use by standing passengers. The defective condition was a proximate cause of Plaintiff being thrown off balance and injured. Plaintiff's injuries, including CRPS, were directly and proximately caused by the defective AirTrain system.

### i.  <u>Duty Owed</u>

Defendants, as the owner, designer, manufacturer, installer, and maintainer of the AirTrain automated people-mover system, owed a duty under the New Jersey Product Liability Act to design, manufacture, and place into the stream of commerce a transportation system that was reasonably fit, suitable, and safe for its intended and foreseeable use, including foreseeable emergency braking events involving standing passengers. This duty included the obligation to design and maintain the AirTrain's braking, signaling, control, and permissive-movement authorization (PMA) systems so as to prevent unsafe abrupt stops during normal operations, and to guard against known or foreseeable system faults through proper design tolerances, fail-safes, inspection, maintenance, and corrective action.

### ii.  <u>Breach / Product Defect</u>

4917-2687-0667, v. 1
328625419v.1

Plaintiff contends that the AirTrain system was defective and unreasonably dangerous at the time it was placed into service and at the time of the incident, including but not limited to one or more of the following defects:

1. Design and/or Manufacturing Defect

The AirTrain experienced an emergency braking event triggered by an invalid Permissive Movement Authorization (PMA), followed by unexpected abrupt unexpected braking, which is not an ordinary or acceptable occurrence in properly designed and maintained automated people-mover systems. Evidence demonstrates that the PMA fault was associated with signal alignment or tolerance issues, resulting in an unnecessary emergency brake application under passenger-service conditions. Such behavior bespeaks a defect in the system's design, manufacture, or calibration, rendering the product unsafe for its intended use.

2. Failure to Incorporate Reasonable Safety Features and Redundancies

The AirTrain system lacked adequate safeguards to prevent or mitigate sudden, violent braking and reverse movement caused by foreseeable signaling or PMA irregularities. Reasonable alternative designs and operational protections existed that would have reduced or eliminated the risk of passenger injury during emergency braking scenarios.

3. Defective Condition Established by Circumstantial Evidence (Malfunction Theory)

Even absent identification of a single failed component, the emergency braking and unexpected train movement would not ordinarily occur in the absence of a product defect, and the AirTrain system was within Defendants' exclusive design, manufacture, maintenance, and control. Plaintiff is therefore entitled to rely on circumstantial evidence of malfunction to establish defect under New Jersey law.

### iii. <u>Causation</u>

The defective condition of the AirTrain system was a proximate cause of Plaintiff's injuries. As a direct result of the defective PMA-related emergency braking event, the AirTrain abruptly stopped and moved unexpectedly while Plaintiff was standing as a fare-paying passenger, causing him to lose balance and suffer traumatic injury to his lower extremity. Plaintiff's medical experts will testify that this trauma precipitated the development of Complex Regional Pain Syndrome (CRPS), which subsequently



STARK
&STARK. PC

4917-2687-0667, v. 1
328625419v.1

spread and resulted in permanent, debilitating pain and functional impairment. The chain of causation, from system defect, to emergency braking and train movement, to biomechanical trauma, to CRPS, is supported by competent engineering and medical testimony and presents classic issues for jury determination.

## 12. DEFENDANTS' LEGAL ISSUES

### a. Negligence:

#### i. Product Liability Act Preemption

Defendants reject Plaintiff's claim of negligence. As to Alstom, any claim for harm from the malfunction of a product, which the AirTrain is, is subsumed and preempted by the Products Liability Act, inclusive of claims arising from design, operation, inspection, and maintenance.

#### ii. Negligence

Defendants reject the notion that Plaintiff was owed a heightened duty of care as common carriers transporting passengers for hire, that Defendants breached any duty owed, or that any breach proximately causing Plaintiff's injuries and damages. Plaintiff's credibility issues preclude any fact finder from determining how the incident occurred, that the incident caused injury, or the scope of any damages flowing therefrom.

#### a. Duty Owed

Port Authority is not a common carrier as a matter of law. As to Alstom, the facts of payment to transition from NJ Transit to the AirTrain does not transform the AirTrain from a free conveyance for the convenience of passengers to a transit for hire scenario contemplated by the common carrier doctrine.

As to Alstom, the scope of its duty is defined by his contract with Port Authority, as a contractual undertaking in keeping with the Restatement (2nd) 324 and its progeny, i.e. not to unreasonably increase the degree of danger to which foreseeable third parties are exposed by virtue of the contractual undertaking's completion. As to Port Authority, it is a premises owner which owes only that duty of care owed to a business invitee, i.e. to avoid unreasonably dangerous conditions of which it had notice.

#### b. Breach

Defendants deny that any basis exists to conclude a duty was breached by either. First, expert testimony is required on these issues and Noonan's report should be barred and his testimony excluded for the reasons set forth in the pending motion. Separately, there is no basis to suggest Port Authority's reliance on Alstom as to the operation and maintenance of the AirTrain



STARK
&STARK.

4917-2687-0667, v. 1
328625419v.1

was unreasonable, or that Port Authority had notice of any dangerous condition or ability to ameliorate that condition by doing anything other than retaining Alstom.

Defendants will contend that all actions taken with respect to the operation, maintenance, and safety protocols of the AirTrain system were reasonable and consistent with industry standards and applicable regulations. Defendants exercised due care in the inspection, testing, and repair of the system, and implemented appropriate operational protocols to address known risks, including the potential for abrupt stops. Safety measures, warnings, and passenger communications were provided in accordance with best practices and regulatory requirements. Defendnats deny that the braking event was a dangerous condition or that any evidence supports that the stopping rate was inappropriate. Furthermore, Defendants responded to prior incidents and system performance indicators in a timely and responsible manner, taking corrective actions as warranted by the circumstances. Defendants deny that any alleged omissions or failures constituted negligence or created an unreasonable risk to passengers, and assert that the risk of sudden emergency braking is inherent to automated transit systems and was mitigated to the extent reasonably possible.

### c. Causation (Proximate Cause)

Defendants deny that any act of either defendant is a **proximate cause** of the incident or Plaintiff's injuries. Plaintiff's failure to exercise reasonable self-protective behavior, including not holding on to available handholds, constitutes intervening and superseding proximate cause of any injury. Plaintiff's comparative fault is the sole basis for any potentially related conditions.

Plaintiff has failed to mitigate his damages by failing to avail himself of medically recommended and available treatment modalities and has engaged in self-harm which is a separate cause of any injury.

Plaintiff's damages experts' opinions are subject to preclusion as inadmissible net opinions which are contrary to admissibility requirements of Daubert.

### iii. Plaintiff's Product Liability Claim pursuant to New Jersey Product Liability Act – N.J.S.A. 2A:58C-1 et seq

Defendants deny that Plaintiff has attempted to assert a claim under the New Jersey Product Liability Act – the Act precludes the negligence claims Plaintiff has asserted to date. Even if asserted, Plaintiff lacks required fact evidence and expert testimony to articulate the specifics of the claimed defect, how the AirTrain system operates, that any inference of defect is reasonable, that the AirTrain was in Defendants' exclusive control, that an alternate design was reasonable, that a risk-utility analysis was conducted, or that alternate warnings were needed and would have been heeded, if made. The age of the system precludes any reasonable inference that this incident occurred due to a manufacturing/design/warnings defect. There is no articulation as to what aspect of the system malfunctioned or should have been designed differently – Plaintiff merely suggests based on the outcome that a defect must have occurred – without basis.

**STARK &STARK** PC

4917-2687-0667, v. 1
328625419v.1

### a. **Causation**

Defendants deny that any act of either defendant is a **proximate cause** of the incident or Plaintiff's injuries. Plaintiff's failure to exercise reasonable self-protective behavior, including not holding on to available handholds, constitutes intervening and superseding proximate cause of any injury. Plaintiff's comparative fault is the sole basis for any potentially related conditions.

Plaintiff has failed to mitigate his damages by failing to avail himself of medically recommended and available treatment modalities and has engaged in self-harm which is a separate cause of any injury.

Plaintiff's damages experts' opinions are subject to preclusion as inadmissible net opinions which are contrary to admissibility requirements of Daubert.

Defendants reserve the right to raise any legal issues that become relevant as this matter progresses. Defendants reserve the specific right to object to Plaintiff's as-yet-unseen demonstratives on an exhibit by exhibit basis.

13. **CHOICE OF LAW:** (If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith).

**None**

14. **MISCELLANEOUS** (Set forth any other matters which require action by, or should be brought to the attention of the Court).

a. **Plaintiff's Dress Attire** – Due to Plaintiff's medical condition, specifically severe Complex Regional Pain Syndrome affecting all four extremities, he is unable to tolerate wearing pants and, at best, can only wear shorts without exacerbating his symptoms. Plaintiff respectfully raises this issue in advance in light of the Court's local decorum rules regarding attire and seeks the Court's understanding and accommodation. Defendants do not object to the extent Plaintiff's attire is supported by treating physician averment of medical necessity and that an appropriate instruction is given to the jury as to how this unusual situation should not be afforded undue weight.

b. **Plaintiff's Service Dog** – Plaintiff has a Certified Psychiatric Service Dog, Edith, a Corgi. She requires a bathroom break approximately every three hours. She wears a service harness as well as a collar and leash. No objection from Defendants.


**STARK & STARK** PC

c. As reported under cover of January 21, 2026, counsel agreed to engage in private mediation on February 3, 2026. No earlier opportunity was available to do so.

d. Plaintiff's and Defendants; Counsel should be Permitted to Use Demonstratives

i. As part of plaintiff's case in chief, plaintiff's counsel seeks to rely upon medical illustrations, photographs, diagrams, and other demonstrative aids, in plaintiff's opening and closing argument in this case. Plaintiff submits that the use of demonstrative evidence in opening and closing arguments, violates no court rule, nor does it violate any case law. See Cross v. Lamb, 16 N.J. Super. 53 (App. Div. 1960); State v. Scherzer, 301 N.J. Super. 363, 434 (App. Div.), certif. Denied, 151 N.J. 466 (1997) ("There is nothing inherently improper in the use of demonstrative or illustrative evidence."); see e.g., N.J.R.E. 611. In fact, New Jersey has a long-standing tradition of allowing attorneys to utilize demonstrative evidence when it will aid the jury in understanding relevant aspects of the case before them, and trial courts are granted "wide latitude" in both admitting demonstrative evidence and visual aids, and in controlling their manner of presentation. Rodd v. Raritan Radiologic Associates, P.A., 373 N.J. Super. 154, 164-65 (App. Div. 2004); see also, Cross v. Lamb, supra.

In Cross v. Lamb, supra, the plaintiff sued for injuries he sustained while working on a construction site. Id. at 59. The defendant was the project=s general contractor. Id. at 59. The plaintiff sustained injuries to three digits on his right hand and claimed a loss of earning capacity. During summation, plaintiff's counsel used blackboards to demonstrate to the jury various illustrations of the losses sustained by the plaintiff, including claimed losses of past and future earnings. Id. at 72. The jury found in favor of the plaintiff and awarded $110,000.00 in damages. Id. at 60. The defendant appealed claiming they were not legally responsible for the plaintiff=s injuries, that the verdict was excessively high, and that plaintiff=s counsel's use of demonstrative aids was prejudicial and caused an inflation of the award. Id. at 60. While the Appellate Division agreed that the defendant had been denied a fair trial considering all of the circumstances, the court did not agree with the defendant's arguments concerning demonstrative evidence in general. Specifically, the court took issue with the fact that the numbers plaintiff=s counsel used in his illustrations were not supported by the evidence. Id. at 77. However, the court's opinion made clear that there was nothing wrong with using blackboards or other visual aids, that the use of same is generally accepted and permissible subject to the discretion of the trial court. Id. at 73. In short, so long as the proffered visual aids are reasonable, will assist the jury in understanding the

STARK
&STARK, PC

case or applying the governing law to the facts at issue, and are accurate and not misleading, there is no reason to bar the use of demonstrative evidence. See also, State v. Mayberry, 52 N.J. 413, 435-36 (1968), cert. denied , 393 U.S. 1043, 89 S. Ct. 673, 21 L. Ed. 2d 593 (1969) (there is nothing inherently improper in the use of demonstrative or illustrative evidence).

In State v. Rivera, 437 N.J. Super. 434 (App. Div. 2014) the Appellate Division was asked to review the propriety of a trial judge's decision to permit the use of visual aids, specifically a power point presentation, during opening statement in a criminal trial. The court noted that the use of power points had, at that point, not been addressed by any New Jersey court in any published decision. Citing to the decision of the Nevada Supreme Court in Watters vs. State, 313 P.3d 243, 247 (Nev. 2013) (a power point is permissible in opening if the "content is consistent with the scope and purpose of opening statement and does not put inadmissible evidence or improper argument before the jury."), the Appellate Division held that it is "the content, not the medium, [which] is important. As such, where a court is presented "with a pre-presentation challenge to the use of a PowerPoint in an opening, a court should apply the law governing opening statements" in determining whether the visual aid proffered is proper. Id. at 449. There is no functional difference between a power point, endorsed directly by the Appellate Division in Rivera, supra, and any other form of demonstrative aid. So long as the proffered demonstrative evidence is relevant, pertains to the merits of the case, is not misleading and may be helpful in explaining the controversy to the jury, it should be permitted.

*JBC   (one week before Trial or any attendee)*

**15. JURY TRIALS** - Not later than ~~a date to be~~ determined by Judge Wigenton.

Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

Counsel for each party shall submit to the Judge, with a copy to opposing counsel, 3 written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

4917-2687-0667, v. 1
328625419v.1

STARK
&STARK ℠

Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.

Proposed voir dire are to be submitted to the trial judge.

**Proposed Voir Dire to be supplied by the parties**

16. **NON-JURY TRIALS** - Not later than          .

Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B with citation to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.

**Not Applicable to this Case**

17. **TRIAL COUNSEL** (List the names of trial counsel for all parties).

    a. **Domenic Sanginiti, Jr., Esquire**, of Stark & Stark on behalf of Plaintiff

    b. **Evan J. Lide, Esquire**, of Stark & Stark on behalf of the Plaintiff

    c. **Andrew J. Heck, Esquire**, of Wilson Elser Moskowitz Edelman & Dicker LLP on behalf of Defendants

    d. **James B. Sharp, Esquire**, of Wilson Elser Moskowitz Edelman & Dicker LLP on behalf of Defendants

    e. **Mathew P. Ross, Esquire**, of Wilson Elser Moskowitz Edelman & Dicker LLP on behalf of Defendants

    f. **Gina Brignola, Esquire**, of Wilson Elser Moskowitz Edelman & Dicker LLP on behalf of Defendants

18. **BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).

The issues of liability and damages SHALL / SHALL NOT be tried separately.



43

Plaintiff opposes bifurcation and trying liability and damages separately. Plaintiff opposed Defendants' motion for bifurcation.

Defendants have filed a motion in limine articulating the necessary grounds for bifurcation in this matter.

Judge Wigenton will determine on January 29, 2026, or as soon as possible thereafter.

19. **ESTIMATED LENGTH OF TRIAL**

Plaintiff estimates the trial will take two weeks. Defendants believe it may be closer to three.
Judge Wigenton will determine in due course.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

*/s/ Evan J. Lide*

**ATTORNEY FOR PLAINTIFF**

*/s/ Andrew Heck*

**ATTORNEY FOR DEFENDANTS**

**UNITED STATES MAGISTRATE JUDGE**

DATED  1/29/26

**STARK &STARK**™

4917-2687-0667, v. 1
328625419v.1
328907887v.1