**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

————————————————————

MATTHEW PENSO,                           CIVIL NUMBER:

    Plaintiff,                       2:23-cv-00474-SDW

    v.                               MOTIONS HEARING

PORT AUTHORITY OF NEW YORK        Pages 1 - 60
AND NEW JERSEY, BOMBARDIER
TRANSPORTATION (HOLDINGS)
USA INC., JOHN DOE COMPANY
#1-5 (fictitious name),

    Defendants.

————————————————————

    Martin Luther King Building & U.S. Courthouse
    50 Walnut Street, Newark, New Jersey 07101
    Thursday, January 29, 2026
    Commencing at 2:33 p.m.

B E F O R E:                   THE HONORABLE SUSAN D. WIGENTON,
                               UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

    STARK & STARK, P.C.
    BY:  EVAN J. LIDE, ESQUIRE
        DOMENIC B. SANGINITI, JR., ESQUIRE
    100 American Metro Boulevard
    Princeton, New Jersey 08543
    For the Plaintiff

    WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
    BY:  ANDREW J. HECK, ESQUIRE
    7 Giralda Farms, Suites 100
    Madison, New Jersey 07940
    For the Defendant

        Joanne L. Sekella, CCR, CRCR, RDR
          Official Court Reporter
           sekella@gmail.com
            (908)310-1177

  Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

(PROCEEDINGS held in open court before The Honorable SUSAN D. WIGENTON, United States District Judge, at 2:33 p.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Good afternoon, counsel.

MR. HECK:  Good afternoon, Your Honor.

MR. LIDE:  Good afternoon, Your Honor.

THE COURT:  Let's get started.

This is the matter of Penso vs. Bombardier Transportation, et al.  It's under docket number 23-474.

Counsel, you may enter your appearances, and then we will get started.

MR. LIDE:  Good afternoon, Your Honor.

May it please the Court, Evan J. Lide and Domenic Sanginiti from Stark & Stark on behalf of the plaintiff, Matthew Penso.

THE COURT:  Good afternoon to both of you.

Mr. Heck.

MR. HECK:  Good afternoon, Your Honor.

May it please the Court, Andrew Heck, Wilson Elser Moskowitz Edelman & Dicker, on behalf of the defense.

THE COURT:  Counsel, you may have a seat.  Thank you for being here.

We initially scheduled this as a trial conference.  I did post onto the docket obviously the fact that I wanted to

focus today on certain motions that have been filed, specifically the motions for summary judgment, and plaintiff made a motion for partial summary judgment, and in addition to that, defendants made a motion to bifurcate the trial.

So that's where I wanted to focus our energy today. I know that you have met with Judge Clark, and he has posted a final pretrial order. I know that we have set a trial date of February 11, but I did -- you have been extremely busy, to put it mildly, and have filed a plethora of motions. So I wanted to kind of focus our energy today on the summary judgment motions and to ascertain where we are in that respect.

So I realize plaintiff moved first for partial summary judgment, but I'd like to address defendants' motion first, which is docket entry 153, and then go from there.

So I will hear from you first, Mr. Heck. And one of the things that plaintiff raises is that this motion really attacks, obviously, the validity or reliability of Mr. Noonan, who is plaintiff's expert, and that that was improperly raised in connection with the summary judgment motion.

So if you could talk to me a little bit about that just in terms of timing.

I read Judge Clark's order to say that all *Daubert* motions were to be filed at a certain time, and I know there are issues about other *Daubert* motions that got filed subsequently. Not my concern for now, but I did want you to

just incorporate for me, if you will, the aspect of Mr. Noonan.

MR. HECK:  Certainly, Your Honor.

To the extent Judge Clark's scheduling order, as Your Honor alluded to, suggested that, as I read it, the dispositive motions and related *Daubert* motions were to be filed on 12/31, I didn't see a way, practical, other than to include them.  One certainly speaks to the other if my main point in my dispositive motion, at least in large part, is that Mr. Noonan's testimony as plaintiff -- as a liability expert is a required element of proof for plaintiff to prove a liability case as to either of my clients.  Without moving to bar him, I didn't see how one could support the -- one could proceed without the other.

Given Judge Clark's scheduling order, it seemed, though, it would be sharp practices to file two separate motions returnable the same day and hold myself to a one-page limit rather than two.  To include both of those arguments in the same filing seemed to be the most practical way to present that to the Court.

THE COURT:  Okay.  So you can go ahead now and just sort of pivot for me, if you will, just into the merits of your application for summary judgment.

I would note that I have read, obviously, the motions and the papers that were associated with the motions,

including your certification, which included a number of exhibits to it, Mr. Heck.

But to the extent you want to elaborate further on that, I will certainly hear from you.

MR. HECK:  Thank you, Your Honor.  And I will not belabor the Court with repeating the niceties of the briefing, since Your Honor has already obviously read the papers.

The first element of the brief writ large would be the fact that -- and I believe it's fairly uncontested, that the AirTrain constitutes a product within the meaning of the New Jersey Products Liability Act.  It is a driverless automated people mover system.  I think "train" is potentially a misnomer.

When you think "train," you think Mr. Conductor. That is not the case here.  There are two certified operators in the control room who are monitoring screens and alarms, but this is a product in the classic sense of the word.

We cite cases in our papers dealing with whether they are paper mills or in fact automated people mover cases from other jurisdictions that have been considered products.  It doesn't appear that issue has been decided within the Third Circuit previously.

But assuming the lack of dispute as to the fact that the AirTrain at Newark constitutes a product, it is my position that the New Jersey Products Liability Act provides

the exclusive remedy for a harm caused by the purported misbehavior or -- I won't go as far as to say malfunction, but at least that's the allegation of that product.

There is case law within, most notably and most highly dealt with, the *Sun Chemical* decision in the New Jersey Supreme Court, Third Circuit, where the gravamen of the case, what the heart of the case really is whether or not the product malfunctioned. And that case dealt more with consumer fraud and whether that could standalone with a products claim.

But in this case, the claim is Mr. Penso is riding on the AirTrain. The AirTrain, as plaintiff's complaint is replete with, malfunctions and causes Mr. Penso injury.

This is exactly on course with those cases where you cannot have a negligent maintenance case that goes right alongside the products case. It is a function of whether there can be established to be a negligent -- I'm sorry, a deficient manufacture, deficient design or improper warning.

So with that said, it is the defendants' position that plaintiff's expert, Mr. Noonan, his testimony should not be admissible under several reasons.

Number one, he cannot identify the problem with the train. We took his deposition. Mr. Noonan provided candid testimony to the effect that he doesn't know whether the loss of PMA, the permissive movement authorization, which is what permits the train to move forward out of its default stopped

position -- he can't tell us whether that's a train issue or track issue.

He wants to point to 45 instances in the 30 days preceding the incident with Mr. Penso for why Alstom -- I'll say Alstom, not the Port Authority -- should have been on notice of this, but he candidly concedes he can't draw linkage between any one of those incidents and our date of loss.  They are different items -- different areas of the track, different dates, different trains.

Mr. Noonan further attempts to hold a work order out for this portion of the track that says some weeks prior there were resistors that needed to be modified.  And that bottom of that work order further then says that work was completed to that area of the track three months later.

Well, the problem with that, according Mr. Noonan, the plaintiff's liability expert, is he has no ability to say the condition when that work order generated was the same as on the date of loss or several months later.  All he can tell you is that the resistors were changed that day and that day. There is no ability to draw a line between the two.

So that precludes the idea that Mr. Noonan has an opinion on this case as to what caused the permissive movement authorization to be lost.

Rather, Mr. Noonan has an opinion that the Alstom maintenance program, which he reviewed in length, of which he

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

finds no fault -- there is not an item that he said was missed.  There is not an item that was not included on the list of things to do that he said ought to have been on that list.

He says, based on no standard whatsoever aside from his own personal standard, that Alstom should have essentially shut down the AirTrain system to find what is not even as sufficient to say needle in the haystack.  He doesn't know if there is a needle.  Go look in the haystack and find something.  I don't know what it is.  I don't know how long you have to look for it.

But because of these 45 instances, which there is no linkage between that, any one instance and the date of loss, you should have shut down its entire AirTrain system until you found something.

I don't know what it is, don't know if there was something to find, but that's Mr. Noonan's opinion in a nutshell.

THE COURT:  You make a more basic argument, though, I think, as well as it relates to the complaint and how it's pled.  So it seems like obviously you are saying if in fact it is determined that it is pled to assert a Product Liability Act claim, they have not proven these things, obviously, and they can't do it with Mr. Noonan.

Talk to me about that aspect of your argument, that

the complaint does not accurately or adequately assert a claim.

MR. HECK:  Certainly, Your Honor.

The complaint speaks only in terms of negligent maintenance and operation.  It does not speak to there being a Products Liability Act claim whatsoever.

We briefed, obviously, the Products Liability Act application to the extent the Court would be inclined to permit that amendment.

And moreover, to the extent the Court is inclined to move past my preemption argument under the Products Liability Act and then permit them to argue negligence, but --

THE COURT:  You make all the alternative arguments.

MR. HECK:  Sure.

The initial point, Your Honor, is correct.  There is no products liability argument pleaded.

So to the extent that is clearly something that could have been pleaded from the outset of this case, it has not been.  So to the extent the Court is inclined to find the preemption argument persuasive, that is an independent basis in and of itself to grant my application.

THE COURT:  All right.  And if you will be kind enough to just sort of talk to me a little bit about the Port Authority aspect, because I understand Alstom is the manufacturer, and this is a system that does not utilize any

*Proceedings recorded by mechanical stenography; District of New Jersey*

human to run the system or anything like that.  So this is all essentially an electronic situation.

But the Port Authority's role.

MR. HECK:  So the Port Authority is essentially -- it's a premises liability defendant.  For the Port Authority, you know, to simplify terms, owns the airport and contracts Alstom to operate the AirTrain for it, to maintain the AirTrain for it.

So to the extent there is a dangerous condition on Port Authority's property that plaintiff suggests is the AirTrain writ large, then the question becomes does Port Authority have notice of that condition?  I'd suggest the answer to that has not been established.

And to the extent argue -- hypothetically, there was notice and there was a dangerous condition, then the question would be whether Port Authority's retention of Alstom to maintain, repair, operate the AirTrain was unreasonable. There has been no proofs put forward that the retention of Alstom was an unreasonable act.

Certainly, "reasonable" is typically a jury question, but there has to be something other than the outcome for the jury to base their determination on of whether the retention of Alstom, the entity by way of successorship, to design, build, install, and has been responsible for this AirTrain since its inception in the 1990s, was an unreasonable way to

square that circle.

THE COURT:  Very well.  All right.  Anything else you want to add, Mr. Heck?

MR. HECK:  Specifically on the Port Authority piece, Your Honor, Port Authority -- the testimony from the corporate designees in this case was pretty unequivocal between Mr. Nazid and Mr. Martin that Port Authority relies on Alstom to -- as their subject matter experts on the automated people mover question.

To the extent there is documentation that is provided from Alstom to Port Authority on a monthly basis, Port Authority has provided uncontroverted testimony that Port Authority does not have the technical wherewithal to do anything beyond read the reports they are given.

The analysis, the alarms, and the codes, and all the niceties that are the hundreds of thousands of pages that have been produced in this case on questions of liability are beyond the canon of the Port Authority's operations folks. They rely on Alstom to do the interpreting.

Certainly, Your Honor, any other issues discretely raised on the papers, I am happy to address any questions.

THE COURT:  I do not, thank you.

MR. HECK:  Thank you, Your Honor.

THE COURT:  I will hear from plaintiff's counsel.

MR. SANGINITI:  Well, thank you, Your Honor.

May it please the Court.  Your Honor, I think initially let me just address the Mr. Noonan situation, and then I can kind of move into the rest of that --

THE COURT:  Sure.

MR. SANGINITI:  -- if that works best.

So initially, the Mr. Noonan pieces really -- it's a *Daubert* motion.  They filed a *Daubert* motion with the idea to make it into a Rule 46.

But I just want to highlight to the Court as a reminder, *Daubert* is about methodology, not conclusions, right?  Mr. Noonan relied on data.  Data directly from the defendants in this case.

So it comes -- the string charts, the foreman pass-downs, the maintenance logs.

So Mr. Noonan's data and conclusions are refined in fact.  In fact, they are refined in fact from the defense.  So any argument that it's based on some conjecture, some random opinion is improper.

Because it's not about the methodology here.  It's about the facts that he has from the defense.

THE COURT:  But it's also about the conclusions he reaches.  Is it not?

MR. SANGINITI:  Your Honor, it would be, but it would be about the conclusions that he reached based on the data.  So long as the data can be -- the conclusions can be reached

by a competing expert with the same data, you have a proper methodology.

It's not that Mr. Noonan is taking this data and using it in some other way or some novel way to come up with some conclusions.

Here --

THE COURT:  But I think that's part of the argument, that he doesn't really come up with any conclusions.  Like, he doesn't do testing of certain things.  He doesn't talk about when it says that it abruptly braked or it abruptly stopped.  There is nothing about sort of the speed of that braking or anything, and that it did in fact operate within acceptable limits, so...

MR. SANGINITI:  And, Your Honor, let me kind of address that, for example.

So the defense in this case has argued that this train was tested a month prior.  But it was tested under different conditions.  The two trains were operating at completely different speeds, and one was a testing track and one was an operations track, right?

So we have two entirely separate and different operations that we are arguing.  Essentially, they are trying to say it's the same, and we are saying, No, it's different. It's a different operation.

And what Mr. Noonan actually did say was that the

improper issue here is the emergency brake, right?  If you lose signal, then the option is to have -- recover that signal --

THE COURT:  So what does he say was wrong with the break?

MR. SANGINITI:  It was that the process was designed to have an emergency brake when you lose the signal.

THE COURT:  Okay.

MR. SANGINITI:  In essence, Your Honor, it's a very simple product case in that Mr. Noonan says if you lose signal, you shouldn't have an emergency brake because there is an unexpected, abrupt stop.

Mr. Lott, the defense expert, just says if it loses signal, that's a way to bring the train under control.

So Mr. Noonan's opinion here is the emergency brake is improper, so it's an improper braking is what I believe he refers it to.

THE COURT:  When you say "the emergency brake is improper," like, I mean, elaborate on that, because is that emergency brake -- is that the cause of what happened that day with Mr. Penso?  Or is that -- because his testimony in the deposition didn't seem to conclude that.

MR. SANGINITI:  Okay, so the issue, right, is as when you have this signal failure, there is no backup.  And instead, it goes signal failure and then an automatic -- it's

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

like a light switch emergency brake to bring the train under control.

THE COURT:  Which it should have.  He testifies that it should have that feature.

MR. SANGINITI:  It should have a feature, correct. But the idea behind that is that there would be something else, meaning if you know you are having this signal loss and you have 45 other signal losses -- in fact, you have that block where our train loses signal, was worked on related to the signal loss -- then you are aware that if there is signal loss, you are going to be having these abrupt stops for your passengers that are not expecting it.

So in essence -- and this -- Your Honor, this is where we get to some of the case law, and we can talk about *Scanlon* and we can talk about *Myrlak* -- I think I am saying that right, Your Honor.  I apologize if I am not.

But the premise is this is a very complex system. This is not necessarily your simple design of a battery.

But instead here, the defendants maintain full control and all operations so the premise that we can't do a root cause analysis when we are involved, well, you are right. But we can at least identify, and we have been able to identify from the data, the stoppage.  We are able to identify what caused the stoppage.

So Mr. Noonan's conclusions are all based on the

facts that we were able to get from the defense.

THE COURT:  But part of your argument as well is that you couldn't get everything, so he couldn't do a fulsome testing and/or analysis to issue or include that in his report.

MR. SANGINITI:  Yes, Your Honor.  What I would argue is that while I don't think it's even needed in this situation, to the extent that this Court would like to know additional information, that's all in the possession of the defense.  And the plaintiff has only operated with everything that it has been given.

But key and important to it is, based on what we have, we can show the defense had notice of this issue, knew of a problem, and failed to fix it.

We can also show Your Honor that the defense employees testified that there was an issue, and a root cause analysis should have been conducted.

Now, had -- with the root cause analysis had been conducted, we would be sitting and have a very different conversation.  But the defendants didn't.  And that's why we have to go to the indeterminant product function or product liability claim where we can't identify the specific sensor or the signal, but instead we can identify about what happened, right?  The theory, there was a malfunction; the malfunction was completely within the control of the defense -- they kept

*Proceedings recorded by mechanical stenography; District of New Jersey*

all of the data -- and in reality, it was something that was not supposed to occur.

THE COURT:  So how does that scientifically help a jury?  Because as you said, it's a complex system.  How does that help the jury if your expert cannot determine exactly the cause and says that they didn't do a root cause analysis and therefore we don't know, but these things happened beforehand. Like, why is the expert needed?

MR. SANGINITI:  Great.  So, Your Honor, the expert is absolutely needed to talk about the train function, to talk about why the emergency brake would be improper under this sensor failure issue.

The expert is important because the expert is going to have to be able to go through the string logs, the foreman pass-down reports to show the notice that the defendants had from this incident.

THE COURT:  Well, the defendants also argue that some of these notices occur in different parts on the tracks and different things like that, so it's not sort of apples to apples in the sense that it happened at the exact same place, exact same time several days before or some period of time before.  There are some sort of nuances in that regard.

MR. SANGINITI:  And that is very fair, Your Honor.

What I would say, though, is that seven of those incidences are Train 8, which is the subject train.

So to kind of bring Your Honor back to, well, why would the jury want to hear from Mr. Noonan, right?  Well, Mr. Noonan is a train expert.  And Mr. Noonan can opine and can give the factual evidence -- or excuse me, factual conclusions based on data.

This isn't based on an unknown methodology where he came up with data.  This is actually just us taking data from the defense and showing them the data.

So we don't -- Mr. Noonan doesn't have to have a complex opinion that needs to be tested here.  Mr. Noonan just has to be able to explain why the data that is from the defense is relevant and how he was able to utilize that to come to this conclusion that the malfunction was the system as it was designed.

So that when you lose a signal, once -- that signal loss, there should be a backup program prior to an emergency brake.

THE COURT:  Okay.

MR. SANGINITI:  Your Honor, I am not sure what other pieces you were ...

THE COURT:  You said, I am going to start my argument with the Noonan piece.  That's what you said.

MR. SANGINITI:  That's exactly it, Your Honor.

THE COURT:  That's what you said, so what's your next piece?

MR. SANGINITI:  I apologize, Your Honor.  You are so right.  I apologize.

So, Your Honor, one of the most important things is, was this tram designed reasonably fit, right?  And that's one of the questions that absolutely becomes a jury question.

Now, we have heard two different things.  We have heard about the Product Liability Act, and we have also heard about negligence, right?

Product Liability Act, to the extent that a failure to warn claim was asserted, sure, that would be subsumed in the Product Liability Act.

But the design case, which Mr. Noonan talks about as to the improper design of the system so that the system loses signal and brakes, that's one thing.  But the second piece to it is the negligence piece.  It's the fact that these defendants had this issue, seven prior --

THE COURT:  Isn't that exactly what the Product Liability Act was created for, is that you don't have those two things.  You have product liability and the theories that fall under product liability, or you have a case that has negligence.

So it seems to me like you essentially concede and agree that the Product Liability Act would apply.  Fair?

MR. SANGINITI:  No.

THE COURT:  You don't?  That's what your brief says.

MR. SANGINITI:  Your Honor, I think what I am saying is Product Liability Act applies and negligence applies.

THE COURT:  So then let's go back.

You do agree the Product Liability Act applies?

MR. SANGINITI:  Applies to the design claim, yes.

THE COURT:  The design only?

MR. SANGINITI:  Well, it would apply to the design; it would apply to the warning.

But it would not apply to the basic general negligence claims against the defendant.

THE COURT:  What is the basic general negligence claim?

MR. SANGINITI:  It's that they had a train that had issues, they failed to maintain it properly, meaning the warnings -- excuse me, not the warnings -- they had issues with this train before, and they kept it in service, knowing that someone could be injured from this train.

So your design is separate from the actual actions of the defendants in how they are taking care of the train.

THE COURT:  Okay.  All right.

What else do you want to add?

MR. SANGINITI:  Your Honor, I think that, you know, to go to *Scanlon*, I think that we at least at minimum have evidence that something was wrong.  And as *Scanlon* teaches us, *Scanlon* shows that when we have a complex system, it's

maintained completely within the control of the defense, that summary judgment would be improper under the circumstances.

Take that with *Myrlak,* and I do think under the circumstances, summary judgment would not be proper as to the plaintiff when it comes to the Product Liability Act.

THE COURT:  So I want to look at your complaint, okay, because at the end of the day, what we are always governed by and have to be bound by is the complaint that has been put before the Court.

So let's look at your complaint, because I would like to know what counts are set forth in your complaint that support the claims that you have even argued here today and/or that you have put in your summary judgment opposition.

MR. SANGINITI:  All right, Your Honor.

THE COURT:  You don't have it?

MR. SANGINITI:  I don't have a copy of my complaint with me.

THE COURT:  Look, Mr. Lide is there.  He is getting ready to go right to it.  It's document number 1.  It's when the case got removed to this Court.

MR. LIDE:  Is there a Wi-Fi password?  I apologize.

THE COURT:  It should be on the table.

Mr. Heck?

MR. HECK:  To the extent counsel is pulling the complaint up, I defer to Your Honor, should I respond to any

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

of Mr. Sanginiti's points during the downtime while they are pulling this up, or do you want me to sit down and be quiet?

THE COURT:  That was very artfully stated.  I would wait.

MR. HECK:  Thank you, Your Honor.

THE COURT:  I am going to ask my law clerk to print another copy.

Do you have a copy, Mr. Heck?  Do you want a copy as well?

MR. HECK:  I should be able to pull it up.  I don't -- I have nothing but briefs in front of me, Judge.

MR. SANGINITI:  We only brought the briefs.

THE COURT:  She is going to print a couple copies.

MR. SANGINITI:  I apologize, Your Honor.

THE COURT:  No worries.

MR. HECK:  And just to correct the record, Your Honor, I do have e-mails that were not produced for confidentiality purposes, but I do have more than just briefs.

THE COURT:  Okay.  That's important.  That's very important.

I will go off the bench for a minute.  Let me just let her get that because I want you to have an opportunity to refer to the complaint.

THE COURTROOM DEPUTY:  All rise.

(A break is taken from 3:01 p.m. to 3:07 p.m.)

THE COURT:  All right, counsel, we will resume.

Ms. Kim was kind enough to give counsel a hard copy of the complaint.

I wanted to just go back to the complaint, and I do recognize -- Mr. Sanginiti, I recognize that your firm didn't do the complaint.  I get that.  But you inherited the case; you substituted in, et cetera.

Going through that complaint, tell me where these claims are pled.

MR. SANGINITI:  All right.  Your Honor, what I would initially say and would concede that the term "Product Liability Act" is not in the complaint.  What I would say, though, is that the basis for a product liability claim is pled.

THE COURT:  All right, tell me where.

MR. SANGINITI:  All right, so where we talk -- or excuse me, where the complaint specifically talks about various different things, for example, let's just talk about Paragraph Number 55 from Bombardier.  Bombardier controlled the air tram.

The next one, Bombardier managed the AirTrain.  Bombardier repaired the AirTrain.  Bombardier failed to properly repair the tracks on the air tram, was responsible for repair and maintenance.

So each of these allegations in theory, certain of

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

them I would say fall under the Product Liability Act.  And then the other thing is, what I would say, Your Honor, is I think some of this complaint actually bleeds negligence, product liability together, which makes it, I would say, a little bit confusing to the reader.

THE COURT:  No, I agree.  There is not a single count in the complaint.  It doesn't exist.  I mean, it's just a narrative of things.  Things.  Because there is not an issue here that the tracks had an issue, there was a problem with the tracks, right?

MR. SANGINITI:  So, Your Honor, plaintiff is not making any allegation as to the track.  Absolutely not.

And, Your Honor, respectfully, sometimes in the course of litigation, certain things are pled that don't actually end up getting proved to the jury.

THE COURT:  All the time.  All the time.

MR. SANGINITI:  Right.  But within that context, it doesn't mean that the claim doesn't exist.  It just means that maybe certain pieces of what we thought we would be able to prove we cannot.

THE COURT:  All right.  Help me understand that.

MR. SANGINITI:  Sure, Your Honor.

For example, so in this case we are making this allegation and our expert opines that the train's design was an issue, meaning that when you have a permissive movement

authorization and you know you are going to lose signal, you shouldn't have an emergency brake.

It's the plaintiff's position that that does go to a jury.

Now, the fact that there is a track allegations in the complaint, if -- that's just not relevant at this point, so it would not be something that would be discussed because it's not in the expert reports. There is no -- there is no nexus to the claim that plaintiff's asserting and the tracks at this point.

THE COURT: Let's focus on Bombardier, also known as Alstrom, which starts in Paragraph 42 of the complaint.

MR. SANGINITI: Yes.

THE COURT: And so as I see it, okay, and perhaps you can tell me differently, Mr. Sanginiti, it basically says Bombardier, just like it alleges with the Port Authority, owned the premises of the airport, owned the AirTrain at the airport, owned the tracks used by the AirTrain. They were a lessor, and then it says they were a lessee.

Like, none of those things are really an issue for us now. Would you agree?

MR. SANGINITI: Your Honor, I would say that some of them are not relevant at this point in time in the case.

THE COURT: Okay. And so you continue on that they maintained the premises of the airport. That's obviously --

and I say all of this to say, without question, when you plead a complaint, you are putting everything out there because you don't know.  You have to go through discovery.  You have to make a determination as to what claims are viable, what claims are not.  You may have to amend the complaint to add things and/or remove certain things.  You may have to amend the complaint to add parties and/or remove other parties.  Like, that's the nature of litigation.

MR. SANGINITI:  Absolutely, Your Honor.

And, Your Honor, just to share, before our firm was brought into this case, there was some pleadings related to potentially amending the complaint, and it didn't go forward at that time.

THE COURT:  No, they made the motion.  That was in 2024, to add a count of -- for punitive damages, which it is not a count.

MR. SANGINITI:  It's a different count.  I don't know -- I guess we have a one-count complaint.

THE COURT:  That's exactly what you have.

MR. SANGINITI:  Your Honor.

THE COURT:  It's not ideal.

MR. SANGINITI:  Your Honor, there is no doubt, and I concede to the Court.

THE COURT:  It's not ideal.

MR. SANGINITI:  It's not ideal.  It's not ideal.

But I will remind the Court that this was filed in New Jersey state court where it's a notice pleading, right, and sometimes the notice that we are pleading, sometimes we don't end up having to plead to the ultimate jury at the end of the case, right?

THE COURT:  Right, "but."  That is all true, but the claims that you are now at summary judgment and you are arguing, it's difficult to find them in the complaint.

MR. SANGINITI:  Your Honor, I would kind of agree with you on that.  I would suggest that maybe we can't find a Product Liability Act claim pled.

But, Your Honor, I would suggest that we have no doubt that we have negligence pled here.

THE COURT:  Right, but then you have the other problem, which is that the Product Liability Act subsumes the negligence claims.  I know you don't agree with that fully, but...

MR. SANGINITI:  Your Honor, I would agree that the Product Liability Act assumes -- subsumes certain product -- like, product-related claims, but it does not go to exactly the other issue, the maintenance, how they were operating the system, which is precisely what was inartfully pled, Your Honor, in the initial complaint.

So if we had only had a failure to warn -- let's just, for argument's sake today, Your Honor, say we have this

*Proceedings recorded by mechanical stenography; District of New Jersey*

complaint and those other allegations were only failure to warn. Well, that would go right within the Product Liability Act, right?

But that's not what we have here. We actually have just general maintenance negligence, and that's what's pled inartfully.

THE COURT: Right, but you are saying that Mr. Noonan is the expert to rely upon to say that the maintenance was insufficient.

MR. SANGINITI: I would take it two spots, Your Honor. I think that we can use Mr. Noonan to talk about the design, which would be under the product liability umbrella.

THE COURT: But Mr. Noonan doesn't proffer an alternative design.

You agree with that, right?

MR. SANGINITI: Actually, Your Honor, I would disagree, because what Mr. Noonan says is that the emergency brake was improper.

THE COURT: And therefore they should have done what?

MR. SANGINITI: Not had an emergency brake --

THE COURT: At all?

MR. SANGINITI: -- that lose the signal. And I don't think that's in dispute. I could be wrong, but that's just my belief.

THE COURT: Okay. All right. Go ahead.

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

MR. SANGINITI:  I know we were chatting about something else just before that.  The negligence claims, right.

So the negligence claims, Mr. Noonan, as a train expert, similar to Mr. Lott, as a train expert, can talk about the fact that they took this train out of service, they had these prior issues.  Mr. Noonan can talk about the fact that this train was subsequently readjusted immediately following this incident.

So they had them make adjustments to put this train back into service following this emergency braking event.

So, Your Honor, I would respectfully state that while the Product Liability Act claims aren't artfully pled, I do think negligence has been pled sufficiently, and I think that there is a sufficient standalone claim of negligence here against the defendants, which is pled properly and which Mr. Noonan can testify to in front of a jury.

THE COURT:  Okay.  Now, you would agree as well, Mr. Sanginiti, that the report or affidavit that was submitted by Mr. Noonan, along with the opposition, is not something that can be relied upon as it relates to his reports that he has already submitted and issued in the case.

MR. SANGINITI:  Well, I would say it's a sworn affidavit, so I think that in reality, he could be questioned upon it, Your Honor.

THE COURT:  It's a report, though, technically.

MR. SANGINITI:  I'm sorry?

THE COURT:  It's another report that he is issuing. Like, why -- they have already deposed him.  He's already issued several reports.

MR. SANGINITI:  I would suggest otherwise, Your Honor, and here is why.

I actually think that we can look at more as what I would call a "clarification" of the way that the defense has framed the issues.

So I think it's just a clarification of their framing.

THE COURT:  Okay.  That's a lovely way to look at it. Not a likely way for it to be considered, but a lovely way to look at it.

Anything else you want to add, Mr. Sanginiti?

MR. SANGINITI:  I have nothing else, Your Honor.

THE COURT:  All right, thank you.

Mr. Heck is about to explode.

MR. HECK:  Taken in reverse order, Your Honor, as Your Honor referenced, the Noonan submission, along with the opposition to defense's motion, is not a sworn affidavit. There is no suggestion that it was signed under penalty of perjury.  It does not pass muster to constitute an affidavit or averment, so it should not be considered in the opposition

to the summary judgment motion, notwithstanding that it's a late report.

THE COURT:  And it's post the deposition of Mr. Noonan and all that as well.

MR. HECK:  Yes, it's late on every metric one could find.  It is late and not sufficiently under penalty of perjury to be considered.

With respect to the idea of the *Daubert* challenges to Mr. Noonan, I think *Daubert* gets used as a bit of a shorthand. The challenge to Mr. Noonan's admissibility is not so tight as to only be to his methodology.  *Daubert* analysis and 702 analysis factors in the fit of the expert's opinions to the facts of the case and the usefulness thereof by the jury.

To the extent we are making the net opinion argument in addition to the methodology argument, that is something that goes to admissibility and is not strictly related only to his methodology, which, although we find that lacking, it is a separate analysis.

On the issue of *Scanlon* that was addressed with respect to the -- under the Products Liability Act the potential for the inferential defect is kind of the basis for *Scanlon*.

Well, one of the key elements for *Scanlon* is that there needs to be a lack of other potential cause for the incident in order for that inference to be proper.

*Proceedings recorded by mechanical stenography; District of New Jersey*

One of the major factors that is identified by Scanlon is the age of the component and whether or not natural progression of the component or a system or a product is an alternate explanation.

This thing has been in operation since 1996.  And without being able to identify the specific component that went sideways, so to speak, then Mr. Noonan cannot possibly have an opinion that this specific incident was caused by any specific component to rule that question out.

As to the abrupt stoppage, there has been no real argument from Mr. Noonan that the rate of deceleration on the test track, which is the only data available, is somehow not reliable to substantiate what the rate was that day.  There has been no suggestion that XYZ task of maintenance would have been materially altering that rate of deceleration.

To the extent that is the best data there is, there is no suggestion it's not reliable data on the deceleration.

And then lastly, Mr. Noonan explicitly declined to offer a design opinion during his deposition.  I think I asked the exact question, Do you have an opinion on design?

And he said no.

So to the extent Mr. Noonan is now being offered to offer a design opinion I think flies in the face of his deposition testimony.

THE COURT:  So are you suggesting, Mr. Heck, that

when Mr. Sanginiti argues that Mr. Noonan indicated that it should have had -- it should not have had this braking component, I guess, as it relates to the stoppage, that he did not testify to that?

MR. HECK:  My recollection, Your Honor, and my interpretation of Mr. Noonan's testimony was that he had no problem whatsoever with the operation of the system.  He took issue with the fact that PMA was lost and the brake needed to happen.

He didn't have an argument about the brake happening. And I don't recall him offering any testimony that there should have been some backup system or some alternate design. Certainly, there has been no alternate feasible design proffered by plaintiff to try to establish a design claim, which is firmly and squarely within the preemptive scope of the Products Liability Act, not a standalone negligence claim.

THE COURT:  Do you want to address, right -- Mr. Sanginiti sort of went into the -- what he believes is the applicability of negligence being properly pled in their complaint and how it would somehow be in this case alongside the Product Liability Act?

MR. HECK:  As Your Honor alluded to, the first 109 paragraphs of the complaint deal with the assertion of various facts or allegations as to, in order, the Port Authority, Bombardier, and then fictitious pleadings.

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

Once we get to Paragraph 110, we get to the actual application of those facts and any legal direction.

And it clearly says, well, number 111, that the train instantaneously went into reverse, causing the claimant to be violently thrown about.

Mr. Noonan says that didn't happen.

And then it goes on to say that the train -- this is Paragraph 114 as an example -- was in a defective condition.

And that as a result, in Paragraphs 115, 116, 117, 118, plaintiff sustained injury.

113, there is a destructive dangerous condition.

So to the extent plaintiff's complaint is complaining of injuries caused by the train, they are complaining about injuries caused by the defective condition of the train, which is what puts it in the products liability bucket.

THE COURT:  Very well.

MR. HECK:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Heck.

All right, so what I would like to do is now to pivot to your motion, Mr. Sanginiti or Mr. Lide, as it relates to partial summary judgment.

MR. LIDE:  Thank you, Your Honor.  When we divided these up, I think I got the easier ones today.

THE COURT:  Okay.  Probably so.

MR. LIDE:  So we move for partial summary judgment on

three very narrow issues, Your Honor.  The first is the common carrier duty, that the AirTrain defendants should be considered common carriers as a matter of law.

We also requested that the *res ipsa loquitur* is available and the jury should be instructed on it, and that the plaintiff's CRPS is proximally caused by the December 15, 2021, AirTrain incident as a matter of law.

THE COURT:  Which you don't have to go into, because as you know, I am not focused on the injury.  So that aspect, we did not need to do.  The *res ipsa* part as well was more focused on a jury instruction and whether that would be applicable.  Obviously, it would be premature for a ruling on that.

And quite frankly, I don't know that we'd ever get to a *res ipsa* jury charge just based on everyone's agreement that this is a complex system.  So it's not just automatically that "Something happened; it therefore must be something wrong."

So talk to me, I guess, about the other aspects of the motion.

MR. LIDE:  The common carrier, Your Honor?

THE COURT:  Yes.

MR. LIDE:  So we will start pretty simply.  The exhibit we provided Your Honor shows that Mr. Penso bought a ticket.  He bought that ticket, and what does that ticket give him?  It gives him a promise of safe passage from Point A to

Point B.

Under the law, very clearly, I think the defendant should be considered a common carrier. *Maison vs. New Jersey Transit Corp.* Interestingly, Your Honor, I was actually amicus counsel on this case in the appellate division, not in the Supreme Court. And it's a fabulous decision by Justice Albin. And Justice Albin points out in here that there are two definitions of what a common carrier is. There's the definition under the common law, and then there's the statutory definition.

The definition under the common law, the common law has described common carriers as entities or persons that hold themselves out to the public as being in the business of transporting passengers.

So let's look at that first. I think that clearly the AirTrain, tram, whatever you want to call it, it's clearly holding themselves out to the public, and they are in the business of transporting passengers. So I think under the common law definition, I think they clearly meet that.

Then there is the statutory definition that *Maison* also talks about as well, also referenced in *Lieberman,* where the statutory definition of "common carrier" includes an individual, corporation, or public agency, quote, "operating motor busses or rail passenger service on established routes within the state or between points in the state and points in

adjacent states."

You know, so I think -- under both definitions, I think the AirTrain meets the definition of a common carrier because it's a corporation that is operating rail passenger service on established routes within the state and between Point A and Point B.

When you look at the rationale as to why -- and so let's look -- because I think the rationale is important because it's clearly a heightened standard.  It's a higher duty that these common carriers owe to the public, and the reason for that is the common carrier has committed to his trust and the safety and lives of people, old and young, women and children, locked up in the coach or railcar, ignorant, helpless, having no eyes, ears or power to guard against danger, who look to him for the safety in their transportation.

I think that's more apparent in a driverless one too, so, yeah, the common carrier applies if you have a bus driver or a train conductor, but even more so when it's a driverless one because it's that trust.  We are inviting the public into this, and so as a result of that, they are held to that higher duty of care because of that.

THE COURT:  How does that play in, then, with the whole aspect of the product liability?  Like, what is the assertion that the Port Authority did or failed to do as it

*Proceedings recorded by mechanical stenography; District of New Jersey*

relates to Mr. Penso's injury?

MR. LIDE:  Well, the defense likes to say, Oh, it's just Alstrom; we are the ones running this.

But not out to the public.  I mean, what does the public think?  The public looks at it's the Port Authority.

So, you know, you want to call it "doctrine of parent authority," whatever, joint venture, whatever.  I mean, the Port Authority is equally responsible for the -- for its AirTrain.  Yes, it's contracted out with Alstrom to run it in certain parts, but overall, even though defense counsel said they might not have the knowledge on how to do it specifically, they still own it and they still control it, and so they still oversee it.

THE COURT:  So in the course of a trial, how do you address what happened with the AirTrain and what Port Authority's responsibility was?  How do those -- and Alstrom, how do they all play a part?

MR. LIDE:  It's almost -- it's a joint venture, Your Honor.  They are all involved in this.  They all have responsibility for safety for these passengers.

You know, interestingly, the caselaw talks about the Port Authority when it's an assault.  And that's different.  They would not be held to a common carrier in the buildings itself.  *Maison* actually was an assault on a New Jersey Transit Bus, so because that happened on the bus in between

Point A and Point B and prevented safe passage for that passenger, they were held to be a common carrier.

If this was Mr. Penso got assaulted at the Port Authority building, they would not be held to the common carrier because that clear -- you know, there is no transporting passengers in that.

But in this situation where Alstrom and the Port Authority are both holding themselves out to the public as -- you know, as the enterprise here, as running this, I think that they should -- you know, the jury should be told and held accountable accordingly.

THE COURT:  All right.  So at the end of the day, while it's a summary judgment motion, there should really, more or less, for a jury -- or a charge to give a definition of "common carrier" to some degree anyway.

MR. LIDE:  I think the important thing -- and I do think the Court can say, These defendants are common carrier. We are going to deal with the charge, you know, as we go through the case and see what evidence is there.

But I think -- I think there is enough here -- he bought a ticket -- that we can say at least Alstrom, I think the Port Authority as well, can be held accountable.

THE COURT:  So do we have to have at least -- is there a part of the case where there has to be proof by the plaintiff that there was something wrong with the train?  Or

*Proceedings recorded by mechanical stenography;*
*District of New Jersey*

it doesn't matter?

MR. LIDE:  For the negligence, sure.  But --

THE COURT:  Or the product liability.

MR. LIDE:  Yes, I think so.  But I think as a threshold issue, we can still say this defendant is a common carrier.  We are going to look at the negligence through the course of the case and what facts and evidence we are going to put on, but as a threshold matter, when you buy -- I mean, I think it's as simple as he bought a ticket.  When he bought that ticket and they sold it to him -- and they hold themselves out to the public:  They are in the business of moving passengers -- under the law, I think very simply they become a common carrier.

THE COURT:  All right.  Very well.  Thank you, Mr. Lide.

Mr. Heck.

MR. HECK:  Thank you, Your Honor.

May it please the Court.  On the common carrier question there -- I do -- I listened to counsel's argument and I read the papers.  I fail to see any argument for why the *Lieberman* decision from New Jersey Supreme Court that explicitly says, "The Port Authority is not a common carrier as a matter of law" should be disregarded.  The highest court of the State of New Jersey has spoken on that question.

The distinction of how and where and why the injury

in the *Maison* case or in another case happened is immaterial.

The fact of the matter is Port Authority is not a common carrier.  Period.  That's the *Lieberman* decision.

With respect to Alstom, the fact that the Products Liability Act preempts any negligence claim renders the entire question of common carrier moot.

If there is no negligence claim because the product liability claim preempts all negligence claims, then it doesn't matter what negligence -- what duty of care under a negligence rubric would be applicable.  The entire question is put to the side by the Products Liability Act.

To the extent plaintiff bought a ticket to access the Rail Link Station of the AirTrain from NJ Transit, it's -- it is not that the AirTrain and Alstom, by operating the AirTrain, is holding themselves out to the public as, Come take the train from A to B; we will take your money.

This is not NJ Transit.  This is not going from Newark Penn to New York Penn, you know, for X dollars.

There is no pedestrian access to that Rail Link Station.  The only way that you are paying to ride the AirTrain is coming off of some other conveyance for hire.  I cannot walk into the Rail Link Station and pay for a ticket just to get on the AirTrain.

If there are -- I don't have the numbers in front of me, Your Honor -- nor do I know if they are kept, candidly --

what percentage of passengers go from terminal to terminal or parking area to terminal that do not pay to access the AirTrain. I know I certainly have never paid to access the AirTrain in my personal traveling.

But to the extent you have a ticket from NJ Transit that provides a payment with the articulation on it for AirTrain access, it would stand to reason there should not be two different duties of care owed to the persons on the AirTrain.

John Q. Public, who is going from Terminal A to Terminal B or to the parking lot to retrieve his vehicle, should not be owed a lesser duty by virtue of not having paid to get on NJ Transit or vice versa. It just doesn't track.

How would Alstom fulfill that, having two different duties to different persons on the AirTrain, of the same actions available to them?

THE COURT: So do you envision, Mr. Heck, how this would play out from a trial perspective in determining the Port Authority's role and this aspect of Alstom's role, Alstom's role as relates to the Product Liability Act?

MR. HECK: So the Product Liability Act would have nothing to do with the claims against Port Authority. There is no allegation or suggestion that they are a product defendant. They did not design, manufacture, et cetera.

The duty of care to Port Authority -- owed by Port

Authority rather, is that of a common premises liability defendant.  It is not that they are -- they are not operating the train.  There is no deposition testimony suggesting that. They own the train infrastructure.  They own the airport. They may run the airport, but they don't run the AirTrain.

To the extent there is a duty of care owed, it is the simple, foreseeable business invitee notice-breach-causation rather than some elevated duty owed by a common carrier.

THE COURT:  And does the defense take the position that Mr. Penso didn't fall, or he twisted his ankle?  I mean, do you know?  I know you take a lot of positions.

MR. HECK:  Am I opposing their motion, Judge, or am I making my own?

THE COURT:  I am just curious in terms of that, and that's the only part of the damages I will even touch on, is just -- because I think there seems to be some question about that.  Obviously, his companion, there is some testimony that obviously she will offer as it relates to that, but I am curious.

MR. HECK:  Well, taking it in pieces, so Ms. Stergas, his then-fiancée, testified she did not see whatever mechanics happened with plaintiff while he had his incident.  Certain parts of his testimony say he fell.  Other parts of his testimony say he didn't fall.

We've had -- Dr. Yamaguchi, in particular, conducted

*Proceedings recorded by mechanical stenography; District of New Jersey*

an analysis to the extent plaintiff testified he was holding on.  Holding on to what was not asked, which unfortunately, as we would all like to have 100 accuracy when we go back to read old deposition transcripts.

But to the extent he wasn't asked the question onto what he was holding, he didn't provide any specific testimony.

And Dr. Yamaguchi's opinion is if he had been holding on to the uprights, he is a six -- I think he was six foot three, 200 some-odd pounds, athletic kid -- there would be no reason why he would not be able to maintain his grip on the handholds that are provided by the train had he been holding on.

If he is holding on to the wall or some of his luggage or Ms. Stergas or who knows what, then he was permitted then to -- if you take him at his word, he was holding on to something and then in fact did have this stumble or fall, depending on which part of his dep you read, then he would have been permitted to be out of balance and have to take the corrective step that he says he took.

Dr. Yamaguchi factors in luggage, which he said was around him.  It was a crowded train.

So there are questions of fact at the summary judgment stage as far as whether his version of events should be believed or not.

And more accurately, I guess for Your Honor's

question, whether or not those are something the Court can decide as a matter of law today, I would suggest there is also a significant credibility gap in taking point to -- at his word, given other events in the case.

THE COURT: Understood. And I have a lot of paperwork to that effect to establish that that is taken -- at issue. There is an issue with that.

All right, so, Mr. Lide, do you want to be heard any further?

MR. LIDE: Can I tag team and let Mr. Sanginiti respond to that?

THE COURT: Sure.

MR. LIDE: Because he asked me to.

THE COURT: Okay.

MR. SANGINITI: Your Honor, I just -- there was discussion about Dr. Yamaguchi, so I just wanted to bring up a key point to that, though, is plaintiff did then retain a rebuttal expert, Dr. Albert, who has opined that all of Dr. Yamaguchi's methodologies for what he found were improper and incorrect.

So I share that with Your Honor only on the basis of yes, there is a defense position, but there is a plaintiff's position as well. And I really think that this is all question of fact for the jury, not really a question of law.

THE COURT: Which is not -- you know, these are not

the bases of the motions for summary judgment anyway.  I was just curious as to that aspect.

And I understand Carolyn Albert is the sort of rebuttal expert to the defense's expert.

MR. SANGINITI:  Yes, Your Honor.

THE COURT:  I saw that in the paperwork as well.

All right, so tell me -- and Mr. Heck mentioned that on February 3rd, you are doing a mediation.

Who are you mediating with, and where is that happening?

MR. HECK:  It's going to be a hybrid proceeding, Your Honor.  Originally, we were attempting to do this live in Orange County so that plaintiff could attend personally. That's not going to work out for reasons, but we are going to do -- the mediator is going to be virtual.  Counsel and I are going to be in my office in Madison.  Plaintiff is going to be appearing virtually.

MR. LIDE:  Correct.

MR. HECK:  We have engaged the services of Judge Latin, who is out of the Orange County area.

THE COURT:  Okay.

MR. HECK:  At the recommendation of my West Coast colleagues.

THE COURT:  That's good.  I mean, I think that's positive, because at this point, this is my plan.  My plan is

to issue an opinion on the summary judgment motions, so -- which would cause us to table the trial. And I know I have given you guys a rough way to go as relates to trial, but that's, you know, like I said, once again, just being mindful of being efficient and not wasting anybody's time. I think I need to address that in writing, and so that is what I will do.

Once I do that, if it is in fact appropriate for us to proceed forward, then I will set a date from there. So counsel will be advised accordingly.

And so the February 11th date that we have is off. The other motions are held in abeyance until such time as I can issue an opinion on those motions we've had oral argument on today. Okay.

So any questions about that? Because I know, as I said, that you have worked very, very feverishly, so I just want to make sure. And I was looking forward to meeting Edith. I am just telling you, I really was. The corgi.

MR. HECK: I did have one question, Your Honor. Your Honor's notice for today suggests we were going to deal with the bifurcation motion as well.

THE COURT: Yes, I think that will be more plainly addressed -- and I understand the arguments, and obviously, plaintiff would like to deal with the entire thing, and I understand those arguments. I don't need to hear further

argument on that.  But I did want to tee that up, and that will be addressed in writing as well.

MR. HECK:  I wanted to make sure we didn't waive it, Judge.  Thank you.

THE COURT:  I'm sorry?

MR. HECK:  I just wanted to make sure we didn't waive it.

THE COURT:  It's not waived, 100 percent.  I do understand that that is an aspect of the argument as well.  Because it looks like for me -- what is your projected?  Because I think you barely -- you have just filed your final pretrial like literally today.  And I am just curious to see what your projection is.

MR. LIDE:  So our initial projection, Your Honor -- and you know, candidly, there are a lot of witnesses on there that I don't think we need to call.

THE COURT:  Sure.

MR. LIDE:  Obviously.  But because it's a federal pretrial order, if we don't put them on there, we are not calling them, so we obviously went over.

I think -- I think the case can be done in about two and a half weeks or so.  I think Mr. Heck was thinking closer to three.  But I think there is even a scenario it could be a little bit shorter, depending on some of these witnesses.

For example, our preference would be to call some of

the treating physicians as opposed to the forensic CRPS expert that's here in New Jersey.  It would be much better to have Mr. Penso's treating physician, who has treated him, done the nerve blocks, I think, for the benefit of the jury, but he is in Irvine, California, and he has got an active practice there.

And so that's why, at the appropriate time, we would like to make a request for the treating physicians, the two of them, Dr. Bone and Dr. Paicius to appear via Zoom.  Obviously, your preference and our preference would be --

THE COURT:  If I am doing a live trial, I don't do Zoom.  So I know, counsel, you called about that, but yeah, just not my practice to do that.  It's either we are all in or we are all out.

MR. LIDE:  Would it be possible in that situation to do a prerecorded *de bene esse*?

THE COURT:  Happens all the time.

MR. LIDE:  So I think this makes sense in terms of your schedule when you let us, when we get your opinion.  I guess the only question I would have too is our clients have travel arrangements to come.  Is it okay for us to cancel those now --

THE COURT:  It is.

MR. LIDE:  -- until we hear from you?

THE COURT:  Sure.

MR. LIDE:  And I would just respectfully request that whatever order you do, if we do proceed, just understand that we do have to get them back here to New Jersey, and it's going to take us a little bit of time.  We are going to get on it right away.

THE COURT:  I understand.  I understand that there are some, you know, coordination issues that have to take place.  So I would not leave you high and dry in that respect.

I guess I was a little concerned because it is a 2023 case and injury happened in 2021, so I am, like, Let's go.  You know, so that was sort of the intent.

MR. LIDE:  And I will say, Your Honor, the attorneys now involved in the case are really moving the case along whereas --

THE COURT:  I see you.  I am very proud of you.

Can we go off the record for a second?

(Discussion held off the record.)

THE COURTROOM DEPUTY:  Court adjourned.

(The proceeding is adjourned at 3:49 p.m.)

FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/S/ Joanne Sekella, CCR, CRCR, RDR          February 13, 2026

Official Court Reporter                              Date

*Proceedings recorded by mechanical stenography; District of New Jersey*

**/**

**/S** [1] - 50:24

**0**

**07101** [1] - 1:11
**07940** [1] - 1:20
**08543** [1] - 1:17

**1**

**1** [2] - 1:6, 21:19
**1-5** [1] - 1:8
**100** [4] - 1:17, 1:20, 44:3, 48:8
**109** [1] - 33:22
**11** [1] - 3:8
**110** [1] - 34:1
**111** [1] - 34:3
**113** [1] - 34:11
**114** [1] - 34:8
**115** [1] - 34:9
**116** [1] - 34:9
**117** [1] - 34:9
**118** [1] - 34:10
**11th** [1] - 47:11
**12/31** [1] - 4:7
**13** [1] - 50:24
**15** [1] - 35:6
**153** [1] - 3:14
**1990s** [1] - 10:25
**1996** [1] - 32:5

**2**

**200** [1] - 44:9
**2021** [2] - 35:7, 50:10
**2023** [1] - 50:9
**2024** [1] - 26:15
**2026** [2] - 1:12, 50:24
**23-474** [1] - 2:10
**29** [1] - 1:12
**2:23-cv-00474-SDW** [1] - 1:4
**2:33** [2] - 1:12, 2:3

**3**

**30** [1] - 7:3
**3:01** [1] - 22:25
**3:07** [1] - 22:25
**3:49** [1] - 50:19
**3rd** [1] - 46:8

**4**

**42** [1] - 25:12
**45** [3] - 7:3, 8:12, 15:8

**46** [1] - 12:8

**5**

**50** [2] - 1:6, 1:11
**55** [1] - 23:19

**7**

**7** [1] - 1:20
**702** [1] - 31:11

**8**

**8** [1] - 17:25

**9**

**908)310-1177** [1] - 1:23

**A**

**abeyance** [1] - 47:12
**ability** [2] - 7:16, 7:20
**able** [10] - 15:22, 15:23, 16:1, 17:14, 18:11, 18:12, 22:10, 24:19, 32:6, 44:10
**above-entitled** [1] - 50:22
**abrupt** [3] - 14:12, 15:11, 32:10
**abruptly** [2] - 13:10
**absolutely** [4] - 17:10, 19:5, 24:12, 26:9
**acceptable** [1] - 13:12
**access** [5] - 41:12, 41:19, 42:2, 42:3, 42:7
**according** [1] - 7:15
**accordingly** [2] - 39:11, 47:10
**accountable** [2] - 39:11, 39:22
**accuracy** [1] - 44:3
**accurately** [2] - 9:1, 44:25
**Act** [28] - 5:11, 5:25, 8:23, 9:6, 9:7, 9:12, 19:7, 19:9, 19:11, 19:18, 19:23, 20:2, 20:4, 21:5, 23:12, 24:1, 27:11, 27:15, 27:19, 28:3, 29:13, 31:20, 33:16, 33:21, 41:5, 41:11,

42:20, 42:21
**act** [1] - 10:19
**actions** [2] - 20:18, 42:16
**active** [1] - 49:5
**actual** [2] - 20:18, 34:1
**add** [6] - 11:3, 20:21, 26:5, 26:7, 26:15, 30:16
**addition** [2] - 3:3, 31:15
**additional** [1] - 16:9
**address** [7] - 3:13, 11:21, 12:2, 13:15, 33:17, 38:15, 47:6
**addressed** [3] - 31:19, 47:23, 48:2
**adequately** [1] - 9:1
**adjacent** [1] - 37:1
**adjourned** [2] - 50:18, 50:19
**adjustments** [1] - 29:10
**admissibility** [2] - 31:10, 31:16
**admissible** [1] - 6:20
**advised** [1] - 47:10
**affidavit** [4] - 29:19, 29:24, 30:22, 30:24
**afternoon** [6] - 2:5, 2:6, 2:7, 2:13, 2:17, 2:19
**age** [1] - 32:2
**agency** [1] - 36:23
**agree** [9] - 19:23, 20:4, 24:6, 25:21, 27:9, 27:16, 27:18, 28:15, 29:18
**agreement** [1] - 35:15
**ahead** [2] - 4:21, 28:25
**aided** [1] - 1:25
**air** [2] - 23:20, 23:23
**airport** [6] - 10:6, 25:17, 25:18, 25:25, 43:4, 43:5
**AirTrain** [32] - 5:10, 5:24, 6:11, 8:7, 8:14, 10:7, 10:8, 10:11, 10:17, 10:24, 23:21, 23:22, 25:17, 25:18, 35:2, 35:7, 36:16, 37:3, 38:9, 38:15, 41:13, 41:14, 41:15,

41:21, 41:23, 42:3, 42:4, 42:7, 42:9, 42:15, 43:5
**al** [1] - 2:10
**alarms** [2] - 5:16, 11:15
**Albert** [2] - 45:18, 46:3
**Albin** [2] - 36:6, 36:7
**allegation** [4] - 6:3, 24:12, 24:24, 42:23
**allegations** [4] - 23:25, 25:5, 28:1, 33:24
**alleges** [1] - 25:16
**alluded** [2] - 4:5, 33:22
**almost** [1] - 38:18
**alongside** [2] - 6:15, 33:20
**Alstom** [15] - 7:4, 7:5, 7:24, 8:6, 9:24, 10:7, 10:16, 10:19, 10:23, 11:7, 11:11, 11:19, 41:4, 41:14, 42:14
**Alstom's** [2] - 42:19, 42:20
**Alstrom** [6] - 25:12, 38:3, 38:9, 38:16, 39:7, 39:21
**altering** [1] - 32:15
**alternate** [3] - 32:4, 33:12, 33:13
**alternative** [2] - 9:13, 28:14
**amend** [2] - 26:5, 26:6
**amending** [1] - 26:12
**amendment** [1] - 9:9
**American** [1] - 1:17
**amicus** [1] - 36:4
**analysis** [10] - 11:15, 15:21, 16:4, 16:17, 16:18, 17:6, 31:11, 31:12, 31:18, 44:1
**AND** [1] - 1:7
**Andrew** [1] - 2:20
**ANDREW** [1] - 1:19
**ankle** [1] - 43:10
**answer** [1] - 10:13
**anyway** [2] - 39:15, 46:1
**apologize** [5] - 15:16, 19:1, 19:2, 21:21, 22:14
**apparent** [1] - 37:17

**appear** [2] - 5:21, 49:9
**appearances** [1] - 2:11
**appearing** [1] - 46:17
**appellate** [1] - 36:5
**apples** [2] - 17:19, 17:20
**applicability** [1] - 33:19
**applicable** [2] - 35:12, 41:10
**application** [4] - 4:23, 9:8, 9:21, 34:2
**applies** [5] - 20:2, 20:4, 20:5, 37:18
**apply** [4] - 19:23, 20:7, 20:8, 20:9
**appropriate** [2] - 47:8, 49:7
**area** [3] - 7:14, 42:2, 46:20
**areas** [1] - 7:8
**argue** [4] - 9:12, 10:14, 16:6, 17:17
**argued** [2] - 13:16, 21:12
**argues** [1] - 33:1
**arguing** [2] - 13:22, 27:8
**argument** [18] - 8:19, 8:25, 9:11, 9:16, 9:20, 12:17, 13:7, 16:2, 18:21, 31:14, 31:15, 32:11, 33:10, 40:19, 40:20, 47:13, 48:1, 48:9
**argument's** [1] - 27:25
**arguments** [4] - 4:18, 9:13, 47:23, 47:25
**arrangements** [1] - 49:21
**artfully** [2] - 22:3, 29:13
**articulation** [1] - 42:6
**ascertain** [1] - 3:11
**aside** [1] - 8:5
**aspect** [8] - 4:1, 8:25, 9:24, 35:9, 37:24, 42:19, 46:2, 48:9
**aspects** [1] - 35:18
**assault** [2] - 38:22, 38:24

*United States District Court*
*District of New Jersey*

assaulted [1] - 39:3
assert [2] - 8:22, 9:1
asserted [1] - 19:10
asserting [1] - 25:9
assertion [2] - 33:23, 37:25
associated [1] - 4:25
assumes [1] - 27:19
assuming [1] - 5:23
athletic [1] - 44:9
attacks [1] - 3:17
attempting [1] - 46:12
attempts [1] - 7:10
attend [1] - 46:13
attorneys [1] - 50:12
AUTHORITY [1] - 1:6
authority [1] - 38:7
Authority [25] - 7:5, 9:24, 10:4, 10:5, 10:12, 11:4, 11:5, 11:7, 11:11, 11:12, 11:13, 25:16, 33:24, 37:25, 38:5, 38:8, 38:22, 39:4, 39:8, 39:22, 40:22, 41:2, 42:22, 42:25, 43:1
Authority's [6] - 10:3, 10:10, 10:16, 11:18, 38:16, 42:19
authorization [3] - 6:24, 7:23, 25:1
automated [3] - 5:12, 5:19, 11:8
automatic [1] - 14:25
automatically [1] - 35:16
available [3] - 32:12, 35:5, 42:16
averment [1] - 30:25
aware [1] - 15:10

**B**

backup [3] - 14:24, 18:16, 33:12
balance [1] - 44:18
bar [1] - 4:13
barely [1] - 48:11
base [1] - 10:22
based [8] - 8:5, 12:17, 12:24, 15:25, 16:12, 18:5, 18:6, 35:15
bases [1] - 46:1

basic [3] - 8:19, 20:9, 20:11
basis [5] - 9:20, 11:11, 23:13, 31:21, 45:21
battery [1] - 15:18
become [1] - 40:13
becomes [2] - 10:11, 19:5
beforehand [1] - 17:7
behalf [2] - 2:15, 2:21
behind [1] - 15:6
belabor [1] - 5:6
belief [1] - 28:24
believes [1] - 33:18
bench [1] - 22:21
bene [1] - 49:16
benefit [1] - 49:4
best [2] - 12:5, 32:16
better [1] - 49:2
between [7] - 7:7, 7:20, 8:13, 11:6, 36:25, 37:5, 38:25
beyond [2] - 11:14, 11:18
bifurcate [1] - 3:4
bifurcation [1] - 47:21
bit [6] - 3:20, 9:23, 24:5, 31:9, 48:24, 50:4
bleeds [1] - 24:3
block [1] - 15:9
blocks [1] - 49:4
Bombardier [9] - 2:9, 23:19, 23:21, 23:22, 25:11, 25:16, 33:25
BOMBARDIER [1] - 1:7
Bone [1] - 49:9
bottom [1] - 7:12
bought [6] - 35:23, 35:24, 39:21, 40:9, 41:12
Boulevard [1] - 1:17
bound [1] - 21:8
brake [14] - 14:1, 14:7, 14:11, 14:15, 14:18, 14:20, 15:1, 17:11, 18:17, 25:2, 28:18, 28:20, 33:8, 33:10
braked [1] - 13:10
brakes [1] - 19:14
braking [4] - 13:11, 14:16, 29:11, 33:2

breach [1] - 43:7
break [2] - 14:5, 22:25
brief [2] - 5:8, 19:25
briefed [1] - 9:7
briefing [1] - 5:6
briefs [3] - 22:11, 22:12, 22:18
bring [4] - 14:14, 15:1, 18:1, 45:16
brought [2] - 22:12, 26:11
bucket [1] - 34:15
build [1] - 10:24
building [1] - 39:4
Building [1] - 1:11
buildings [1] - 38:23
bus [2] - 37:18, 38:25
Bus [1] - 38:25
business [4] - 36:13, 36:18, 40:11, 43:7
busses [1] - 36:24
busy [1] - 3:8
but.. [1] - 27:17
buy [1] - 40:8
BY [2] - 1:16, 1:19

**C**

California [1] - 49:5
cancel [1] - 49:21
candid [1] - 6:22
candidly [3] - 7:6, 41:25, 48:15
cannot [6] - 6:14, 6:21, 17:5, 24:20, 32:7, 41:22
canon [1] - 11:18
care [6] - 20:19, 37:22, 41:9, 42:8, 42:25, 43:6
Carolyn [1] - 46:3
carrier [20] - 35:2, 35:20, 36:3, 36:8, 36:22, 37:3, 37:11, 37:18, 38:23, 39:2, 39:5, 39:15, 39:17, 40:6, 40:13, 40:18, 40:22, 41:3, 41:6, 43:8
carriers [3] - 35:3, 36:12, 37:10
case [39] - 4:12, 5:15, 6:4, 6:6, 6:7, 6:8, 6:10, 6:14, 6:15, 7:22, 9:18, 11:6, 11:17, 12:12, 13:16, 14:10,

15:14, 19:12, 19:20, 21:20, 23:6, 24:23, 25:23, 26:11, 27:5, 29:22, 31:13, 33:20, 36:5, 39:19, 39:24, 40:7, 41:1, 45:4, 48:21, 50:10, 50:13
caselaw [1] - 38:21
cases [3] - 5:18, 5:19, 6:13
causation [1] - 43:7
caused [7] - 6:1, 7:22, 15:24, 32:8, 34:13, 34:14, 35:6
causes [1] - 6:12
causing [1] - 34:4
CCR [2] - 1:22, 50:24
certain [10] - 3:1, 3:23, 13:9, 23:25, 24:14, 24:19, 26:6, 27:19, 38:10, 43:22
certainly [8] - 4:3, 4:8, 5:4, 9:3, 10:20, 11:20, 33:13, 42:3
CERTIFICATE [1] - 50:20
certification [1] - 5:1
certified [1] - 5:15
certify [1] - 50:21
cetera [2] - 23:7, 42:24
challenge [1] - 31:10
challenges [1] - 31:8
changed [1] - 7:19
charge [3] - 35:15, 39:14, 39:18
charts [1] - 12:13
chatting [1] - 29:1
Chemical [1] - 6:5
children [1] - 37:13
circle [1] - 11:1
Circuit [2] - 5:22, 6:6
circumstances [2] - 21:2, 21:4
cite [1] - 5:18
CIVIL [1] - 1:3
claim [19] - 6:9, 6:10, 8:23, 9:2, 9:6, 16:22, 19:10, 20:5, 20:12, 23:13, 24:18, 25:9, 27:11, 29:15, 33:14,

33:16, 41:5, 41:7, 41:8
claimant [1] - 34:4
claims [13] - 20:10, 21:12, 23:9, 26:4, 27:7, 27:16, 27:20, 29:2, 29:4, 29:13, 41:8, 42:22
clarification [2] - 30:9, 30:11
Clark [1] - 3:6
Clark's [3] - 3:22, 4:4, 4:15
classic [1] - 5:17
clear [1] - 39:5
clearly [7] - 9:17, 34:3, 36:2, 36:15, 36:16, 36:19, 37:9
clerk [1] - 22:6
clients [2] - 4:12, 49:20
closer [1] - 48:22
coach [1] - 37:13
Coast [1] - 46:22
codes [1] - 11:15
colleagues [1] - 46:23
coming [1] - 41:21
Commencing [1] - 1:12
committed [1] - 37:11
common [28] - 35:1, 35:3, 35:20, 36:3, 36:8, 36:9, 36:11, 36:12, 36:19, 36:22, 37:3, 37:10, 37:11, 37:18, 38:23, 39:2, 39:4, 39:15, 39:17, 40:5, 40:13, 40:18, 40:22, 41:3, 41:6, 43:1, 43:8
companion [1] - 43:17
COMPANY [1] - 1:8
competing [1] - 13:1
complaining [2] - 34:12, 34:13
complaint [32] - 6:11, 8:20, 9:1, 9:4, 21:6, 21:8, 21:10, 21:11, 21:16, 21:25, 22:23, 23:3, 23:4, 23:6, 23:8, 23:12, 23:17, 24:3, 24:7, 25:6, 25:12, 26:2, 26:5, 26:7, 26:12, 26:18, 27:8, 27:23,

28:1, 33:20, 33:23, 34:12
**completed** [1] - 7:13
**completely** [3] - 13:19, 16:25, 21:1
**complex** [5] - 15:17, 17:4, 18:10, 20:25, 35:16
**component** [5] - 32:2, 32:3, 32:6, 32:9, 33:3
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concede** [3] - 19:22, 23:11, 26:23
**concedes** [1] - 7:6
**concern** [1] - 3:25
**concerned** [1] - 50:9
**conclude** [1] - 14:22
**conclusion** [1] - 18:13
**conclusions** [9] - 12:10, 12:15, 12:21, 12:24, 12:25, 13:5, 13:8, 15:25, 18:5
**condition** [7] - 7:17, 10:9, 10:12, 10:15, 34:8, 34:11, 34:14
**conditions** [1] - 13:18
**conducted** [3] - 16:17, 16:19, 43:25
**Conductor** [1] - 5:14
**conductor** [1] - 37:19
**conference** [1] - 2:24
**confidentiality** [1] - 22:18
**confusing** [1] - 24:5
**conjecture** [1] - 12:17
**connection** [1] - 3:19
**considered** [6] - 5:20, 30:14, 30:25, 31:7, 35:3, 36:3
**constitute** [1] - 30:24
**constitutes** [2] - 5:10, 5:24
**consumer** [1] - 6:8
**context** [1] - 24:17
**continue** [1] - 25:24
**contracted** [1] - 38:9
**contracts** [1] - 10:6

**control** [7] - 5:16, 14:14, 15:2, 15:20, 16:25, 21:1, 38:12
**controlled** [1] - 23:19
**conversation** [1] - 16:20
**conveyance** [1] - 41:21
**coordination** [1] - 50:7
**copies** [1] - 22:13
**copy** [5] - 21:16, 22:7, 22:8, 23:2
**corgi** [1] - 47:18
**Corp** [1] - 36:4
**corporate** [1] - 11:5
**corporation** [2] - 36:23, 37:4
**correct** [5] - 9:15, 15:5, 22:16, 46:18, 50:21
**corrective** [1] - 44:19
**counsel** [12] - 2:5, 2:11, 2:22, 11:24, 21:24, 23:1, 23:2, 36:5, 38:10, 46:15, 47:10, 49:12
**counsel's** [1] - 40:19
**count** [5] - 24:6, 26:15, 26:16, 26:17, 26:18
**counts** [1] - 21:11
**County** [2] - 46:13, 46:20
**couple** [1] - 22:13
**course** [4] - 6:13, 24:14, 38:14, 40:7
**COURT** [99] - 1:1, 2:5, 2:8, 2:17, 2:22, 4:21, 8:19, 9:13, 9:22, 11:2, 11:22, 11:24, 12:4, 12:21, 13:7, 14:4, 14:8, 14:18, 15:3, 16:2, 17:3, 17:17, 18:18, 18:21, 18:24, 19:17, 19:25, 20:3, 20:6, 20:11, 20:20, 21:6, 21:15, 21:18, 21:22, 22:3, 22:6, 22:13, 22:15, 22:19, 23:1, 23:15, 24:6, 24:16, 24:21, 25:11, 25:14, 25:24, 26:14, 26:19, 26:21,

26:24, 27:6, 27:14, 28:7, 28:13, 28:19, 28:21, 28:25, 29:18, 30:1, 30:3, 30:13, 30:18, 31:3, 32:25, 33:17, 34:16, 34:18, 34:24, 35:8, 35:21, 37:23, 38:14, 39:12, 39:23, 40:3, 40:14, 42:17, 43:9, 43:14, 45:5, 45:12, 45:14, 45:25, 46:6, 46:21, 46:24, 47:22, 48:5, 48:8, 48:17, 49:11, 49:17, 49:23, 49:25, 50:6, 50:15, 50:20
**Court** [22] - 1:22, 2:14, 2:20, 4:20, 5:6, 6:6, 9:8, 9:10, 9:19, 12:1, 12:9, 16:8, 21:9, 21:20, 26:23, 27:1, 36:6, 39:17, 40:18, 40:21, 45:1, 50:25
**court** [4] - 2:1, 27:2, 40:23, 50:18
**Courthouse** [1] - 1:11
**COURTROOM** [3] - 2:4, 22:24, 50:18
**CRCR** [2] - 1:22, 50:24
**created** [1] - 19:18
**credibility** [1] - 45:3
**crowded** [1] - 44:21
**CRPS** [2] - 35:6, 49:1
**curious** [4] - 43:14, 43:19, 46:2, 48:12

### D

**damages** [2] - 26:15, 43:15
**danger** [1] - 37:15
**dangerous** [3] - 10:9, 10:15, 34:11
**data** [17] - 12:11, 12:15, 12:24, 12:25, 13:1, 13:3, 15:23, 17:1, 18:5, 18:7, 18:8, 18:11, 32:12, 32:16, 32:17
**date** [6] - 3:7, 7:7, 7:18, 8:13, 47:9, 47:11
**Date** [1] - 50:25

**dates** [1] - 7:9
**Daubert** [9] - 3:22, 3:24, 4:6, 12:7, 12:10, 31:8, 31:9, 31:11
**days** [2] - 7:3, 17:21
**de** [1] - 49:16
**deal** [4] - 33:23, 39:18, 47:20, 47:24
**dealing** [1] - 5:18
**dealt** [2] - 6:5, 6:8
**deceleration** [3] - 32:11, 32:15, 32:17
**December** [1] - 35:6
**decide** [1] - 45:2
**decided** [1] - 5:21
**decision** [4] - 6:5, 36:6, 40:21, 41:3
**declined** [1] - 32:18
**default** [1] - 6:25
**defect** [1] - 31:21
**defective** [2] - 34:8, 34:14
**defendant** [6] - 10:5, 20:10, 36:2, 40:5, 42:24, 43:2
**Defendant** [1] - 1:21
**Defendants** [1] - 1:9
**defendants** [11] - 3:4, 12:12, 15:19, 16:20, 17:15, 17:17, 19:16, 20:19, 29:16, 35:2, 39:17
**defendants'** [2] - 3:13, 6:18
**defense** [18] - 2:21, 12:16, 12:20, 13:16, 14:13, 16:1, 16:10, 16:13, 16:15, 16:25, 18:8, 18:12, 21:1, 30:9, 38:2, 38:10, 43:9, 45:22
**defense's** [2] - 30:22, 46:4
**defer** [1] - 21:25
**deficient** [2] - 6:17
**definition** [8] - 36:9, 36:10, 36:11, 36:19, 36:20, 36:22, 37:3, 39:14
**definitions** [2] - 36:8, 37:2
**degree** [1] - 39:15
**dep** [1] - 44:17
**deposed** [1] - 30:4
**deposition** [7] -

6:22, 14:22, 31:3, 32:19, 32:24, 43:3, 44:4
**DEPUTY** [3] - 2:4, 22:24, 50:18
**described** [1] - 36:12
**design** [19] - 6:17, 10:23, 15:18, 19:12, 19:13, 20:5, 20:6, 20:7, 20:18, 24:24, 28:12, 28:14, 32:19, 32:20, 32:23, 33:12, 33:13, 33:14, 42:24
**designed** [3] - 14:6, 18:14, 19:4
**designees** [1] - 11:6
**destructive** [1] - 34:11
**determination** [2] - 10:22, 26:4
**determine** [1] - 17:5
**determined** [1] - 8:22
**determining** [1] - 42:18
**DICKER** [1] - 1:19
**Dicker** [1] - 2:21
**different** [19] - 7:8, 7:9, 13:18, 13:19, 13:21, 13:23, 13:24, 16:19, 17:18, 17:19, 19:6, 23:18, 26:17, 38:22, 42:8, 42:14, 42:15
**differently** [1] - 25:15
**difficult** [1] - 27:8
**direction** [1] - 34:2
**directly** [1] - 12:11
**disagree** [1] - 28:17
**discovery** [1] - 26:3
**discretely** [1] - 11:20
**discussed** [1] - 25:7
**Discussion** [1] - 50:17
**discussion** [1] - 45:16
**dispositive** [2] - 4:6, 4:9
**dispute** [2] - 5:23, 28:23
**disregarded** [1] - 40:23
**distinction** [1] - 40:25

District [1] - 2:3
DISTRICT [3] - 1:1, 1:1, 1:14
divided [1] - 34:22
division [1] - 36:5
docket [3] - 2:10, 2:25, 3:14
doctrine [1] - 38:6
document [1] - 21:19
documentation [1] - 11:10
DOE [1] - 1:8
dollars [1] - 41:18
Domenic [1] - 2:14
DOMENIC [1] - 1:16
done [3] - 28:19, 48:21, 49:3
doubt [2] - 26:22, 27:13
down [4] - 8:7, 8:14, 17:15, 22:2
downs [1] - 12:14
downtime [1] - 22:1
Dr [8] - 43:25, 44:7, 44:20, 45:16, 45:18, 45:19, 49:9
draw [2] - 7:6, 7:20
driver [1] - 37:18
driverless [3] - 5:11, 37:17, 37:19
dry [1] - 50:8
during [2] - 22:1, 32:19
duties [2] - 42:8, 42:15
duty [8] - 35:2, 37:10, 37:22, 41:9, 42:12, 42:25, 43:6, 43:8

**E**

e-mails [1] - 22:17
ears [1] - 37:14
easier [1] - 34:23
EDELMAN [1] - 1:19
Edelman [1] - 2:21
Edith [1] - 47:18
effect [2] - 6:23, 45:6
efficient [1] - 47:5
either [2] - 4:12, 49:13
elaborate [2] - 5:3, 14:19
electronic [1] - 10:2
element [2] - 4:11, 5:8
elements [1] - 31:23

elevated [1] - 43:8
ELSER [1] - 1:19
Elser [1] - 2:20
emergency [13] - 14:1, 14:7, 14:11, 14:15, 14:18, 14:20, 15:1, 17:11, 18:16, 25:2, 28:17, 28:20, 29:11
employees [1] - 16:16
end [5] - 21:7, 24:15, 27:4, 39:12
energy [2] - 3:5, 3:10
engaged [1] - 46:19
enter [1] - 2:11
enterprise [1] - 39:9
entire [4] - 8:14, 41:5, 41:10, 47:24
entirely [1] - 13:21
entities [1] - 36:12
entitled [1] - 50:22
entity [1] - 10:23
entry [1] - 3:14
envision [1] - 42:17
equally [1] - 38:8
ESQUIRE [3] - 1:16, 1:16, 1:19
esse [1] - 49:16
essence [2] - 14:9, 15:13
essentially [5] - 8:6, 10:2, 10:4, 13:22, 19:22
establish [2] - 33:14, 45:6
established [4] - 6:16, 10:13, 36:24, 37:5
et [3] - 2:10, 23:7, 42:24
EVAN [1] - 1:16
Evan [1] - 2:14
event [1] - 29:11
events [2] - 44:23, 45:4
evidence [4] - 18:4, 20:24, 39:19, 40:7
exact [3] - 17:20, 17:21, 32:20
exactly [6] - 6:13, 17:5, 18:23, 19:17, 26:19, 27:20
example [5] - 13:15, 23:18, 24:23, 34:8, 48:25
exclusive [1] - 6:1
excuse [3] - 18:4, 20:15, 23:17

exhibit [1] - 35:23
exhibits [1] - 5:2
exist [2] - 24:7, 24:18
expecting [1] - 15:12
expert [21] - 3:18, 4:11, 6:19, 7:16, 13:1, 14:13, 17:5, 17:8, 17:9, 17:13, 18:3, 24:24, 25:8, 28:8, 29:5, 45:18, 46:4, 49:1
expert's [1] - 31:12
experts [1] - 11:8
explain [1] - 18:11
explanation [1] - 32:4
explicitly [2] - 32:18, 40:22
explode [1] - 30:19
extent [21] - 4:4, 5:3, 9:8, 9:10, 9:17, 9:19, 10:9, 10:14, 11:10, 16:8, 19:9, 21:24, 31:14, 32:16, 32:22, 34:12, 41:12, 42:5, 43:6, 44:1, 44:5
extremely [1] - 3:8
eyes [1] - 37:14

**F**

fabulous [1] - 36:6
face [1] - 32:23
fact [21] - 2:25, 5:9, 5:19, 5:23, 8:21, 12:16, 13:12, 15:8, 19:15, 25:5, 29:6, 29:7, 33:8, 41:2, 41:4, 44:16, 44:22, 45:24, 47:8
factors [3] - 31:12, 32:1, 44:20
facts [6] - 12:20, 16:1, 31:13, 33:24, 34:2, 40:7
factual [2] - 18:4
fail [1] - 40:20
failed [4] - 16:14, 20:14, 23:22, 37:25
failure [6] - 14:24, 14:25, 17:12, 19:9, 27:24, 28:1
fair [2] - 17:23, 19:23
fairly [1] - 5:9
fall [5] - 19:20, 24:1,

43:10, 43:24, 44:17
far [2] - 6:2, 44:23
Farms [1] - 1:20
fault [1] - 8:1
feasible [1] - 33:13
feature [2] - 15:4, 15:5
February [4] - 3:8, 46:8, 47:11, 50:24
federal [1] - 48:18
FEDERAL [1] - 50:20
fell [1] - 43:23
feverishly [1] - 47:16
Fi [1] - 21:21
fiancée [1] - 43:21
fictitious [2] - 1:8, 33:25
file [1] - 4:16
filed [8] - 3:1, 3:9, 3:23, 3:24, 4:7, 12:7, 27:1, 48:11
filing [1] - 4:19
final [2] - 3:7, 48:11
firm [2] - 23:5, 26:10
firmly [1] - 33:15
first [7] - 3:12, 3:14, 3:15, 5:8, 33:22, 35:1, 36:15
fit [2] - 19:4, 31:12
fix [1] - 16:14
flies [1] - 32:23
focus [4] - 3:1, 3:5, 3:10, 25:11
focused [2] - 35:9, 35:11
folks [1] - 11:18
following [2] - 29:8, 29:11
foot [1] - 44:8
FOR [1] - 1:1
foregoing [1] - 50:21
foreman [2] - 12:13, 17:14
forensic [1] - 49:1
foreseeable [1] - 43:7
forth [1] - 21:11
forward [5] - 6:25, 10:18, 26:12, 47:9, 47:17
framed [1] - 30:10
framing [1] - 30:12
frankly [1] - 35:14
fraud [1] - 6:9
front [3] - 22:11, 29:17, 41:24

fulfill [1] - 42:14
full [1] - 15:19
fully [1] - 27:16
fulsome [1] - 16:3
function [3] - 6:15, 16:21, 17:10

**G**

gap [1] - 45:3
general [3] - 20:9, 20:11, 28:5
generated [1] - 7:17
Giralda [1] - 1:20
Given [1] - 4:15
given [4] - 11:14, 16:11, 45:4, 47:3
governed [1] - 21:8
grant [1] - 9:21
gravamen [1] - 6:6
great [1] - 17:9
grip [1] - 44:10
guard [1] - 37:14
guess [6] - 26:18, 33:3, 35:18, 44:25, 49:20, 50:9
guys [1] - 47:3

**H**

half [1] - 48:22
handholds [1] - 44:11
happy [1] - 11:21
hard [1] - 23:2
harm [1] - 6:1
haystack [2] - 8:8, 8:9
hear [6] - 3:15, 5:4, 11:24, 18:2, 47:25, 49:24
heard [4] - 19:6, 19:7, 45:8
HEARING [1] - 1:5
heart [1] - 6:7
HECK [29] - 1:19, 2:6, 2:19, 4:3, 5:5, 9:3, 9:14, 10:4, 11:4, 11:23, 21:24, 22:5, 22:10, 22:16, 30:20, 31:5, 33:5, 33:22, 34:17, 40:17, 42:21, 43:12, 43:20, 46:11, 46:19, 46:22, 47:19, 48:3, 48:6
Heck [14] - 2:18, 2:20, 3:15, 5:2, 11:3, 21:23, 22:8, 30:19, 32:25,

34:18, 40:16, 42:17, 46:7, 48:22
**heightened** [1] - 37:9
**held** [9] - 2:1, 37:21, 38:23, 39:2, 39:4, 39:10, 39:22, 47:12, 50:17
**help** [3] - 17:3, 17:5, 24:21
**helpless** [1] - 37:14
**high** [1] - 50:8
**higher** [2] - 37:9, 37:21
**highest** [1] - 40:23
**highlight** [1] - 12:9
**highly** [1] - 6:5
**hire** [1] - 41:21
**hold** [4] - 4:17, 7:10, 36:12, 40:10
**holding** [10] - 36:17, 39:8, 41:15, 44:1, 44:2, 44:6, 44:7, 44:11, 44:13, 44:16
**HOLDINGS** [1] - 1:7
**Honor** [77] - 2:6, 2:7, 2:13, 2:19, 4:3, 4:5, 5:5, 5:7, 9:3, 9:15, 11:5, 11:20, 11:23, 11:25, 12:1, 12:23, 13:14, 14:9, 15:13, 15:16, 16:6, 16:15, 17:9, 17:23, 18:1, 18:19, 18:23, 19:1, 19:3, 20:1, 20:22, 21:14, 21:25, 22:5, 22:14, 22:17, 23:10, 24:2, 24:11, 24:13, 24:22, 25:22, 26:9, 26:10, 26:20, 26:22, 27:9, 27:12, 27:18, 27:23, 27:25, 28:11, 28:16, 29:12, 29:25, 30:7, 30:17, 30:20, 30:21, 33:5, 33:22, 34:17, 34:22, 35:1, 35:20, 35:23, 36:4, 38:19, 40:17, 41:25, 45:15, 45:21, 46:5, 46:12, 47:19, 48:14, 50:12
**Honor's** [2] - 44:25, 47:20
**Honorable** [1] - 2:2
**HONORABLE** [1] - 1:13

**human** [1] - 10:1
**hundreds** [1] - 11:16
**hybrid** [1] - 46:11
**hypothetically** [1] - 10:14

**I**

**idea** [4] - 7:21, 12:7, 15:6, 31:8
**ideal** [4] - 26:21, 26:24, 26:25
**identified** [1] - 32:1
**identify** [7] - 6:21, 15:22, 15:23, 16:22, 16:23, 32:6
**ignorant** [1] - 37:13
**immaterial** [1] - 41:1
**immediately** [1] - 29:8
**important** [7] - 16:12, 17:13, 19:3, 22:19, 22:20, 37:8, 39:16
**improper** [11] - 6:17, 12:18, 14:1, 14:16, 14:19, 17:11, 19:13, 21:2, 28:18, 45:19
**improperly** [1] - 3:18
**inartfully** [2] - 27:22, 28:6
**INC** [1] - 1:8
**inception** [1] - 10:25
**incidences** [1] - 17:25
**incident** [7] - 7:4, 17:16, 29:9, 31:25, 32:8, 35:7, 43:22
**incidents** [1] - 7:7
**inclined** [3] - 9:8, 9:10, 9:19
**include** [3] - 4:8, 4:18, 16:4
**included** [2] - 5:1, 8:2
**includes** [1] - 36:22
**including** [1] - 5:1
**incorporate** [1] - 4:1
**incorrect** [1] - 45:20
**independent** [1] - 9:20
**indeterminant** [1] - 16:21
**indicated** [1] - 33:1
**individual** [1] - 36:23
**inference** [1] - 31:25

**inferential** [1] - 31:21
**information** [1] - 16:9
**infrastructure** [1] - 43:4
**inherited** [1] - 23:6
**initial** [3] - 9:15, 27:23, 48:14
**injured** [1] - 20:17
**injuries** [2] - 34:13, 34:14
**injury** [6] - 6:12, 34:10, 35:9, 38:1, 40:25, 50:10
**install** [1] - 10:24
**instance** [1] - 8:13
**instances** [2] - 7:3, 8:12
**instantaneously** [1] - 34:4
**instead** [3] - 14:25, 15:19, 16:23
**instructed** [1] - 35:5
**instruction** [1] - 35:11
**insufficient** [1] - 28:9
**intent** [1] - 50:11
**Interestingly** [1] - 36:4
**interestingly** [1] - 38:21
**interpretation** [1] - 33:6
**interpreting** [1] - 11:19
**invitee** [1] - 43:7
**inviting** [1] - 37:20
**involved** [3] - 15:21, 38:19, 50:13
**ipsa** [3] - 35:4, 35:10, 35:15
**Irvine** [1] - 49:5
**issue** [22] - 5:21, 7:1, 7:2, 14:1, 14:23, 16:4, 16:13, 16:16, 17:12, 19:16, 24:8, 24:9, 24:25, 25:20, 27:21, 31:19, 33:8, 40:5, 45:7, 47:1, 47:13
**issued** [2] - 29:22, 30:5
**issues** [8] - 3:24, 11:20, 20:14, 20:15, 29:7, 30:10, 35:1, 50:7
**issuing** [1] - 30:3

**item** [2] - 8:1, 8:2
**items** [1] - 7:8
**itself** [2] - 9:21, 38:24

**J**

**January** [1] - 1:12
**JERSEY** [2] - 1:1, 1:7
**Jersey** [13] - 1:11, 1:17, 1:20, 5:11, 5:25, 6:5, 27:2, 36:3, 38:24, 40:21, 40:24, 49:2, 50:3
**Joanne** [2] - 1:22, 50:24
**John** [1] - 42:10
**JOHN** [1] - 1:8
**joint** [2] - 38:7, 38:18
**JR** [1] - 1:16
**JUDGE** [1] - 1:14
**Judge** [9] - 2:3, 3:6, 3:22, 4:4, 4:15, 22:11, 43:12, 46:19, 48:4
**judgment** [17] - 3:2, 3:3, 3:10, 3:13, 3:19, 4:23, 21:2, 21:4, 21:13, 27:7, 31:1, 34:21, 34:25, 39:13, 44:23, 46:1, 47:1
**jurisdictions** [1] - 5:20
**jury** [18] - 10:20, 10:22, 17:4, 17:5, 18:2, 19:5, 24:15, 25:4, 27:4, 29:17, 31:13, 35:5, 35:11, 35:15, 39:10, 39:14, 45:24, 49:4
**Justice** [2] - 36:6, 36:7

**K**

**kept** [3] - 16:25, 20:16, 41:25
**key** [3] - 16:12, 31:23, 45:17
**kid** [1] - 44:9
**Kim** [1] - 23:2
**kind** [8] - 3:10, 9:22, 12:3, 13:14, 18:1, 23:2, 27:9, 31:21
**King** [1] - 1:11
**knowing** [1] - 20:16
**knowledge** [1] - 38:11

**known** [1] - 25:11
**knows** [1] - 44:14

**L**

**lack** [2] - 5:23, 31:24
**lacking** [1] - 31:17
**large** [3] - 4:9, 5:8, 10:11
**lastly** [1] - 32:18
**late** [3] - 31:2, 31:5, 31:6
**Latin** [1] - 46:20
**law** [14] - 6:4, 15:14, 22:6, 35:3, 35:7, 36:2, 36:9, 36:11, 36:19, 40:12, 40:23, 45:2, 45:24
**least** [6] - 4:9, 6:3, 15:22, 20:23, 39:21, 39:23
**leave** [1] - 50:8
**legal** [1] - 34:2
**length** [1] - 7:25
**less** [1] - 39:14
**lessee** [1] - 25:19
**lesser** [1] - 42:12
**lessor** [1] - 25:19
**liability** [17] - 4:10, 4:12, 7:16, 9:16, 10:5, 11:17, 16:22, 19:19, 19:20, 23:13, 24:4, 28:12, 34:15, 37:24, 40:3, 41:8, 43:1
**Liability** [28] - 5:11, 5:25, 8:22, 9:6, 9:7, 9:11, 19:7, 19:9, 19:11, 19:18, 19:23, 20:2, 20:4, 21:5, 23:12, 24:1, 27:11, 27:15, 27:19, 28:2, 29:13, 31:20, 33:16, 33:21, 41:5, 41:11, 42:20, 42:21
**LIDE** [23] - 1:16, 2:7, 2:13, 21:21, 34:22, 34:25, 35:20, 35:22, 38:2, 38:18, 39:16, 40:2, 40:4, 45:10, 45:13, 46:18, 48:14, 48:18, 49:15, 49:18, 49:24, 50:1, 50:12
**Lide** [5] - 2:14, 21:18, 34:20, 40:15, 45:8
**Lieberman** [3] -

36:21, 40:21, 41:3
**light** [1] - 15:1
**likely** [1] - 30:14
**limit** [1] - 4:18
**limits** [1] - 13:13
**line** [1] - 7:20
**Link** [3] - 41:13, 41:19, 41:22
**linkage** [2] - 7:6, 8:13
**list** [2] - 8:3, 8:4
**listened** [1] - 40:19
**literally** [1] - 48:12
**litigation** [2] - 24:14, 26:8
**live** [2] - 46:12, 49:11
**lives** [1] - 37:12
**LLP** [1] - 1:19
**locked** [1] - 37:13
**logs** [2] - 12:14, 17:14
**look** [13] - 8:9, 8:11, 21:6, 21:10, 21:18, 30:8, 30:13, 30:15, 36:15, 37:7, 37:8, 37:15, 40:6
**looking** [1] - 47:17
**looks** [2] - 38:5, 48:10
**loquitur** [1] - 35:4
**lose** [6] - 14:2, 14:7, 14:10, 18:15, 25:1, 28:22
**loses** [3] - 14:13, 15:9, 19:13
**loss** [8] - 6:23, 7:7, 7:18, 8:13, 15:7, 15:10, 15:11, 18:16
**losses** [1] - 15:8
**lost** [2] - 7:23, 33:8
**lott** [1] - 29:5
**Lott** [1] - 14:13
**lovely** [2] - 30:13, 30:14
**luggage** [2] - 44:14, 44:20
**Luther** [1] - 1:11

## M

**Madison** [2] - 1:20, 46:16
**mails** [1] - 22:17
**main** [1] - 4:8
**maintain** [5] - 10:7, 10:17, 15:19, 20:14, 44:10
**maintained** [2] -

21:1, 25:25
**maintenance** [9] - 6:14, 7:25, 9:5, 12:14, 23:24, 27:21, 28:5, 28:8, 32:14
**Maison** [4] - 36:3, 36:20, 38:24, 41:1
**major** [1] - 32:1
**malfunction** [4] - 6:2, 16:24, 18:13
**malfunctioned** [1] - 6:8
**malfunctions** [1] - 6:12
**managed** [1] - 23:21
**manufacture** [2] - 6:17, 42:24
**manufacturer** [1] - 9:25
**Martin** [2] - 1:11, 11:7
**materially** [1] - 32:15
**matter** [11] - 2:9, 11:8, 35:3, 35:7, 40:1, 40:8, 40:23, 41:2, 41:9, 45:2, 50:22
**Matthew** [1] - 2:16
**MATTHEW** [1] - 1:3
**mean** [8] - 14:19, 24:7, 24:18, 38:4, 38:7, 40:8, 43:10, 46:24
**meaning** [4] - 5:10, 15:7, 20:14, 24:25
**means** [1] - 24:18
**mechanical** [1] - 1:24
**mechanics** [1] - 43:21
**mediating** [1] - 46:9
**mediation** [1] - 46:8
**mediator** [1] - 46:15
**meet** [1] - 36:19
**meeting** [1] - 47:17
**meets** [1] - 37:3
**mentioned** [1] - 46:7
**merits** [1] - 4:22
**met** [1] - 3:6
**methodologies** [1] - 45:19
**methodology** [7] - 12:10, 12:19, 13:2, 18:6, 31:11, 31:15, 31:17
**metric** [1] - 31:5
**Metro** [1] - 1:17
**might** [1] - 38:11

**mildly** [1] - 3:9
**mills** [1] - 5:19
**mindful** [1] - 47:4
**minimum** [1] - 20:23
**minute** [1] - 22:21
**misbehavior** [1] - 6:2
**misnomer** [1] - 5:13
**missed** [1] - 8:2
**modified** [1] - 7:12
**money** [1] - 41:16
**monitoring** [1] - 5:16
**month** [1] - 13:17
**monthly** [1] - 11:11
**months** [2] - 7:14, 7:18
**moot** [1] - 41:6
**moreover** [1] - 9:10
**Moskowitz** [1] - 2:21
**MOSKOWITZ** [1] - 1:19
**most** [4] - 4:19, 6:4, 19:3
**motion** [16] - 3:3, 3:4, 3:13, 3:16, 3:19, 4:9, 12:7, 26:14, 30:22, 31:1, 34:20, 35:19, 39:13, 43:12, 47:21
**MOTIONS** [1] - 1:5
**motions** [15] - 3:1, 3:2, 3:9, 3:11, 3:23, 3:24, 4:6, 4:17, 4:24, 4:25, 46:1, 47:1, 47:12, 47:13
**motor** [1] - 36:24
**move** [4] - 6:25, 9:11, 12:3, 34:25
**moved** [1] - 3:12
**movement** [3] - 6:24, 7:22, 24:25
**mover** [3] - 5:12, 5:19, 11:9
**moving** [3] - 4:12, 40:12, 50:13
**MR** [99] - 2:6, 2:7, 2:13, 2:19, 4:3, 5:5, 9:3, 9:14, 10:4, 11:4, 11:23, 11:25, 12:5, 12:23, 13:14, 14:6, 14:9, 14:23, 15:5, 16:6, 17:9, 17:23, 18:19, 18:23, 19:1, 19:24, 20:1, 20:5, 20:7, 20:13, 20:22, 21:14, 21:16,

21:21, 21:24, 22:5, 22:10, 22:12, 22:14, 22:16, 23:10, 23:16, 24:11, 24:17, 24:22, 25:13, 25:22, 26:9, 26:17, 26:20, 26:22, 26:25, 27:9, 27:18, 28:10, 28:16, 28:20, 28:22, 29:1, 29:23, 30:2, 30:6, 30:17, 30:20, 31:5, 33:5, 33:22, 34:17, 34:22, 34:25, 35:20, 35:22, 38:2, 38:18, 39:16, 40:2, 40:4, 40:17, 42:21, 43:12, 43:20, 45:10, 45:13, 45:15, 46:5, 46:11, 46:18, 46:19, 46:22, 47:19, 48:3, 48:6, 48:14, 48:18, 49:15, 49:18, 49:24, 50:1, 50:12
**must** [1] - 35:17
**muster** [1] - 30:24
**Myrlak** [2] - 15:15, 21:3

## N

**name** [1] - 1:8
**narrative** [1] - 24:8
**narrow** [1] - 35:1
**natural** [1] - 32:2
**nature** [1] - 26:8
**Nazid** [1] - 11:7
**necessarily** [1] - 15:18
**need** [4] - 35:10, 47:6, 47:25, 48:16
**needed** [5] - 7:12, 16:7, 17:8, 17:10, 33:8
**needle** [2] - 8:8, 8:9
**needs** [2] - 18:10, 31:24
**negligence** [24] - 9:12, 19:8, 19:15, 19:21, 20:2, 20:10, 20:11, 24:3, 27:13, 27:16, 28:5, 29:2, 29:4, 29:14, 29:15, 33:16, 33:19, 40:2, 40:6, 41:5, 41:7, 41:8, 41:9, 41:10
**negligent** [3] - 6:14, 6:16, 9:4
**nerve** [1] - 49:4

**net** [1] - 31:14
**never** [1] - 42:3
**NEW** [3] - 1:1, 1:6, 1:7
**New** [14] - 1:11, 1:17, 1:20, 5:11, 5:25, 6:5, 27:2, 36:3, 38:24, 40:21, 40:24, 41:18, 49:2, 50:3
**Newark** [3] - 1:11, 5:24, 41:18
**next** [2] - 18:24, 23:21
**nexus** [1] - 25:9
**niceties** [2] - 5:6, 11:16
**NJ** [4] - 41:13, 41:17, 42:5, 42:13
**none** [1] - 25:20
**Noonan** [39] - 3:17, 4:2, 6:19, 6:22, 7:10, 7:15, 7:21, 7:24, 8:24, 12:2, 12:6, 12:11, 13:3, 13:25, 14:10, 18:2, 18:3, 18:9, 18:10, 18:22, 19:12, 28:7, 28:11, 28:13, 28:17, 29:4, 29:7, 29:17, 29:20, 30:21, 31:4, 31:9, 32:7, 32:11, 32:18, 32:22, 33:1, 34:6
**Noonan's** [7] - 4:10, 8:17, 12:15, 14:15, 15:25, 31:10, 33:6
**notably** [1] - 6:4
**note** [1] - 4:24
**nothing** [4] - 13:11, 22:11, 30:17, 42:22
**notice** [9] - 7:6, 10:12, 10:15, 16:13, 17:15, 27:2, 27:3, 43:7, 47:20
**notice-breach-causation** [1] - 43:7
**notices** [1] - 17:18
**notwithstanding** [1] - 31:1
**novel** [1] - 13:4
**nuances** [1] - 17:22
**Number** [1] - 23:19
**NUMBER** [1] - 1:3
**number** [5] - 2:10, 5:1, 6:21, 21:19, 34:3
**numbers** [1] - 41:24

| | | | | |
|---|---|---|---|---|
| **nutshell** [1] - 8:18 | 31:14, 32:8, 32:19, 32:20, 32:23, 44:7, 47:1, 47:13, 49:19 | 34:9 | **permits** [1] - 6:25 | **plethora** [1] - 3:9 |

**nutshell** [1] - 8:18

**O**

**obviously** [15] - 2:25, 3:17, 4:24, 5:7, 8:21, 8:23, 9:7, 25:25, 35:12, 43:17, 43:18, 47:23, 48:18, 48:20, 49:9
**occur** [2] - 17:2, 17:18
**odd** [1] - 44:9
**OF** [2] - 1:1, 1:6
**offer** [3] - 32:19, 32:23, 43:18
**offered** [1] - 32:22
**offering** [1] - 33:11
**office** [1] - 46:16
**OFFICIAL** [1] - 50:20
**Official** [2] - 1:22, 50:25
**old** [2] - 37:12, 44:4
**once** [4] - 18:15, 34:1, 47:4, 47:8
**one** [21] - 3:15, 4:8, 4:13, 4:17, 6:21, 7:7, 8:13, 13:19, 13:20, 19:3, 19:4, 19:14, 23:21, 26:18, 31:5, 31:23, 32:1, 37:17, 37:20, 47:19
**one-count** [1] - 26:18
**one-page** [1] - 4:17
**ones** [2] - 34:23, 38:3
**open** [1] - 2:1
**operate** [3] - 10:7, 10:17, 13:12
**operated** [1] - 16:10
**operating** [6] - 13:18, 27:21, 36:23, 37:4, 41:14, 43:2
**operation** [4] - 9:5, 13:24, 32:5, 33:7
**operations** [4] - 11:18, 13:20, 13:22, 15:20
**operators** [1] - 5:15
**opine** [1] - 18:3
**opined** [1] - 45:18
**opines** [1] - 24:24
**opinion** [15] - 7:22, 7:24, 8:17, 12:18, 14:15, 18:10,

31:14, 32:8, 32:19, 32:20, 32:23, 44:7, 47:1, 47:13, 49:19
**opinions** [1] - 31:12
**opportunity** [1] - 22:22
**opposed** [1] - 49:1
**opposing** [1] - 43:12
**opposition** [4] - 21:13, 29:20, 30:22, 30:25
**option** [1] - 14:2
**oral** [1] - 47:13
**Orange** [2] - 46:13, 46:20
**order** [12] - 3:7, 3:22, 4:4, 4:15, 7:10, 7:13, 7:17, 30:20, 31:25, 33:24, 48:19, 50:2
**originally** [1] - 46:12
**otherwise** [1] - 30:6
**ought** [1] - 8:3
**outcome** [1] - 10:21
**outset** [1] - 9:18
**overall** [1] - 38:10
**oversee** [1] - 38:13
**owe** [1] - 37:10
**owed** [5] - 42:8, 42:12, 42:25, 43:6, 43:8
**own** [5] - 8:6, 38:12, 43:4, 43:13
**owned** [3] - 25:17, 25:18
**owns** [1] - 10:6

**P**

**P.C** [1] - 1:15
**p.m** [5] - 1:12, 2:3, 22:25, 50:19
**page** [1] - 4:17
**Pages** [1] - 1:6
**pages** [1] - 11:16
**Paicius** [1] - 49:9
**paid** [2] - 42:3, 42:12
**paper** [1] - 5:19
**papers** [5] - 4:25, 5:7, 5:18, 11:21, 40:20
**paperwork** [2] - 45:6, 46:6
**Paragraph** [4] - 23:19, 25:12, 34:1, 34:8
**paragraphs** [1] - 33:23
**Paragraphs** [1] -

34:9
**parent** [1] - 38:6
**parking** [2] - 42:2, 42:11
**part** [8] - 4:9, 13:7, 16:2, 35:10, 38:17, 39:24, 43:15, 44:17
**partial** [4] - 3:3, 3:12, 34:21, 34:25
**particular** [1] - 43:25
**parties** [2] - 26:7
**parts** [4] - 17:18, 38:10, 43:23
**pass** [3] - 12:14, 17:15, 30:24
**pass-down** [1] - 17:15
**pass-downs** [1] - 12:14
**passage** [2] - 35:25, 39:1
**passenger** [3] - 36:24, 37:4, 39:2
**passengers** [7] - 15:12, 36:14, 36:18, 38:20, 39:6, 40:12, 42:1
**password** [1] - 21:21
**past** [1] - 9:11
**pay** [2] - 41:22, 42:2
**paying** [1] - 41:20
**payment** [1] - 42:6
**pedestrian** [1] - 41:19
**penalty** [2] - 30:23, 31:6
**Penn** [2] - 41:18
**Penso** [9] - 2:9, 2:16, 6:10, 6:12, 7:4, 14:21, 35:23, 39:3, 43:10
**PENSO** [1] - 1:3
**Penso's** [2] - 38:1, 49:3
**people** [4] - 5:12, 5:19, 11:8, 37:12
**percent** [1] - 48:8
**percentage** [1] - 42:1
**perhaps** [1] - 25:14
**period** [2] - 17:21, 41:3
**perjury** [2] - 30:24, 31:7
**permissive** [3] - 6:24, 7:22, 24:25
**permit** [2] - 9:9, 9:12

**permits** [1] - 6:25
**permitted** [2] - 44:15, 44:18
**personal** [2] - 8:6, 42:4
**personally** [1] - 46:13
**persons** [3] - 36:12, 42:8, 42:15
**perspective** [1] - 42:18
**persuasive** [1] - 9:20
**physician** [1] - 49:3
**physicians** [2] - 49:1, 49:8
**piece** [5] - 11:4, 18:22, 18:25, 19:14, 19:15
**pieces** [4] - 12:6, 18:20, 24:19, 43:20
**pivot** [2] - 4:22, 34:19
**place** [2] - 17:20, 50:8
**plainly** [1] - 47:22
**Plaintiff** [2] - 1:4, 1:18
**plaintiff** [20] - 2:15, 3:2, 3:12, 3:16, 4:10, 4:11, 10:10, 16:10, 21:5, 24:11, 33:14, 34:10, 39:25, 41:12, 43:22, 44:1, 45:17, 46:13, 46:16, 47:24
**plaintiff's** [10] - 3:18, 6:11, 6:19, 7:16, 11:24, 25:3, 25:9, 34:12, 35:6, 45:22
**plan** [2] - 46:25
**play** [3] - 37:23, 38:17, 42:18
**plead** [2] - 26:1, 27:4
**pleaded** [2] - 9:16, 9:18
**pleading** [2] - 27:2, 27:3
**pleadings** [2] - 26:11, 33:25
**pled** [13] - 8:21, 8:22, 23:9, 23:14, 24:14, 27:11, 27:13, 27:22, 28:5, 29:13, 29:14, 29:16, 33:19

**plethora** [1] - 3:9
**PMA** [2] - 6:24, 33:8
**Point** [6] - 35:25, 36:1, 37:6, 39:1
**point** [9] - 4:9, 7:3, 9:15, 25:6, 25:10, 25:23, 45:3, 45:17, 46:25
**points** [4] - 22:1, 36:7, 36:25
**Port** [31] - 7:5, 9:23, 10:3, 10:4, 10:5, 10:10, 10:11, 10:16, 11:4, 11:5, 11:7, 11:11, 11:12, 11:18, 25:16, 33:24, 37:25, 38:5, 38:8, 38:15, 38:22, 39:3, 39:7, 39:22, 40:22, 41:2, 42:19, 42:22, 42:25
**PORT** [1] - 1:6
**portion** [1] - 7:11
**position** [7] - 5:25, 6:18, 7:1, 25:3, 43:9, 45:22, 45:23
**positions** [1] - 43:11
**positive** [1] - 46:25
**possession** [1] - 16:9
**possible** [1] - 49:15
**possibly** [1] - 32:7
**post** [2] - 2:25, 31:3
**posted** [1] - 3:6
**potential** [2] - 31:21, 31:24
**potentially** [2] - 5:12, 26:12
**pounds** [1] - 44:9
**power** [1] - 37:14
**practical** [2] - 4:7, 4:19
**practice** [2] - 49:5, 49:13
**practices** [1] - 4:16
**preceding** [1] - 7:4
**precisely** [1] - 27:22
**precludes** [1] - 7:21
**preemption** [2] - 9:11, 9:20
**preemptive** [1] - 33:15
**preempts** [2] - 41:5, 41:8
**preference** [3] - 48:25, 49:10
**premature** [1] - 35:12
**premise** [2] - 15:17, 15:20

premises [4] - 10:5, 25:17, 25:25, 43:1
prerecorded [1] - 49:16
present [1] - 4:19
pretrial [3] - 3:7, 48:12, 48:19
pretty [2] - 11:6, 35:22
prevented [1] - 39:1
previously [1] - 5:22
Princeton [1] - 1:17
print [2] - 22:6, 22:13
problem [6] - 6:21, 7:15, 16:14, 24:9, 27:15, 33:7
proceed [3] - 4:14, 47:9, 50:2
proceeding [2] - 46:11, 50:19
proceedings [1] - 50:22
Proceedings [1] - 1:24
PROCEEDINGS [1] - 2:1
process [1] - 14:6
produced [3] - 1:25, 11:17, 22:17
Product [19] - 8:22, 19:7, 19:9, 19:11, 19:17, 19:23, 20:2, 20:4, 21:5, 23:11, 24:1, 27:11, 27:15, 27:19, 28:2, 29:13, 33:21, 42:20, 42:21
product [20] - 5:10, 5:17, 5:24, 6:3, 6:8, 14:10, 16:21, 19:19, 19:20, 23:13, 24:4, 27:19, 27:20, 28:12, 32:3, 37:24, 40:3, 41:7, 42:23
product-related [1] - 27:20
Products [9] - 5:11, 5:25, 9:6, 9:7, 9:11, 31:20, 33:16, 41:4, 41:11
products [5] - 5:20, 6:9, 6:15, 9:16, 34:15
proffer [1] - 28:13
proffered [1] - 33:14
program [2] - 7:25, 18:16
progression [1] -

32:3
projected [1] - 48:10
projection [2] - 48:13, 48:14
promise [1] - 35:25
proof [2] - 4:11, 39:24
proofs [1] - 10:18
proper [3] - 13:1, 21:4, 31:25
properly [4] - 20:14, 23:23, 29:16, 33:19
property [1] - 10:10
proud [1] - 50:15
prove [2] - 4:11, 24:20
proved [1] - 24:15
proven [1] - 8:23
provide [1] - 44:6
provided [5] - 6:22, 11:10, 11:12, 35:23, 44:11
provides [2] - 5:25, 42:6
proximally [1] - 35:6
public [11] - 36:13, 36:17, 36:23, 37:10, 37:20, 38:4, 38:5, 39:8, 40:11, 41:15
Public [1] - 42:10
pull [1] - 22:10
pulling [2] - 21:24, 22:2
punitive [1] - 26:15
purported [1] - 6:1
purposes [1] - 22:18
put [8] - 3:8, 10:18, 21:9, 21:13, 29:10, 40:8, 41:11, 48:19
puts [1] - 34:15
putting [1] - 26:2

**Q**

questioned [1] - 29:24
questions [5] - 11:17, 11:21, 19:5, 44:22, 47:15
quiet [1] - 22:2
quite [1] - 35:14
quote [1] - 36:23

**R**

Rail [3] - 41:13, 41:19, 41:22
rail [2] - 36:24, 37:4

railcar [1] - 37:13
raised [2] - 3:18, 11:21
raises [1] - 3:16
random [1] - 12:17
rate [3] - 32:11, 32:13, 32:15
rather [4] - 4:18, 7:24, 43:1, 43:8
rationale [2] - 37:7, 37:8
RDR [2] - 1:22, 50:24
reached [2] - 12:24, 12:25
reaches [1] - 12:22
read [8] - 3:22, 4:5, 4:24, 5:7, 11:14, 40:20, 44:3, 44:17
reader [1] - 24:5
readjusted [1] - 29:8
ready [1] - 21:19
real [1] - 32:10
reality [2] - 17:1, 29:24
realize [1] - 3:12
really [10] - 3:16, 6:7, 12:6, 13:8, 25:20, 39:13, 45:23, 45:24, 47:18, 50:13
reason [3] - 37:11, 42:7, 44:10
reasonable [1] - 10:20
reasonably [1] - 19:4
reasons [2] - 6:20, 46:14
rebuttal [2] - 45:18, 46:4
recognize [2] - 23:5
recollection [1] - 33:5
recommendation [1] - 46:22
record [4] - 22:16, 50:16, 50:17, 50:22
recorded [1] - 1:24
recover [1] - 14:2
refer [1] - 22:23
referenced [2] - 30:21, 36:21
refers [1] - 14:17
refined [2] - 12:15, 12:16
regard [1] - 17:22
related [5] - 4:6, 15:9, 26:11, 27:20,

31:16
relates [8] - 8:20, 29:21, 33:3, 34:20, 38:1, 42:20, 43:18, 47:3
relevant [3] - 18:12, 25:6, 25:23
reliability [1] - 3:17
reliable [2] - 32:13, 32:17
relied [2] - 12:11, 29:21
relies [1] - 11:7
rely [2] - 11:19, 28:8
remedy [1] - 6:1
remind [1] - 27:1
reminder [1] - 12:10
remove [2] - 26:6, 26:7
removed [1] - 21:20
renders [1] - 41:5
repair [3] - 10:17, 23:23, 23:24
repaired [1] - 23:22
repeating [1] - 5:6
replete [1] - 6:12
report [5] - 16:5, 29:19, 30:1, 30:3, 31:2
Reporter [2] - 1:22, 50:25
REPORTER'S [1] - 50:20
reports [5] - 11:14, 17:15, 25:8, 29:21, 30:5
request [2] - 49:8, 50:1
requested [1] - 35:4
required [1] - 4:11
res [3] - 35:4, 35:10, 35:15
resistors [2] - 7:12, 7:19
respect [5] - 3:11, 31:8, 31:20, 41:4, 50:8
respectfully [3] - 24:13, 29:12, 50:1
respond [2] - 21:25, 45:11
responsibility [2] - 38:16, 38:20
responsible [3] - 10:24, 23:23, 38:8
rest [1] - 12:3
result [2] - 34:9, 37:21
resume [1] - 23:1
retain [1] - 45:17

retention [3] - 10:16, 10:18, 10:22
retrieve [1] - 42:11
returnable [1] - 4:17
reverse [2] - 30:20, 34:4
reviewed [1] - 7:25
ride [1] - 41:20
riding [1] - 6:10
rise [2] - 2:4, 22:24
role [4] - 10:3, 42:19, 42:20
room [1] - 5:16
root [4] - 15:21, 16:16, 16:18, 17:6
rough [1] - 47:3
routes [2] - 36:24, 37:5
rubric [1] - 41:10
Rule [1] - 12:8
rule [1] - 32:9
ruling [1] - 35:12
run [4] - 10:1, 38:9, 43:5
running [2] - 38:3, 39:9

**S**

safe [2] - 35:25, 39:1
safety [3] - 37:12, 37:15, 38:20
sake [1] - 27:25
SANGINITI [50] - 1:16, 11:25, 12:5, 12:23, 13:14, 14:6, 14:9, 14:23, 15:5, 16:6, 17:9, 17:23, 18:19, 18:23, 19:1, 19:24, 20:1, 20:5, 20:7, 20:13, 20:22, 21:14, 21:16, 22:12, 22:14, 23:10, 23:16, 24:11, 24:17, 24:22, 25:13, 25:22, 26:9, 26:17, 26:20, 26:22, 26:25, 27:9, 27:18, 28:10, 28:16, 28:20, 28:22, 29:1, 29:23, 30:2, 30:6, 30:17, 45:15, 46:5
Sanginiti [9] - 2:15, 23:5, 25:15, 29:19, 30:16, 33:1, 33:18, 34:20, 45:10
Sanginiti's [1] - 22:1
saw [1] - 46:6

**Scanlon** [8] - 15:15, 20:23, 20:24, 20:25, 31:19, 31:22, 31:23, 32:2
**scenario** [1] - 48:23
**schedule** [1] - 49:19
**scheduled** [1] - 2:24
**scheduling** [2] - 4:4, 4:15
**scientifically** [1] - 17:3
**scope** [1] - 33:15
**screens** [1] - 5:16
**seat** [1] - 2:22
**second** [2] - 19:14, 50:16
**see** [8] - 4:7, 4:13, 25:14, 39:19, 40:20, 43:21, 48:12, 50:15
**seem** [1] - 14:22
**Sekella** [2] - 1:22, 50:24
**sekella@gmail. com** [1] - 1:23
**sense** [3] - 5:17, 17:20, 49:18
**sensor** [2] - 16:22, 17:12
**separate** [4] - 4:16, 13:21, 20:18, 31:18
**service** [5] - 20:16, 29:6, 29:11, 36:24, 37:5
**services** [1] - 46:19
**set** [3] - 3:7, 21:11, 47:9
**seven** [2] - 17:24, 19:16
**several** [4] - 6:20, 7:18, 17:21, 30:5
**share** [2] - 26:10, 45:21
**sharp** [1] - 4:16
**shorter** [1] - 48:24
**shorthand** [1] - 31:9
**show** [3] - 16:13, 16:15, 17:15
**showing** [1] - 18:8
**shows** [2] - 20:25, 35:23
**shut** [2] - 8:7, 8:14
**side** [1] - 41:11
**sideways** [1] - 32:7
**signal** [18] - 14:2, 14:3, 14:7, 14:11, 14:14, 14:24, 14:25, 15:7, 15:8, 15:9, 15:10, 16:23,

18:15, 19:14, 25:1, 28:22
**signed** [1] - 30:23
**significant** [1] - 45:3
**similar** [1] - 29:5
**simple** [4] - 14:10, 15:18, 40:9, 43:7
**simplify** [1] - 10:6
**simply** [2] - 35:22, 40:12
**single** [1] - 24:6
**sit** [1] - 22:2
**sitting** [1] - 16:19
**situation** [5] - 10:2, 12:2, 16:8, 39:7, 49:15
**six** [2] - 44:8
**so..** [1] - 13:13
**sold** [1] - 40:10
**some-odd** [1] - 44:9
**someone** [1] - 20:17
**sometimes** [3] - 24:13, 27:3
**sorry** [3] - 6:16, 30:2, 48:5
**sort** [8] - 4:22, 9:23, 13:11, 17:19, 17:22, 33:18, 46:3, 50:11
**speaks** [2] - 4:8, 9:4
**specific** [5] - 16:22, 32:6, 32:8, 32:9, 44:6
**specifically** [4] - 3:2, 11:4, 23:17, 38:12
**speed** [1] - 13:11
**speeds** [1] - 13:19
**spoken** [1] - 40:24
**spots** [1] - 28:10
**square** [1] - 11:1
**squarely** [1] - 33:15
**stage** [1] - 44:23
**stand** [1] - 42:7
**standalone** [3] - 6:9, 29:15, 33:16
**standard** [3] - 8:5, 8:6, 37:9
**STARK** [2] - 1:15
**Stark** [2] - 2:15
**start** [2] - 18:21, 35:22
**started** [2] - 2:8, 2:12
**starts** [1] - 25:12
**State** [1] - 40:24
**state** [5] - 27:2, 29:12, 36:25, 37:5
**states** [1] - 37:1
**States** [1] - 2:2

**STATES** [2] - 1:1, 1:14
**Station** [3] - 41:13, 41:20, 41:22
**statutory** [3] - 36:10, 36:20, 36:22
**stenography** [1] - 1:24
**step** [1] - 44:19
**Stergas** [2] - 43:20, 44:14
**still** [4] - 38:12, 38:13, 40:5
**stop** [1] - 14:12
**stoppage** [4] - 15:23, 15:24, 32:10, 33:3
**stopped** [2] - 6:25, 13:10
**stops** [1] - 15:11
**Street** [1] - 1:11
**strictly** [1] - 31:16
**string** [2] - 12:13, 17:14
**stumble** [1] - 44:16
**subject** [2] - 11:8, 17:25
**submission** [1] - 30:21
**submitted** [2] - 29:19, 29:22
**subsequently** [2] - 3:25, 29:8
**substantiate** [1] - 32:13
**substituted** [1] - 23:7
**subsumed** [1] - 19:10
**subsumes** [2] - 27:15, 27:19
**successorship** [1] - 10:23
**sufficient** [2] - 8:8, 29:15
**sufficiently** [2] - 29:14, 31:6
**suggest** [5] - 10:12, 27:10, 27:12, 30:6, 45:2
**suggested** [1] - 4:5
**suggesting** [2] - 32:25, 43:3
**suggestion** [4] - 30:23, 32:14, 32:17, 42:23
**suggests** [2] - 10:10, 47:20
**Suites** [1] - 1:20

**summary** [17] - 3:2, 3:3, 3:10, 3:13, 3:19, 4:23, 21:2, 21:4, 21:13, 27:7, 31:1, 34:21, 34:25, 39:13, 44:22, 46:1, 47:1
**Sun** [1] - 6:5
**support** [2] - 4:13, 21:12
**supposed** [1] - 17:2
**Supreme** [3] - 6:6, 36:6, 40:21
**SUSAN** [2] - 1:13, 2:2
**sustained** [1] - 34:10
**switch** [1] - 15:1
**sworn** [2] - 29:23, 30:22
**system** [16] - 5:12, 8:7, 8:14, 9:25, 10:1, 15:17, 17:4, 18:13, 19:13, 20:25, 27:22, 32:3, 33:7, 33:12, 35:16

## T

**table** [2] - 21:22, 47:2
**tag** [1] - 45:10
**talks** [4] - 19:12, 23:17, 36:21, 38:21
**task** [1] - 32:14
**teaches** [1] - 20:24
**team** [1] - 45:10
**technical** [1] - 11:13
**technically** [1] - 30:1
**tee** [1] - 48:1
**term** [1] - 23:11
**terminal** [3] - 42:1, 42:2
**Terminal** [2] - 42:10, 42:11
**terms** [5] - 3:21, 9:4, 10:6, 43:14, 49:18
**test** [1] - 32:12
**tested** [3] - 13:17, 18:10
**testified** [3] - 16:16, 43:21, 44:1
**testifies** [1] - 15:3
**testify** [2] - 29:17, 33:4
**testimony** [14] - 4:10, 6:19, 6:23, 11:5, 11:12, 14:21,

32:24, 33:6, 33:11, 43:3, 43:17, 43:23, 43:24, 44:6
**testing** [3] - 13:9, 13:19, 16:4
**THE** [102] - 1:1, 1:13, 2:4, 2:5, 2:8, 2:17, 2:22, 4:21, 8:19, 9:13, 9:22, 11:2, 11:22, 11:24, 12:4, 12:21, 13:7, 14:4, 14:8, 14:18, 15:3, 16:2, 17:3, 17:17, 18:18, 18:21, 18:24, 19:17, 19:25, 20:3, 20:6, 20:11, 20:20, 21:6, 21:15, 21:18, 21:22, 22:3, 22:6, 22:13, 22:15, 22:19, 22:24, 23:1, 23:15, 24:6, 24:16, 24:21, 25:11, 25:14, 25:24, 26:14, 26:19, 26:21, 26:24, 27:6, 27:14, 28:7, 28:13, 28:19, 28:21, 28:25, 29:18, 30:1, 30:3, 30:13, 30:18, 31:3, 32:25, 33:17, 34:16, 34:18, 34:24, 35:8, 35:21, 37:23, 38:14, 39:12, 39:23, 40:3, 40:14, 42:17, 43:9, 43:14, 45:5, 45:12, 45:14, 45:25, 46:6, 46:21, 46:24, 47:22, 48:5, 48:8, 48:17, 49:11, 49:17, 49:23, 49:25, 50:6, 50:15, 50:18
**themselves** [5] - 36:13, 36:17, 39:8, 40:11, 41:15
**then-fiancée** [1] - 43:21
**theories** [1] - 19:19
**theory** [2] - 16:24, 23:25
**therefore** [3] - 17:7, 28:19, 35:17
**thereof** [1] - 31:13
**thinking** [1] - 48:22
**Third** [2] - 5:21, 6:6
**thousands** [1] - 11:16
**three** [4] - 7:14,

35:1, 44:9, 48:23
**threshold** [2] - 40:5, 40:8
**thrown** [1] - 34:5
**Thursday** [1] - 1:12
**ticket** [9] - 35:24, 39:21, 40:9, 40:10, 41:12, 41:22, 42:5
**tight** [1] - 31:10
**timing** [1] - 3:21
**today** [10] - 3:1, 3:5, 3:10, 21:12, 27:25, 34:23, 45:2, 47:14, 47:20, 48:12
**together** [1] - 24:4
**took** [4] - 6:22, 29:6, 33:7, 44:19
**touch** [1] - 43:15
**track** [10] - 7:2, 7:8, 7:11, 7:14, 13:19, 13:20, 24:12, 25:5, 32:12, 42:13
**tracks** [6] - 17:18, 23:23, 24:9, 24:10, 25:9, 25:18
**train** [32] - 5:12, 5:14, 6:22, 6:25, 7:1, 13:17, 14:14, 15:1, 15:9, 17:10, 17:25, 18:3, 20:13, 20:16, 20:17, 20:19, 29:4, 29:5, 29:6, 29:8, 29:10, 34:3, 34:7, 34:13, 34:14, 37:19, 39:25, 41:16, 43:3, 43:4, 44:11, 44:21
**Train** [1] - 17:25
**train's** [1] - 24:24
**trains** [2] - 7:9, 13:18
**tram** [4] - 19:4, 23:20, 23:23, 36:16
**transcript** [2] - 1:24, 50:21
**transcription** [1] - 1:25
**transcripts** [1] - 44:4
**Transit** [6] - 36:4, 38:25, 41:13, 41:17, 42:5, 42:13
**Transportation** [1] - 2:10
**TRANSPORTATION** [1] - 1:7
**transportation** [1] - 37:16
**transporting** [3] -

36:14, 36:18, 39:6
**travel** [1] - 49:21
**traveling** [1] - 42:4
**treated** [1] - 49:3
**treating** [3] - 49:1, 49:3, 49:8
**trial** [8] - 2:24, 3:4, 3:7, 38:14, 42:18, 47:2, 47:3, 49:11
**true** [1] - 27:6
**trust** [2] - 37:12, 37:20
**try** [1] - 33:14
**trying** [1] - 13:22
**twisted** [1] - 43:10
**two** [14] - 4:16, 4:18, 5:15, 7:20, 13:18, 13:21, 19:6, 19:19, 28:10, 36:7, 42:8, 42:14, 48:21, 49:8
**typically** [1] - 10:20

## U

**U.S** [1] - 1:11
**ultimate** [1] - 27:4
**umbrella** [1] - 28:12
**uncontested** [1] - 5:9
**uncontroverted** [1] - 11:12
**under** [22] - 2:10, 6:20, 9:11, 13:17, 14:14, 15:1, 17:11, 19:20, 21:2, 21:3, 24:1, 28:12, 30:23, 31:6, 31:20, 36:2, 36:9, 36:11, 36:18, 37:2, 40:12, 41:9
**understood** [1] - 45:5
**unequivocal** [1] - 11:6
**unexpected** [1] - 14:12
**unfortunately** [1] - 44:2
**UNITED** [2] - 1:1, 1:14
**United** [1] - 2:2
**unknown** [1] - 18:6
**unreasonable** [3] - 10:17, 10:19, 10:25
**up** [12] - 13:4, 13:8, 18:7, 21:25, 22:2, 22:10, 24:15, 27:4, 34:23, 37:13, 45:16, 48:1
**uprights** [1] - 44:8

**USA** [1] - 1:8
**usefulness** [1] - 31:13
**utilize** [2] - 9:25, 18:12

## V

**validity** [1] - 3:17
**various** [2] - 23:18, 33:23
**vehicle** [1] - 42:11
**venture** [2] - 38:7, 38:18
**versa** [1] - 42:13
**version** [1] - 44:23
**via** [1] - 49:9
**viable** [1] - 26:4
**vice** [1] - 42:13
**violently** [1] - 34:5
**virtual** [1] - 46:15
**virtually** [1] - 46:17
**virtue** [1] - 42:12
**vs** [2] - 2:9, 36:3

## W

**wait** [1] - 22:4
**waive** [2] - 48:3, 48:6
**waived** [1] - 48:8
**walk** [1] - 41:22
**wall** [1] - 44:13
**Walnut** [1] - 1:11
**wants** [1] - 7:3
**warn** [3] - 19:10, 27:24, 28:2
**warning** [2] - 6:17, 20:8
**warnings** [2] - 20:15
**wasting** [1] - 47:5
**weeks** [2] - 7:11, 48:22
**West** [1] - 46:22
**whatsoever** [3] - 8:5, 9:6, 33:7
**whereas** [1] - 50:14
**wherewithal** [1] - 11:13
**whole** [1] - 37:24
**Wi** [1] - 21:21
**Wi-Fi** [1] - 21:21
**WIGENTON** [2] - 1:13, 2:2
**WILSON** [1] - 1:19
**Wilson** [1] - 2:20
**witnesses** [2] - 48:15, 48:24
**women** [1] - 37:12
**word** [3] - 5:17,

44:15, 45:4
**works** [1] - 12:5
**worries** [1] - 22:15
**writ** [2] - 5:8, 10:11
**writing** [2] - 47:6, 48:2

## X

**XYZ** [1] - 32:14

## Y

**Yamaguchi** [3] - 43:25, 44:20, 45:16
**Yamaguchi's** [2] - 44:7, 45:19
**York** [1] - 41:18
**YORK** [1] - 1:6
**young** [1] - 37:12

## Z

**Zoom** [2] - 49:9, 49:12

*United States District Court*
*District of New Jersey*